1  BRUCE G. FAGEL, State Bar No. 103674
   EDUARDO J. ASCENCIO, State Bar No. 182061
2  Law Offices of Bruce G. Fagel
   & Associates
3  100 North Crescent Drive, Suite 360
   Beverly Hills, California 90210
4  Tel: (310) 281-8700
   Fax: (310) 281-5656
5  brucefagel@fagellaw.com
   eduardoascencio@fagellaw.com
6
   Attorneys for Plaintiffs
7

8                   UNITED STATES DISTRICT COURT
9                 EASTERN DISTRICT OF CALIFORNIA
10

11 I.P., a MINOR, by and through her        Case No. 2:13-CV-01012 JAM-CKD
   guardian ad litem, FACUNDO
12 PALACIO DIAZ, MICAELA PALACIO,            [Consolidated with 2:13-CV-02013
                                             JAM-CKD]
13      Plaintiffs,
                                             DECLARATION OF BRUCE G. FAGEL
14 vs.                                       SUPPORTING OPPOSITION TO MOTION
                                             OF UNITED STATES TO EXCLUDE DR.
15 UNITED STATES OF AMERICA,                 MANNING AND PHILLIPS ' TESTIMONY
                                             AND REPORTS
16      Defendant.
                                             Date:  November 19, 2014
17 ──────────────────────────────           Time:  9:30 a.m
   I.P, A MINOR, BY AND THROUGH HER          Judge: Hon. John A. Mendez
18 GUARDIAN AD LITEM, FAGUNDO                Crtrm: 6, 14t[th] Floor
   PALACIO, MICAELA PALACIO,
19 FACUNDO PALACIO DIAZ,

20      Plaintiffs,

21 vs.

22 BANNER HEALTH, AN ARIZONA
   CORPORATION, DOING BUSINESS AS
23 BANNER LASSEN MEDICAL CENTER,
   DOES 1-250, INCLUSIVE,
24
        Defendants.
25

26

27

28

                                        1

1    <u>DECLARATION OF BRUCE G. FAGEL IN SUPPORT OF OPPOSITION</u>

2    <u>TO MOTION TO EXCLUDE TESTIMONY OF DRS. MANNING AND</u>

3    <u>PHILLIPS</u>

4    I, BRUCE G. FAGEL declare as follows:

5    1.    I am the attorney for Plaintiffs in the above-entitled

6    action.

7    2. On July 9, 2014, both plaintiff and defense designated experts

8    with reports or declarations filed for each designated experts. On

9    liability issues, Plaintiffs designated one obstetrician (Dr. Albert

10   Phillips) and two maternal-fetal medicine experts (Dr. Frank Manning

11   and Dr. Richard Paul). Dr. Manning only formed opinions on the standard

12   of care relative to Dr. Davainis, while Dr. Paul formed opinions about

13   both Dr. Davainis and the hospital nurses.

14   3. Defendant U.S.A. designated one family practice physician who

15   does obstetrics (Dr. Daljeet Rai) and one maternal-fetal medicine

16   expert (Dr. Maurice Druzin) with both experts prepared to testify about

17   Dr. Davainis. Defendant Banner Health designated a maternal-fetal

18   medicine expert to testify about the hospital nurses.

19   4. On Sept. 5, 2014, both plaintiffs and defendants submitted

20   supplemental designations with some reports. Dr. Phillips, Dr.

21   Manning, and Dr. Paul each prepared a report which responded to the

22   opinions expressed by Dr. Rai, Dr. Druzin, and Dr. Ross. These reports

23   were attached to plaintiff's supplemental designation. Dr. Druzin

24   prepared a supplemental report which responded to the opinions

25   expressed by Dr. Paul, Dr. Phillips, and Dr. Manning. In addition,

26   defendant U.S.A. designated a second maternal-fetal medicine expert

27   (Dr. Michael Nageotte) and attached a report by him which was not part

28   of the initial expert disclosures on July 9, 2014.

1   5. Because the defendant U.S.A. had already designated a
2   maternal-fetal medicine expert and Dr. Nageotte's report was
3   essentially identical to Dr. Druzin's report with regard to the care
4   rendered by Dr. Davainis, plaintiff filed a motion to exclude Dr.
5   Nageotte and his report. This motion was initially filed on Sept. 19,
6   2014 (two weeks after the supplemental designation) and set for hearing
7   before Magistrate Judge Delany on Oct. 29, 2014.
8   6. Both plaintiff and defendants then proceeded with expert
9   discovery. The first deposition was Dr. Maurice Druzin on Oct. 1, 2014.
10  At that deposition, Dr. Druzin confirmed that the standard of care
11  applicable to Dr. Davainis in this case was the standard of care for an
12  obstetrician, and that there was not a separate standard of care for a
13  family medicine physician who practices obstetrics. The next
14  deposition scheduled was Dr. Richard Paul on Oct. 3, 2014.
15  7. On Oct. 8, 2014, plaintiff received notice that defendant
16  United States had filed a motion to exclude the testimony of Dr.
17  Phillips and Dr. Manning, and their reports, as being cumulative of Dr.
18  Paul. Prior to that filing, I spoke directly with Assistant U.S.
19  Attorney Victoria Boesch on the morning of Oct. 3, 2014, to explain that
20  Dr. Phillips was designated as a general obstetrician with opinions
21  regarding the standard of care involving Dr. Davainis and that the
22  U.S.A. had designated Dr. Rai in a similar fashion.
23  8. It was also explained that Dr. Manning would be testifying for
24  plaintiffs about Dr. Davainis, and that he specifically did not have
25  opinions about the nursing care. Thus Dr. Manning would be testifying
26  in a similar fashion to the United States designated maternal-fetal
27  medicine expert, Dr. Druzin.
28  9. With regard to Dr. Paul, although he did have opinions about Dr.

3
Declaration of Bruce G. Fagel re Drs. Manning and Phillips

1   Davainis and the U.S.A. was entitled to ask those opinions at

2   deposition, he was primarily designated to testify about the nursing

3   care, in response to Banner Health's designated maternal-fetal

4   medicine expert, Dr. Ross. Thus, there was nothing cumulative about the

5   designation of one obstetrician and two maternal-fetal medicine

6   experts, since the defendants, together, had one family medicine

7   obstetrician and two maternal-fetal medicine experts. The addition of

8   Dr. Nageotte would, however, be cumulative to Dr. Druzin, and if

9   allowed would give the defendants three such experts to the plaintiff's

10  two.

11        10. In my discussion with Assistant Unites States Attorney

12  Boesch, I asked why she did not file her motion regarding Dr. Phillips

13  and Dr. Manning until just prior to the deposition of Dr. Paul when she

14  was aware of both their designation in this case and their reports and

15  opinions as of July 9, 2014, some 3 months earlier and I was told that

16  she was preparing this motion "as part of their response" to

17  plaintiff's motion to exclude Dr. Nageotte. She explained that since

18  plaintiff's motion referenced that Dr. Nageotte would be cumulative to

19  Dr. Druzin, that she would now claim that both Dr. Manning and Dr.

20  Phillips, "as obstetricians" would be cumulative to Dr. Paul.

21        11. I explained that Dr. Phillips was a general obstetrician,

22  unlike Dr. Paul and Dr. Manning, and that Dr. Phillips was not

23  cumulative since the United States was using Dr. Rai to defend Dr.

24  Davainis.

25        12. With regard to Dr. Manning and Dr. Paul, I explained that since

26  Banner Health designated a maternal-fetal medicine expert, Dr. Ross to

27  testify about the nursing care, Dr. Paul was designated in a similar

28  capacity, and Dr. Manning would be offering opinions about Dr. Davainis

Declaration of Bruce G. Fagel re Drs. Manning and Phillips

1  only. This distinction was then confirmed prior to starting Dr. Paul's

2  deposition, which then proceeded with his opinions about the nursing

3  care, causation, and the fetal monitor strip interpretation.

4        13.    Attached as Exhibit A is a true and correct copy of the

5  plaintiffs' expert report of Frank A. Manning, M.D., dated June 26,

6  2014, that was included in the Plaintiffs' initial disclosure of expert

7  witnesses.

8        14.    Attached as Exhibit B is a true and correct copy of the

9  plaintiffs' expert report of Albert J. Phillips, dated June 17, 2014,

10 which was included in the Plaintiff's initial disclosure of expert

11 witnesses.

12       15.    Attached as Exhibit C is a true and correct copy of the

13 plaintiffs' obstetrical expert report of Richard H. Paul, M.D.,

14 MD, dated June 30, 2014, which was included in the Plaintiffs' initial

15 disclosure of expert witnesses.

16       16.    Attached as Exhibit D is a true and correct copy of a letter

17 from Plaintiffs' attorney to the Assistant United States Attorney,

18 dated October 6, 2014.

19       I declare under penalty of perjury that the foregoing is true and

20 correct and that this declaration was executed on October 28, 2014, at

21 Beverly Hills, California.

22

23                            /s/ Bruce G. Fagel
                           BRUCE G. FAGEL

24                            Attorneys for Plaintiffs

25

26

27

28

# Exhibit A

## DECLARATION OF FRANK A. MANNING, MD

I, Frank A. Manning, MD, declare, as follows:

1.    All of the information set forth in this declaration is based upon my personal knowledge and/or my review of the medical records and deposition transcripts identified in this declaration. If called as a witness, I would and could testify competently to the following:

2.    I am a physician licensed to practice medicine in the State of New York. I received my Medical Degree from the University of Manitoba, in Manitoba, Winnipeg, Canada, in 1970. Thereafter, I completed a one (1) year rotating internship at LAC+USC County Hospital in Los Angeles, California from 1970 - 1971. I then completed a three (3) year residency in Obstetrics and Gynecology at the Health Sciences Center in Manitoba, Winnipeg, Canada from 1971 - 1974. I completed a two (2) year fellowship in Perinatal Medicine at Nuffield Institute for Medical Research, in Oxford, England from 1974-1976. I have been Board Certified in Obstetrics and Gynecology by the American Board of Medical Specialties since 1979. I have been Board Certified in Maternal-Fetal Medicine by the American Board of Medical Specialties since 1983. I have been a Professor in Obstetrics and Gynecology at several universities including USC, Columbia, and NYU. I am on the Editorial Board, and also the Review boards, of several peer review medical journals. I have published over 160 articles on Obstetrics and Gynecology in peer-reviewed medical journals, and authored chapters in medical texts on the issues of Obstetrics and Gynecology. Attached hereto is a true and correct copy of my Curriculum Vitae.

3.    Currently, I am the Assistant Director, in the Division of Maternal Fetal Medicine, Department of Obstetrics and Gynecology at Westchester County Medical Center in Valhalla, New York. I am familiar with the standard of care expected of reasonably prudent physicians, including family practitioners, practicing obstetrics and gynecology in the State of California during the times relevant to this lawsuit. The standard of practice is a national standard and applied to Susanville, CA, in April 2012. As an obstetrician and gynecologist who has managed labors and deliveries in a hospital setting for many years, I am also familiar with the standard of care as it pertains to labor and delivery nurses practicing in the state of California during the times relevant to this lawsuit. The standard of practice is a national standard and applies to nurses and

Law Offices
of
Bruce G. Fagel
&
Associates

1

G:\FILA\CE...\DECLARATION OF FRANK A.wpd

1  hospitals throughout the nation, including Susanville, CA.

2      4.      As part of my education, training and experience, I have expertise in the area of

3  causation as it pertains to hypoxic ischemic brain injuries suffered by babies during the events of

4  labor, delivery and resuscitation.

5      5.      I have been retained by the attorneys for the minor Plaintiff, Isabella Palacio, as

6  well as her parents, Plaintiffs Micaela Palacio and Facundo Diaz, to review pertinent medical

7  records and to provide professional opinions regarding the standards of care as they pertain to the

8  family practitioner and labor and delivery nurses involved in the labor of Micaela Palacio and

9  delivery of Isabella Palacio on April 29, 2012, at Banner Lassen Medical Center in Susanville,

10  CA. I have also been asked to form and provide opinions with regard to whether any standard of

11  care violations caused Isabella Palacio's injuries.

12      6.      This Declaration is offered for purposes of Plaintiffs' Expert Disclosure.

13      7.      I have reviewed the prenatal records of Micaela Palacio from Northeast Rural

14  Health Clinics.  Additionally, I have reviewed Mrs. Palacio's medical records and fetal heart rate

15  tracings from Banner Lassen Medical Center in Susanville, CA.  I have reviewed pertinent medical

16  records on Isabella Palacio from UC Davis Medical Center, all of which summarize her pertinent

17  NICU course, radiographic and laboratory studies and diagnoses. I have also reviewed the

18  depositions of Paul Davainis, MD, the family practitioner who managed Mrs. Palacio's labor and

19  delivered Isabella Palacio and Kelley Delcarlo, RN, one of the Labor and Delivery nurses who

20  rendered care to Mrs. Palacio.  I am advised that Nurse Leeth, the other labor and delivery nurse

21  who rendered care to Mrs. Palacio, has not yet given deposition testimony.

22      My review of the materials listed herein revealed the following factual information:

23      8.      According to her prenatal records from Northeastern Rural Health Clinics

24  ("Northeastern"), Mrs. Palacio's pregnancy history indicates that she gave birth to two healthy

25  children prior to becoming pregnant with Isabella.  On August 15, 2000, Mrs. Palacio gave birth

26  to her first child weighing approximately 7 pounds at 40 weeks gestation and on January 20,

27  2005, she gave birth to her second child weighing about 8 lbs, also at 40 weeks gestation.  Both

28  children were born vaginally and are reportedly healthy and developing normally.

Law Offices
of
Bruce G. Fagel
&
Associates

2

1    9.    My review of Mrs. Palacio's prenatal records was unremarkable. According to the

2  records, Mrs. Palacio commenced prenatal care at Northeastern in Susanville, CA, in September

3  2011. On October 20, 2011, she presented at 11 weeks gestation with a blood pressure of 100/64

4  and positive fetal movement. Prenatal laboratory studies, including RPR and antibodies, were

5  negative and non-reactive. Blood was negative for both illicit drug use and alcohol consumption.

6  Mrs. Palacio's prenatal visits at 15 and 19 weeks, on November 16, 2011, and December 15,

7  2011, respectively, were also unremarkable.

8    10.    On December 15, 2011, Mrs. Palacio underwent an obstetric ultrasound at 20

9  weeks demonstrating normal fetal anatomy. Her estimated date of delivery (EDD) was May 3,

10  2012, according to this study.

11    11.    Mrs. Palacio continued her routine prenatal care at Northeastern throughout early

12  2012. Again, all her subsequent prenatal visits were unremarkable. On January 18, 2012, Mrs.

13  Palacio's three (3) hour glucose tolerance test was within normal limits. Mrs. Palacio's prenatal

14  visits on February 15, March 14, March 28, April 11, April 18 and April 25 all yielded normal

15  physical examination findings. The fetal monitoring during each of those visits was reassuring.

16  Group Beta Strep (GBS) testing on April 11, 2012, was negative. Review of Mrs. Palacio's

17  prenatal care records demonstrates no anomalies, abnormalities or complications.

18    12.    Mrs. Palacio presented in active labor to Labor & Delivery at Banner Lassen

19  Medical Center on April 29, 2012, at approximately 11 pm. Ginger Leeth, RN, and Kelley

20  DelCarlo, RN, were assigned to care for Mrs. Palacio during her labor. According to Nurse

21  DelCarlo's deposition testimony, Mrs. Palacio was the only patient in Labor and Delivery that

22  night until she delivered by Cesarean section at 5:28 am the following morning. Upon her

23  presentation to Labor & Delivery, Mrs. Palacio was placed on an external fetal heart monitor.

24    13.    Nurse Leeth performed a vaginal examination on Mrs. Palacio at 11:20 pm and

25  determined that Mrs. Palacio's cervix was dilated to 4 cm with 70% effacement. Mrs. Palacio's

26  membranes were intact. The fetus was noted to be positioned 1 cm above the ischial spines and

27  fetal movement was present. Nurse DelCarlo testified that she was unaware of any complications

28  in Mrs. Palacio's prenatal course. Nurse DelCarlo documented that the fetal heart rate was 140

Law Offices
of
Bruce G. Fagel
&
Associates

3

1   beats per minute (bpm) and demonstrated reassuring moderate variability.

2        14.     At 11:30 pm, Nurse DelCarlo called Paul Davainis, MD, the on-call family

3   practitioner in Labor & Delivery, to inform him of her evaluation of Mrs. Palacio and obtain

4   admission orders. Nurse DelCarlo documented that she advised Dr. Davainis of maternal and fetal

5   status, including the vaginal examination results and the fetal heart rate pattern. Nurse DelCarlo

6   testified in her deposition that she had no concerns relative to maternal and fetal status upon the

7   patient's admission. Nurse DelCarlo testified that the fetal heart rate pattern was reassuring.

8        15.     At 12:09 am on April 30, 2012, Mrs. Palacio's vaginal exam showed 5 cm of

9   dilatation and 80% effacement. The fetus was noted to be at 2 cm above the ischial spines. At

10  12:17 am, Nurse DelCarlo documented a reassuring fetal heart rate pattern with 135 bpm and

11  moderate variability. An epidural was ordered for Mrs. Palacio at 12:30 am, according to the

12  nursing notes. At 12:30 am, the fetal heart rate pattern continued to be reassuring with moderate

13  variability and 140 bpm as noted in the nursing documentation. At 1:00 am, the fetal heart rate

14  was still reassuring with moderate variability and a baseline of 135 bpm. At 1:08 am, Nurse Leeth

15  performed a vaginal exam showing 6 cm of cervical dilatation and 80% effacement. The fetus was

16  1cm above the ischial spines. At 1:17 am, an epidural was administered to Mrs. Palacio by CRNA

17  Joel Paoner.

18       16.     Between 1:30 am and 1:40 am, several variable and late decelerations lasting

19  between 45-90 seconds appear on the fetal monitor strip. During this time, Dr. Davainis was

20  available by phone. However, Nurse DelCarlo testified that she did not advise Dr. Davainis about

21  these decelerations. Dr. Davainis confirmed that he was not notified about these decelerations.

22  Nursing documentation indicates that oxygen and fluids were administered to the patient and she

23  was placed on her left side.

24       17.     At 1:47 am, Mrs. Palacio's membranes spontaneously ruptured. Nurse DelCarlo

25  testified that the fluid was clear, although the nursing notes indicate conflicting entries regarding

26  the existence of meconium. At 1:54 am, a deep variable fetal heart rate deceleration to 60 bpm

27  lasting 40 seconds with overshoot to 180 bpm is evident on the fetal heart rate strip. Nurse

28  DelCarlo testified that she spoke to Dr. Davainis to tell him that "delivery was imminent". (Nurse

Law Offices
of
Bruce G. Fagel
&
Associates

4

1  DelCarlo admitted, however, that she did not tell Dr. Davainis about the prior fetal heart rate

2  decelerations.

3       18.    At 1:56 am, Nurse DelCarlo performed a vaginal examination showing 9 cm of

4  cervical dilatation and 100% effacement. The fetal station was now "0", according to the nursing

5  notes. Both Dr. Davainis and Nurse DelCarlo testified that they expected this multiparous patient

6  to make about 1 cm per hour of cervical change. Notwithstanding their expectations, Mrs. Palacio

7  stopped making cervical change, according to the testimony of Nurse DelCarlo and the nursing

8  notes. When the cervix stops dilating, this is commonly referred to as an "arrest of labor".

9       19.    At 2:00 am, early, variable and late decelerations are documented in the nursing

10  notes and appear on the fetal monitor strip. Uterine contractions are noted to be strong at this

11  time. Nurse DelCarlo testified that she did not express any concerns to Nurse Leeth or Dr.

12  Davainis about those decelerations.

13       20.    Dr. Davainis testified that he first met Mrs. Palacio at her bedside at 2:15 am.

14  Nurse DelCarlo did not notify Dr. Davainis about any of the decelerations but testified that Dr.

15  Davainis looked at the fetal monitor strip upon his arrival. Dr. Davainis confirmed that he looked

16  at the fetal monitor strip when he arrived and was aware of the strip continuously throughout the

17  morning. The nursing staff continued to document early and late decelerations at 2:30 am.

18  Between 2:45 am and 2:47 am, the fetal monitor strip demonstrated deep recurrent variable

19  decelerations with overshoot to 180 bpm.

20       21.    From 3:00 am onward, the fetal monitor strip clearly revealed deep, late recurrent

21  decelerations in the fetal heart rate. At 3:13 am, Mrs. Palacio's last documented vaginal

22  examination showed that she remained at 9 cm cervical dilatation. Dr. Davainis testified that he

23  was at the patient's bedside at 3:30 am and was aware that she had stopped making cervical

24  progress as of 1:56 am. Although Dr. Davainis testified that he had performed many Cesarean

25  sections at Banner Lassen Medical Center prior to April 2012, including numerous emergency

26  Cesarean sections, he discouraged Mrs. Palacio from undergoing a Cesarean section citing

27  *maternal* risks such as bleeding.

28       22.    The nursing staff repeatedly documented recurrent late decelerations in the fetal

Law Offices
of
Bruce G. Fagel
&
Associates

5

1    heart rate from 3:15 am until 5:00 am. Nurse DelCarlo testified that she was aware of the

2    recurrent late decelerations. However, Nurse DelCarlo testified that she never advocated for the

3    patient by challenging Dr. Davainis's plan to continue allowing this patient to labor. Dr. Davainis

4    testified that he was at the patient's bedside a third time at 4 am but encouraged her to continue a

5    trial of labor despite being aware of the continuous pattern of recurrent late fetal heart rate

6    decelerations.

7        23.    Dr. Davainis issued an order for a Cesarean section at 5:00 am. The necessary

8    personnel were assembled minutes after 5:00 am and all were present in the OR by 5:13 am,

9    according to the records. In fact, Dr. Davainis testified that the personnel could have been

10   assembled within minutes at any time that morning.

11       24.    Although all members of the OR team were present by 5:13 am, the patient was

12   not incised until 5:22 am. Prior to incising the patient, Dr. Davainis testified that he spent several

13   minutes in the OR attempting to auscultate fetal heart tones. Additionally, CRNA Paoner testified

14   that he attempted to re-bolus the patient's epidural but knew that general anesthesia would have

15   anesthetized the patient more rapidly.

16       25.    Isabella Palacio was delivered by C section at 5:28 am on April 30, 2012, without

17   spontaneous respiration, movement or tone. There was no heart rate at birth. APGAR scores of 0,

18   2, and 3 and 1, 5 and 10 minutes, respectively, were documented. As of 10 minutes of life, the

19   baby was still unresponsive, flaccid and demonstrated no spontaneous respiration. Isabella was

20   intubated and placed on a mechanical ventilator. Isabella's initial arterial cord blood gas was

21   drawn at 6:00 am and revealed values of pH 7.10, pCO2 57, pO2 30, HCO3 16.9 and base excess

22   of -11.1. An arterial blood gas was next drawn at 6:42 am during bag valve mask (BVM)

23   ventilation and values were noted to be pH 6.84, pO2 66, pCO2 97, HCO3 10.6 with a base

24   excess of -20.6. The baby was transferred to UC Davis for hypothermia and arrived at UC Davis

25   at 12:20 pm.

26       26.    According to the NICU admission records from UC Davis Medical Center,

27   Isabella Palacio was admitted with a diagnosis of severe hypoxic ischemic encephalopathy (HIE)

28   and underwent whole body cooling. The blood gasses clearly evidence severe acidosis from

Law Offices
of
Bruce G. Fagel
&
Associates

6

1  perinatal asphyxia consistent with the diagnosis of HIE. Hypoxic ischemic encephalopathy is a

2  brain injury that results from lack of perfusion to the brain resulting in lack of adequate

3  oxygenation, or hypoxia.

4      27.    When admitted to the NICU at UC Davis, Isabella demonstrated no suck or Moro

5  reflexes. She had neither plantar nor palmar grasp bilaterally. Isabella underwent several EEG

6  studies with markedly abnormal results demonstrative of clinical seizure activity. Isabella's brain

7  MRI on May 7, 2012, demonstrated significant irreversible brain injury caused by severe HIE. On

8  May 24, 2012, Isabella underwent gastrostomy tube placement for feeding due to her inability to

9  nipple. She remained in the NICU at UC Davis for 6 weeks and was discharged on June 5, 2012.

10  She was discharged on Phenobarbital, among other medications, to control her seizure activity.

11  Isabella Palacio's condition was noted to be permanent and severe and, throughout her admission

12  to UC Davis, the parents were continually informed that their child's deficits were likely to require

13  lifelong medical care and therapeutic interventions.

14      28.    Based upon my review of the referenced medical records and deposition

15  transcripts, as well as my education, training and experience, it is my opinion that Paul Davainis,

16  MD, and the nursing staff at Banner Lassen Medical Center assigned to Mrs. Palacio during her

17  labor on April 29, 2012, violated the accepted standards of care and proximately caused Isabella's

18  injuries as follows:

19      A.    The standard of care required that the nursing staff recognize signs of fetal

20  intolerance to labor demonstrated by fetal monitoring changes as seen here and communicate

21  those concerns to the provider, Dr. Davainis, no later than 2 am on April 30, 2012. Delivery in

22  this case should have been accomplished no later than 3:00 am to 3:15 am, based on the severe

23  recurrent variable decelerations in the fetal heart rate evidencing fetal intolerance to labor. In

24  addition, there was no cervical change beyond 9 cm and there would be no reasonable expectation

25  of an imminent delivery. According to Dr. Davainis's own deposition testimony, the personnel

26  necessary to perform an emergency C section could easily have been assembled much earlier and

27  delivery could have been effected at least 2 hours earlier. Delivery at 5:28 am was below the

28  standard of care.

Law Offices
of
Bruce G. Fagel
&
Associates

7

  **B.**  The severe late decelerations, which had become recurrent as of 3:00 am, evidenced fetal intolerance to labor. Both the nurses and Dr. Davainis were continuously aware of the persistent fetal distress and of the potentially devastating consequences to the fetus, including severe hypoxia. The failure to deliver the baby by C section no later than 3:30 am was below the standard of care.

  **C.**  It is my further opinion that the violations of the standard of care by Dr. Davainis and the nursing staff were substantial factors in causing Isabella's severe hypoxic-ischemic brain injuries and all the resulting injuries. Mrs. Palacio's prenatal course was uncomplicated and normal. The fetal heart rate was reassuring, and there was good fetal movement, upon Mrs. Palacio's admission to Labor & Delivery on the night of April 29, 2012. Further, there is no evidence that this child's injuries are attributable to congenital, teratogenic, infectious or metabolic etiologies. The delay in effecting delivery, given the arrest of dilatation during the manifestation of recurrent late decelerations, caused Isabella Palacio's injuries to a reasonable degree of medical probability. Earlier delivery would have resulted in less hypoxia and less injury to the fetus, to a reasonable degree of medical probability.

  **D.**  The foregoing Declaration is not an exhaustive list of all of my opinions. As this case progresses, I reserve the right to amend and/or supplement these opinions after review of further medical records, declarations, deposition testimony and the opinions of other physicians.

  I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _26_ day of June, 2014, at Tuckahoe, NY.

                Frank A. Manning, MD

Law Offices
of
uce G. Fagel
&
Associates

Exhibit B

# DECLARATION OF ALBERT J. PHILLIPS, MD

I, Albert J. Phillips declare and state as follows:

1.      All of the information set forth herein is based upon my personal knowledge, and/or based upon my review of the medical records, deposition transcripts, physician declarations, and other materials set forth herein. If called as a witness I could and would testify to the following:

2.      I received a Bachelor of Arts Degree in 1977 from Occidental College, graduating *cum laude*. I then attended the University of Southern California School of Medicine from 1977-1981, and received my Medical Degree in 1981. Thereafter, I completed an internship and residency in Obstetrics and Gynecology from 1981-1985 at Los Angeles County/USC Medical Center.

3.      I began private practice as an OB/GYN in 1985, and have been practicing Obstetrics and Gynecology in the Los Angeles area since 1985. I have been Board Certified in Obstetrics and Gynecology since 1987, and was re-certified in 1996, 2006 and 2013.

4.      I have staff privileges at Providence St. John's Health Center in Santa Monica, CA, and at Santa Monica-UCLA Medical Center. I am a Diplomate of the American Board of Obstetrics and Gynecology, and a Fellow of the American College of Obstetrics and Gynecology. I have been an appointed Expert Medical Reviewer for the Medical Board of California since 2006.

5.      I have an active obstetrical and gynecological practice in Santa Monica and perform obstetric Hospitalist duties at Providence St. John's. I routinely and regularly act as an attending obstetrician rendering care to laboring patients. During the mother's labor in this case, Dr. Davainis, a family practitioner, was rendering obstetric care as Mrs. Palacio's attending physician. Based on my education, training, experience, and review of the materials set forth herein, I am familiar with the national standard of care as it pertains to the hospital nursing staff at Banner Lassen Medical Center and Paul Davainis, M.D., during the events of the labor of the mother, Micaela Palacio, and the delivery of her baby, Isabella Palacio. Based on my education, training, experience, and review of the materials set forth herein, I am familiar with the issues of

Law Offices
of
Bruce G. Fagel
&
Associates

Declaration of Albert Phillips, M.D.

1  causation as they pertain to injuries suffered by the mother and baby in this case. I can

2  competently testify with regard to the issues of standard of care and causation as they relate to the

3  acts and omissions of the hospital staff at Banner Lassen Medical Center and Paul Davainis, MD.

4       6.     This Declaration is offered for purposes of Plaintiffs' Expert Disclosure.

5       7.     I have reviewed the prenatal records of Micaela Palacio from Northeast Rural

6  Health Clinics. Additionally, I have reviewed Mrs. Palacio's medical records and fetal heart rate

7  tracings from Banner Lassen Medical Center in Susanville, CA. I have reviewed pertinent medical

8  records on Isabella Palacio from UC Davis Medical Center, all of which summarize her pertinent

9  NICU course, radiographic and laboratory studies and diagnoses. I have also reviewed the

10  depositions of Paul Davainis, MD, the family practitioner who managed Mrs. Palacio's labor and

11  delivered Isabella Palacio. In addition, I reviewed the depositions of Kelley Delcarlo, RN, one of

12  the Labor and Delivery nurses who rendered care to Mrs. Palacio, and Joel Paoner, CRNA, the

13  nurse anesthetist who gave Mrs. Palacio her epidural. I am advised that Nurse Leeth, the other

14  labor and delivery nurse who rendered care to Mrs. Palacio, has not yet given deposition

15  testimony.

16       My review of the materials listed herein revealed the following factual information:

17       8.     According to her prenatal records from Northeastern Rural Health Clinics

18  ("Northeastern"), Mrs. Palacio's pregnancy history indicates that she gave birth to two healthy

19  children prior to becoming pregnant with Isabella. On August 15, 2000, Mrs. Palacio gave birth to

20  her first child weighing approximately 7 pounds at 40 weeks gestation and on January 20, 2005,

21  she gave birth to her second child weighing about 8 lbs, also at 40 weeks gestation. Both children

22  were born vaginally and are reportedly healthy and developing normally.

23       9.     My review of Mrs. Palacio's prenatal records was unremarkable. According to the

24  records, Mrs. Palacio commenced prenatal care at Northeastern in Susanville, CA, in September

25  2011. On October 20, 2011, she presented at 11 weeks gestation with a blood pressure of 100/64

26  and positive fetal movement. Prenatal laboratory studies, including RPR and antibodies, were

27  negative and non-reactive. Blood was negative for both illicit drug use and alcohol consumption.

28  Mrs. Palacio's prenatal visits at 15 and 19 weeks, on November 16, 2011, and December 15,

Law Offices
of
Bruce G. Fagel
&
Associates

2

Declaration of Albert Phillips, M.D.

1    2011, respectively, were also unremarkable.

2        10.    On December 15, 2011, Mrs. Palacio underwent an obstetric ultrasound at 20

3    weeks demonstrating normal fetal anatomy. Her estimated date of delivery (EDD) was May 3,

4    2012, according to this study.

5        11.    Mrs. Palacio continued her routine prenatal care at Northeastern throughout early

6    2012. Again, all her subsequent prenatal visits were unremarkable. On January 18, 2012, Mrs.

7    Palacio's three (3) hour glucose tolerance test was within normal limits. Mrs. Palacio's prenatal

8    visits on February 15, March 14, March 28, April 11, April 18 and April 25 all yielded normal

9    physical examination findings. The fetal heart rate during each of those visits was reassuring.

10   Group Beta Strep (GBS) testing on April 11, 2012, was negative. Review of Mrs. Palacio's

11   prenatal care records demonstrates no anomalies, abnormalities or complications.

12       12.    Mrs. Palacio presented in active labor to Labor & Delivery at Banner Lassen

13   Medical Center on April 29, 2012, at approximately 11 pm. Ginger Leeth, RN, and Kelley

14   DelCarlo, RN, were assigned to care for Mrs. Palacio during her labor. According to Nurse

15   DelCarlo's deposition testimony, Mrs. Palacio was the only patient in Labor and Delivery that

16   night until she delivered by Cesarean section at 5:28 am the following morning. Upon her

17   presentation to Labor & Delivery, Mrs. Palacio was placed on an external fetal heart monitor.

18       13.    Nurse Leeth performed a vaginal examination on Mrs. Palacio at 11:20 pm and

19   determined that Mrs. Palacio's cervix was dilated to 4 cm with 70% effacement. Mrs. Palacio's

20   membranes were intact. The fetus was noted to be positioned 1 cm above the ischial spines and

21   fetal movement was present. Nurse DelCarlo testified that she was unaware of any complications

22   in Mrs. Palacio's prenatal course. Nurse DelCarlo documented that the fetal heart rate was 140

23   beats per minute (bpm) and demonstrated reassuring moderate variability.

24       14.    At 11:30 pm, Nurse DelCarlo called Paul Davainis, MD, the on-call family

25   practitioner in Labor & Delivery, to inform him of her evaluation of Mrs. Palacio and obtain

26   admission orders. Nurse DelCarlo documented that she advised Dr. Davainis of maternal and fetal

27   status, including the vaginal examination results and the fetal heart rate pattern. Nurse DelCarlo

28   testified in her deposition that she had no concerns relative to maternal and fetal status upon the

Law Offices
of
Bruce G. Fagel
&
Associates

3

Declaration of Albert Phillips, M.D.

1   patient's admission. Nurse DelCarlo testified that the fetal heart rate pattern was reassuring.

2       15.   At 12:09 am on April 30, 2012, Mrs. Palacio's vaginal exam showed 5 cm of

3   dilatation and 80% effacement. The fetus was noted to be at 2 cm above the ischial spines. At

4   12:17 am, Nurse DelCarlo documented a reassuring fetal heart rate pattern with 135 bpm and

5   moderate variability. An epidural was ordered for Mrs. Palacio at 12:30 am, according to the

6   nursing notes. At 12:30 am, the fetal heart rate pattern continued to be reassuring with moderate

7   variability and 140 bpm as noted in the nursing documentation. At 1:00 am, the fetal heart rate

8   was still reassuring with moderate variability and a baseline of 135 bpm. At 1:08 am, Nurse Leeth

9   performed a vaginal exam showing 6 cm of cervical dilatation and 80% effacement. The fetus was

10  1cm above the ischial spines. At 1:17 am, an epidural was administered to Mrs. Palacio by CRNA

11  Joel Paoner.

12      16.   Between 1:30 am and 1:40 am, several variable and late decelerations lasting

13  between 45-90 seconds appear on the fetal monitor strip. During this time, Dr. Davainis was

14  available by phone. However, Nurse DelCarlo testified that she did not advise Dr. Davainis about

15  these decelerations. Dr. Davainis confirmed that he was not notified about these decelerations.

16  Nursing documentation indicates that oxygen and fluids were administered to the patient and she

17  was placed on her left side.

18      17.   At 1:47 am, Mrs. Palacio's membranes spontaneously ruptured. Nurse DelCarlo

19  testified that the fluid was clear, although the nursing notes indicate conflicting entries regarding

20  the existence of meconium. At 1:54 am, a deep variable fetal heart rate deceleration to 60 bpm

21  lasting 40 seconds with overshoot to 180 bpm is evident on the fetal heart rate strip. Nurse

22  DelCarlo testified that she spoke to Dr. Davainis to tell him that "delivery was imminent".  Nurse

23  DelCarlo admitted, however, that she did not tell Dr. Davainis about the prior fetal heart rate

24  decelerations.

25      18.   At 1:56 am, Nurse DelCarlo performed a vaginal examination showing 9 cm of

26  cervical dilatation and 100% effacement. The fetal station was now "0", according to the nursing

27  notes. Both Dr. Davainis and Nurse DelCarlo testified that they expected this multiparous patient

28  to make about 1 cm per hour of cervical change. Notwithstanding their expectations, Mrs. Palacio

Law Offices
of
Bruce G. Fagel
&
Associates

4

Declaration of Albert Phillips, M.D.

1  stopped making cervical change, according to the testimony of Nurse DelCarlo and the nursing

2  notes. When the cervix stops dilating, this is commonly referred to as an "arrest of labor".

3       19.    At 2:00 am, early, variable and late decelerations are documented in the nursing

4  notes and appear on the fetal monitor strip. Uterine contractions are noted to be strong at this

5  time. Nurse DelCarlo testified that she did not express any concerns to Nurse Leeth or Dr.

6  Davainis about those decelerations.

7       20.    Dr. Davainis testified that he first met Mrs. Palacio at her bedside at 2:15 am.

8  Nurse DelCarlo did not notify Dr. Davainis about any of the decelerations but testified that Dr.

9  Davainis looked at the fetal monitor strip upon his arrival. Dr. Davainis confirmed that he looked

10  at the fetal monitor strip when he arrived and was aware of the strip continuously throughout the

11  morning. The nursing staff continued to document early and late decelerations at 2:30 am.

12  Between approximately 1:45 and 3:00 am, the fetal monitor strip demonstrated deep recurrent

13  variable decelerations with occasional overshoots to 180 bpm.

14       21.    From 3:00 am onward, the fetal monitor strip clearly revealed deep, late recurrent

15  decelerations in the fetal heart rate. At 3:13 am, Mrs. Palacio's last documented vaginal

16  examination showed that she remained at 9 cm cervical dilatation. Dr. Davainis testified that he

17  was at the patient's bedside at 3:30 am and was aware that she had stopped making cervical

18  progress as of 1:56 am. Although Dr. Davainis testified that he had performed many Cesarean

19  sections at Banner Lassen Medical Center prior to April 2012, including numerous emergency

20  Cesarean sections, he discouraged Mrs. Palacio from undergoing a Cesarean section citing

21  *maternal* risks such as bleeding.

22       22.    The nursing staff repeatedly documented recurrent late decelerations in the fetal

23  heart rate from 3:15 am until 5:00 am. Nurse DelCarlo testified that she was aware of the

24  recurrent late decelerations. However, Nurse DelCarlo testified that she never advocated for the

25  patient by challenging Dr. Davainis's plan to continue allowing this patient to labor. Dr. Davainis

26  testified that he was at the patient's bedside a third time at 4 am but encouraged her to continue a

27  trial of labor despite being aware of the continuous pattern of recurrent late fetal heart rate

28  decelerations.

Law Offices
of
Bruce G. Pagel
&
Associates

Declaration of Albert Phillips, M.D.

23. Dr. Davainis issued an order for a Cesarean section at 5:00 am. The necessary personnel were assembled minutes after 5:00 am and all were present in the OR by 5:13 am, according to the records. In fact, Dr. Davainis testified that the personnel could have been assembled within minutes at any time that morning.

24. Although all members of the OR team were present by 5:13 am, the patient was not incised until 5:22 am. Prior to incising the patient, Dr. Davainis testified that he spent several minutes in the OR attempting to auscultate fetal heart tones. Additionally, CRNA Paoner testified that he attempted to re-bolus the patient's epidural but knew that general anesthesia would have anesthetized the patient more rapidly.

25. Isabella Palacio was delivered by C section at 5:28 am on April 30, 2012, without spontaneous respiration, movement or tone. There was no heart rate at birth. APGAR scores of 0, 2, and 3 at 1, 5 and 10 minutes, respectively, were documented. As of 10 minutes of life, the baby was still unresponsive, flaccid and demonstrated no spontaneous respiration. Isabella was intubated and placed on a mechanical ventilator. Isabella's initial arterial cord blood gas was drawn at 6:00 am and revealed values of pH 7.10, pCO2 57, pO2 30, HCO3 16.9 and base excess of -11.1. An arterial blood gas was next drawn at 6:42 am during bag valve mask (BVM) ventilation and values were noted to be pH 6.84, pO2 66, pCO2 97, HCO3 10.6 with a base excess of -20.6. The baby was transferred to UC Davis for hypothermia and arrived at UC Davis at 12:20 pm.

26. According to the NICU admission records from UC Davis Medical Center, Isabella Palacio was admitted with a diagnosis of severe hypoxic ischemic encephalopathy (HIE) and underwent whole body cooling. The blood gasses clearly evidence acidosis from perinatal asphyxia consistent with the diagnosis of HIE. Hypoxic ischemic encephalopathy is a brain injury that results from lack of perfusion to the brain resulting in lack of adequate oxygenation, or hypoxia.

27. When admitted to the NICU at UC Davis, Isabella demonstrated no suck or Moro reflexes. She had neither plantar nor palmar grasp bilaterally. Isabella underwent several EEG studies with markedly abnormal results demonstrative of clinical seizure activity. Isabella's brain

Law Offices
of
Bruce G. Fagel
&
Associates

6

Declaration of Albert Phillips, M.D.

1  MRI on May 7, 2012, demonstrated significant irreversible brain injury caused by severe HIE. On

2  May 24, 2012, Isabella underwent gastrostomy tube placement for feeding due to her inability to

3  nipple. She remained in the NICU at UC Davis for 6 weeks and was discharged on June 5, 2012.

4  She was discharged on Phenobarbital, among other medications, to control her seizure activity.

5  Isabella Palacio's condition was noted to be permanent and severe and, throughout her admission

6  to UC Davis, the parents were continually informed that their child's deficits were likely to require

7  lifelong medical care and therapeutic interventions.

8      28.   Based upon my review of the referenced medical records and deposition

9  transcripts, as well as my education, training and experience, it is my opinion that Paul Davainis,

10  MD, and the nursing staff at Banner Lassen Medical Center assigned to Mrs. Palacio during her

11  labor on April 29, 2012, violated the accepted standards of care and proximately caused Isabella's

12  injuries as follows:

13      A.   The standard of care required that the nursing staff recognize signs of fetal

14  intolerance to labor demonstrated by fetal monitoring changes as seen here and communicate

15  those concerns to the provider, Dr. Davainis, no later than 2 am on April 30, 2012. Delivery in

16  this case should have been accomplished no later than 3:00 am to 3:15 am, based on the severe

17  recurrent variable decelerations in the fetal heart rate evidencing fetal intolerance to labor.  In

18  addition, there was no cervical change beyond 9 cm and there would be no reasonable expectation

19  of an imminent delivery. According to Dr. Davainis's own deposition testimony, the personnel

20  necessary to perform an emergency C section could easily have been assembled much earlier and

21  delivery could have been effected at least 2 hours earlier.  Delivery at 5:28 am was below the

22  standard of care.

23      B.   Additionally, when Dr. Davainis continued expressing his desire to continue the

24  trial of labor, the standard of care required the nursing staff to advocate for a C section. If Dr.

25  Davainis had refused to perform a C section, despite this advocacy, the standard of care required

26  the nursing staff to then access their chain of command in the face of this rapidly deteriorating

27  fetal heart rate. The severe late decelerations, which had become recurrent as of 3:00 am,

28  evidenced fetal intolerance to labor. Both the nurses and Dr. Davainis were continuously aware of

Law Offices
of
Bruce G. Fagel
&
Associates

7

Declaration of Albert Phillips, M.D.

1   the persistent fetal distress and of the potentially devastating consequences to the fetus, including

2   severe hypoxia. The failure to deliver the baby by C section no later than 3:30 am was below the

3   standard of care.

4        C.    It is my further opinion that the violations of the standard of care by Dr. Davainis

5   and the nursing staff were substantial factors in causing Isabella's severe hypoxic-ischemic brain

6   injuries and all the resulting injuries. Mrs. Palacio's prenatal course was uncomplicated and

7   normal. The fetal heart rate was reassuring, and there was good fetal movement, upon Mrs.

8   Palacio's admission to Labor & Delivery on the night of April 29, 2012. Further, there is no

9   evidence that this child's injuries are attributable to congenital, teratogenic, infectious or

10   metabolic etiologies. The delay in effecting delivery, given the arrest of dilatation during the

11   manifestation of recurrent late decelerations, caused Isabella Palacio's injuries to a reasonable

12   degree of medical probability. Earlier delivery would have resulted in less hypoxia and less injury

13   to the fetus, to a reasonable degree of medical probability.

14        D.    The foregoing Declaration is not an exhaustive list of all of my opinions: As this

15   case progresses, I reserve the right to amend and/or supplement these opinions after review of

16   further medical records, declarations, deposition testimony and the opinions of other physicians.

17        I declare under penalty of perjury under the laws of the United States that the foregoing is

18   true and correct. Executed this 17 day of June, 2014, at Santa Monica, CA.

19

20                               Albert J. Phillips, MD

21

22

23

24

25

26

27

28

Law Offices
of
Bruce G. Fagel
&
Associates

# Exhibit C

## DECLARATION OF RICHARD H. PAUL, MD

I, Richard H. Paul, MD, declare and state as follows:

1. All of the information set forth herein is based upon my personal knowledge, and/or based upon my review of the medical records, deposition transcripts, physician declarations, and other materials set forth herein. If called as a witness I could and would testify to the following:

2. I received my Medical Degree in 1960 from Loma Linda University School of Medicine, and then completed an OB/GYN Residency in 1964 at White Memorial Medical Center. I was Board Certified in 1967 in Obstetrics and Gynecology (with re-certification in 1986), and received sub-specialty certification in Maternal-Fetal Medicine in 1976. I am a Professor *Emeritus* in the Department of Obstetrics and Gynecology at the Keck School of Medicine, University of Southern California. Previously, I was Director of the Division of Maternal-Fetal Medicine, Department of Obstetrics and Gynecology at LA County/USC Medical Center from 1978 to 1998. I was also Program Director of Fellowship Training, Division of Maternal-Fetal Medicine, Department of Obstetrics and Gynecology at LA County/USC Medical Center from 1974 to 2000.

Through the years, I have acted as a consultant for various organizations including the American College of Obstetricians and Gynecologists and the National Institute of Child Health and Human Development (NIH). I have managed thousands of laboring patients and delivered their children over my 50 year career. One of my major research interests throughout my career has been fetal heart rate interpretation and monitoring and I have published extensively on the subject. I am an expert on fetal heart rate interpretation. Attached hereto is a correct copy of my Curriculum Vitae.

3. Based upon my education, training, experience, research, and teaching responsibilities, I am competent and qualified to render opinions on the national standard of care governing physicians and nursing staff rendering care to laboring patients as of 2012. Specifically, I am familiar with the national standard of care as it pertains to the hospital nursing staff at Banner Lassen Medical Center and Paul Davainis, M.D., during the events of the labor of

Law Offices
of
Bruce G. Fagel
&
Associates

1

Declaration of Richard H. Paul, M.D.

1   the mother, Micaela Palacio, and the delivery of her baby, Isabella Palacio. Based on my

2   education, training, experience, research, and review of the materials set forth herein, I am

3   familiar with the issues of causation as they pertain to injuries suffered by the mother and baby in

4   this case. I can competently testify with regard to the issues of standard of care and causation as

5   they relate to the acts and omissions of the hospital staff at Banner Lassen Medical Center and

6   Paul Davainis, MD.

7       4.    In forming my opinions in this case, I reviewed the prenatal records of Micaela

8   Palacio from Northeast Rural Health Clinics. Additionally, I have reviewed Mrs. Palacio's

9   medical records and fetal heart rate tracings from Banner Lassen Medical Center in Susanville,

10   CA. I have reviewed pertinent medical records on Isabella Palacio from UC Davis Medical

11   Center, all of which summarize her pertinent NICU course, radiographic and laboratory studies

12   and diagnoses. I have also reviewed the deposition of Paul Davainis, MD, the family practitioner

13   who managed Mrs. Palacio's labor and delivered Isabella Palacio. In addition, I reviewed the

14   deposition of Kelley Delcarlo, RN, one of the Labor and Delivery nurses who rendered care to

15   Mrs. Palacio during her labor.

16       5.    This Declaration is offered for purposes of Plaintiffs' Expert Disclosure.

17       My review of the materials listed herein revealed the following factual information:

18       6.    Mrs. Palacio's pregnancy history indicates that she gave birth to two healthy

19   children prior to becoming pregnant with Isabella. On August 15, 2000, Mrs. Palacio gave birth

20   to her first child weighing approximately 7 pounds at 40 weeks gestation and on January 20,

21   2005, she gave birth to her second child weighing about 8 lbs, also at 40 weeks gestation. Both

22   children were born vaginally and are reportedly healthy and developing normally.

23       7.    My review of Mrs. Palacio's prenatal records from Northeastern Rural Health

24   Clinics ("Northeastern") in Susanville, CA, was unremarkable. According to the records, Mrs.

25   Palacio commenced prenatal care at Northeastern in September 2011. On October 20, 2011, she

26   presented at 11 weeks gestation with a blood pressure of 100/64 and positive fetal movement.

27   Prenatal laboratory studies, including RPR and antibodies, were negative and non-reactive.

28   Blood was negative for both illicit drug use and alcohol consumption. Mrs. Palacio's prenatal

Law Offices of Bruce G. Fagel & Associates

1   visits at 15 and 19 weeks, on November 16, 2011, and December 15, 2011, respectively, were

2   also unremarkable.

3       8.      On December 15, 2011, Mrs. Palacio underwent an obstetric ultrasound at 20

4   weeks demonstrating normal fetal anatomy. Her estimated date of delivery (EDD) was May 3,

5   2012, according to this study.

6       9.      Mrs. Palacio continued her routine prenatal care at Northeastern throughout early

7   2012. Again, all her subsequent prenatal visits were unremarkable. On January 18, 2012, Mrs.

8   Palacio's three (3) hour glucose tolerance test was within normal limits. Mrs. Palacio's prenatal

9   visits on February 15, March 14, March 28, April 11, April 18 and April 25 all yielded normal

10  physical examination findings. The fetal heart tones during each of those visits were reassuring.

11  Group Beta Strep (GBS) testing on April 11, 2012, was negative. Review of Mrs. Palacio's

12  prenatal care records demonstrates no anomalies, abnormalities or complications.

13      10.     Mrs. Palacio presented in active labor to Labor & Delivery at Banner Lassen

14  Medical Center on April 29, 2012, at approximately 11 pm. Ginger Leeth, RN, and Kelley

15  DelCarlo, RN, were assigned to care for Mrs. Palacio during her labor. According to Nurse

16  DelCarlo's deposition testimony, Mrs. Palacio was the only patient in Labor and Delivery that

17  night until she delivered by Cesarean section at 5:28 am the following morning. Upon her

18  presentation to Labor & Delivery, Mrs. Palacio was placed on an external fetal heart monitor.

19      11.     Based on the nursing records, Nurse Leeth performed a vaginal examination on

20  Mrs. Palacio at 11:20 pm and determined that Mrs. Palacio's cervix was dilated to 4 cm with

21  70% effacement. Mrs. Palacio's membranes were intact. The fetus was noted to be positioned 1

22  cm above the ischial spines and fetal movement was present. Nurse DelCarlo testified that she

23  was unaware of any complications in Mrs. Palacio's prenatal course. Nurse DelCarlo

24  documented that the fetal heart rate was 140 beats per minute (bpm) and demonstrated reassuring

25  moderate variability, or what is currently known as a "Category I" heart rate.

26      12.     At 11:30 pm, Nurse DelCarlo called Paul Davainis, MD, the on-call family

27  practitioner in Labor & Delivery, to inform him of her evaluation of Mrs. Palacio and obtain

28  admission orders. Nurse DelCarlo documented that she advised Dr. Davainis of maternal and

Law Offices
of
Bruce G. Fagel
&
Associates

3

Declaration of Richard H. Paul, M.D.

1   fetal status, including the vaginal examination results and the fetal heart rate pattern. Nurse

2   DelCarlo testified in her deposition that she had no concerns relative to maternal and fetal status

3   upon the patient's admission. Nurse DelCarlo testified that the fetal heart rate pattern was

4   reassuring.

5        13.    At 12:09 am on April 30, 2012, Mrs. Palacio's vaginal exam showed 5 cm of

6   dilatation and 80% effacement, based on the nursing documentation. The fetus was noted to be at

7   2 cm above the ischial spines. At 12:17 am, Nurse DelCarlo documented a reassuring fetal heart

8   rate pattern with 135 bpm and moderate variability. An epidural was ordered for Mrs. Palacio at

9   12:30 am, according to the nursing notes. At 12:30 am, the fetal heart rate pattern continued to be

10  reassuring with moderate variability and 140 bpm as noted in the nursing documentation. At 1:00

11  am, the fetal heart rate was still reassuring with moderate variability and a baseline of 135 bpm.

12  At 1:08 am, Nurse Leeth performed a vaginal exam showing 6 cm of cervical dilatation and 80%

13  effacement. The fetus was 1cm above the ischial spines. At 1:17 am, an epidural was

14  administered to Mrs. Palacio by CRNA Joel Paoner.

15       14.    Between 1:30 am and 1:40 am, several variable and late decelerations lasting

16  between 45-90 seconds appeared on the fetal monitor strip. During this time, Dr. Davainis was

17  available by phone. However, Nurse DelCarlo testified that she did not advise Dr. Davainis about

18  these decelerations. Dr. Davainis confirmed that he was not notified about these decelerations.

19  Nursing documentation indicated that oxygen and IV fluids were administered to the patient and

20  she was placed on her left side in an attempt to resuscitate the fetus.

21       15.    At 1:47 am, Mrs. Palacio's membranes spontaneously ruptured. Nurse DelCarlo

22  testified that the fluid was clear, although the nursing notes indicate conflicting entries regarding

23  the existence of meconium. At 1:54 am, a deep variable fetal heart rate deceleration to 60 bpm

24  lasting 40 seconds with overshoot to 180 bpm is evident on the fetal heart rate strip. Nurse

25  DelCarlo testified that she spoke to Dr. Davainis to tell him that "delivery was imminent". Nurse

26  DelCarlo admitted, however, that she did not tell Dr. Davainis about the prior fetal heart

27  rate decelerations.

28       16.    At 1:56 am, Nurse DelCarlo performed a vaginal examination showing 9 cm of

*Law Offices of Bruce G. Fagel & Associates*

4

Declaration of Richard H. Paul, M.D.

1   cervical dilatation and 100% effacement. The fetal station was now "0", according to the nursing

2   notes. Both Dr. Davainis and Nurse DelCarlo testified that they expected this multiparous patient

3   to minimally dilate at least 1 cm per hour. Notwithstanding their expectations, Mrs. Palacio

4   stopped making cervical change, according to the testimony of Nurse DelCarlo and the nursing

5   notes. When the cervix stops dilating, this is commonly referred to as an "arrest of labor".

6        17.    At 2:00 am, early, variable and late decelerations are documented in the nursing

7   notes and appear on the fetal monitor strip. Uterine contractions are noted to be strong at this

8   time. Nurse DelCarlo testified that she did not express any concerns to Nurse Leeth or Dr.

9   Davainis about those decelerations.

10        18.    Dr. Davainis testified that he first met Mrs. Palacio at her bedside at 2:15 am.

11   Nurse DelCarlo did not notify Dr. Davainis about any of the decelerations but testified that Dr.

12   Davainis looked at the fetal monitor strip upon his arrival. Dr. Davainis confirmed that he looked

13   at the fetal monitor strip when he arrived and was aware of the strip continuously throughout the

14   morning. The nursing staff continued to document early and late decelerations at 2:30 am. There

15   was significant loss of fetal heart rate recording which made pattern interpretation difficult.

16   Between approximately 1:45 am and 3:00 am, the fetal monitor strip demonstrated deep recurrent

17   variable and late decelerations with occasional overshoot to 180 bpm.

18        19.    From 3:00 am onward, the fetal monitor strip clearly revealed deep, late recurrent

19   decelerations in the fetal heart rate. Such repetitive decelerations are ominous signs of fetal

20   intolerance to labor and commonly known as "Category III" fetal heart tracings. At 3:13 am, Mrs.

21   Palacio's last documented vaginal examination showed that she remained at 9 cm cervical

22   dilatation. Dr. Davainis testified that he was at the patient's bedside at 3:30 am and was aware

23   that she had stopped making cervical progress as of 1:56 am. Although Dr. Davainis testified that

24   he had performed many Cesarean sections at Banner Lassen Medical Center prior to April 2012,

25   including numerous emergency Cesarean sections, he encouraged Mrs. Palacio to continue her

26   trial of labor and attempt a vaginal delivery.

27        20.    The nursing staff repeatedly documented recurrent late decelerations in the fetal

28   heart rate from 3:15 am until 5:00 am. Nurse DelCarlo testified that she was aware of the

Law Offices
of
Bruce G. Fagel
&
Associates

5
Declaration of Richard H. Paul, M.D.

1   recurrent late decelerations. However, Nurse DelCarlo testified that she never advocated for the

2   patient by challenging Dr. Davainis's plan to continue allowing this patient to labor.  Dr.

3   Davainis testified that he was at the patient's bedside a third time at 4 am but encouraged her to

4   continue a trial of labor despite being aware of the continuous pattern of recurrent late fetal heart

5   rate decelerations.

6       21.    Dr. Davainis issued an order for a Cesarean section at 5:00 am. The necessary

7   personnel were assembled minutes after 5:00 am and all were present in the OR by 5:13 am,

8   according to the records. In fact, Dr. Davainis testified that the personnel could have been

9   assembled within minutes at any time that morning.

10      22.    Although all members of the OR team were present by 5:13 am, the patient was

11  not incised until 5:22 am. Prior to incising the patient, Dr. Davainis testified that he spent several

12  minutes in the OR attempting to auscultate fetal heart tones.

13      23.    Isabella Palacio was delivered by C section at 5:28 am on April 30, 2012, without

14  spontaneous respiration, movement or tone. There was no heart rate at birth. APGAR scores of 0,

15  2, and 3 and 1, 5 and 10 minutes, respectively, were documented. As of 10 minutes of life, the

16  baby was still unresponsive, flaccid and demonstrated no spontaneous respiration. Isabella was

17  intubated and placed on a mechanical ventilator. Isabella's initial arterial cord blood gas was

18  drawn at 6:00 am and revealed values of pH 7.10, pCO2 57, pO2 30, HCO3 16.9 and base excess

19  of -11.1. An arterial blood gas was next drawn at 6:42 am during bag valve mask (BVM)

20  ventilation and values were noted to be pH 6.84, pO2 66, pCO2 97, HCO3 10.6 with a base

21  excess of -20.6. The baby was transferred to UC Davis for hypothermia and arrived at UC Davis

22  at 12:20 pm.

23      24.    According to the NICU admission records from UC Davis Medical Center,

24  Isabella Palacio was admitted with a diagnosis of severe hypoxic ischemic encephalopathy (HIE)

25  and underwent whole body cooling. The blood gasses clearly evidence acidosis from perinatal

26  asphyxia consistent with the diagnosis of HIE. Hypoxic ischemic encephalopathy is a brain injury

27  that results from lack of perfusion to the brain resulting in lack of adequate oxygenation, or

28  hypoxia.

Law Offices
of
Bruce G. Fagel
&
Associates

Declaration of Richard H. Paul, M.D.

25.     When admitted to the NICU at UC Davis, Isabella demonstrated no suck or Moro reflexes. She had neither plantar nor palmar grasp bilaterally. Isabella underwent several EEG studies with markedly abnormal results demonstrative of clinical seizure activity. Isabella's brain MRI on May 7, 2012, demonstrated significant irreversible brain injury caused by severe HIE. On May 24, 2012, Isabella underwent gastrostomy tube placement for feeding due to her inability to nipple. She remained in the NICU at UC Davis for 6 weeks and was discharged on June 5, 2012. She was discharged on Phenobarbital, among other medications, to control her seizure activity. Isabella Palacio's condition was noted to be permanent and severe and, throughout her admission to UC Davis, the parents were continually informed that their child's deficits were likely to require lifelong medical care and therapeutic interventions.

26.     Based upon my review of the referenced medical records and deposition transcripts, as well as my education, training and experience, it is my opinion that Paul Davainis, MD, and the nursing staff at Banner Lassen Medical Center assigned to Mrs. Palacio during her labor on April 29, 2012, violated the accepted standards of care and proximately caused Isabella's injuries as follows:

A.     The standard of care required that the nursing staff recognize signs of fetal intolerance to labor demonstrated by fetal monitoring changes as seen here and communicate those concerns to the provider, Dr. Davainis, no later than 2 am on April 30, 2012. Delivery by Cesarean section should have been ordered when Dr. Davainis saw the patient at 3:30 am, based on the severe recurrent variable decelerations and the failure of the patient to make cervical change. There was no cervical change beyond 9 cm so there would have been no reasonable expectation of an "imminent" delivery. According to Dr. Davainis's own deposition testimony, the personnel necessary to perform an emergency C section could easily have been assembled much earlier and delivery could have been effected at least 2 hours earlier. Delivery at 5:28 am was below the national standard of care.

B.     Additionally, when Dr. Davainis continued expressing his desire to continue the trial of labor, the standard of care required the nursing staff to advocate for a C section for Mrs. Palacio. If such advocacy had failed, the standard of care required the nursing staff to then access

Law Offices
of
Bruce G. Fagel
&
Associates

1   their chain of command in the face of this rapidly deteriorating fetal heart rate. The severe late

2   decelerations, which had become recurrent as of 3:00 am, evidenced fetal intolerance to labor.

3   Both the nurses and Dr. Davainis were continuously aware of the persistent fetal distress and of

4   the potentially devastating consequences to the fetus, including severe hypoxia.

5        C.    The standard of care also required the application of a fetal scalp electrode at

6   approximately 2:30 am when there was significant loss of fetal heart rate data and this would

7   have provided enhanced continuous fetal heart rate recording. The fetal scalp electrode would

8   have remained on as the patient was taken to the operating room and alerted the providers to the

9   deteriorating fetal status and would have prompted more timely delivery.

10        D.    It is my further opinion that the violations of the standard of care by Dr. Davainis

11   and the nursing staff were substantial factors in causing the marked depression of the fetus and

12   the acidosis. Mrs. Palacio's prenatal course was uncomplicated and normal. The fetal heart rate

13   was reassuring, and there was good fetal movement, upon Mrs. Palacio's admission to Labor &

14   Delivery on the night of April 29, 2012. The delay in effecting delivery, given the arrest of

15   dilatation during the manifestation of recurrent late decelerations, caused Isabella Palacio's

16   severe perinatal depression to a reasonable degree of medical probability. Earlier delivery would

17   have resulted in less hypoxia and better APGAR scores, to a reasonable degree of medical

18   probability.

19        E.    The foregoing Declaration is not an exhaustive list of all of my opinions. As this

20   case progresses, I reserve the right to amend and/or supplement these opinions after review of

21   further medical records, declarations, deposition testimony and the opinions of other physicians.

22        I declare under penalty of perjury under the laws of the United States that the foregoing is

23   true and correct.  Executed this _30th_ day of June, 2014, at San Luis Obispo, CA.

24

25

26   Richard H. Paul, M.D.

27

28

Law Offices
of
Bruce G. Fagel
&
Associates

8

Declaration of Richard H. Paul, M.D.

# Exhibit D

*Law Offices of Bruce G. Fagel and Associates*

A LAW CORPORATION

*100 North Crescent Drive • Suite 360*
*Beverly Hills, California 90210*
*(310) 281 • 8700 • Fax (310) 281 • 5656*
*www.Fagellaw.com*

*Reply to*
BEVERLY HILLS
ADDRESS

BRUCE G. FAGEL, M.D., J.D.
BRON DRAGANOV
THOMAS S. ALCH*
RICHARD AKEMON
EDUARDO J. ASCENCIO

TRUDY FAGEL, FIRM MANAGER

\* ADMITTED IN CALIFORNIA, ARIZONA  AND NEVADA

October 6, 2014

**<u>VIA FACSIMILE (916) 554-2900 & U.S. MAIL</u>**

Victoria Boesch, Assistant US Attorney
United States Attorney's Office
501 I Street, Suite 10-100
Sacramento, California 95814

Re:   Isabella Palacio vs U.S.A.

Dear Ms. Boesch:

This will confirm the several phone discussions that we had on Friday, October 3, 2014, following your letter of the same date and prior to the deposition of Dr. Richard Paul. While I disagree with your claim that plaintiff's experts are cumulative, I cannot prevent you from cancelling the depositions of Dr. Phillips and Dr. Manning and, I cannot prevent you from filing a motion with the Court, although I question why you did not file such a motion after the initial designation of experts several months ago or even after the supplemental expert reports were filed on September 5, 2014. I will agree to extend the time to complete the depositions of the experts past the current date of November 5, if you prepare such a stipulation and if the stipulation is accepted by the Court. To that end, I would suggest extending the date for completion of discovery to the end of December 2014, which will correspond to the date for the filing of any dispositive motions. If the Court allows such an extension then, we may need to move some depositions currently set for October into November because of other conflicts. If the Court does not allow for such an extension of discovery, you will have waived your right to take the deposition of Dr. Phillips and Dr. Manning.

With regard to the deposition of Dr. Paul, since he is a maternal-fetal medicine specialist, similar to Dr. Druzin, Dr. Manning, and Dr. Ross, his position in this case is not cumulative to Dr. Phillips, who is a general obstetrician and is prepared to testify about the standard of care applicable to Dr. Davainis in this case, which,ccording to Dr. Druzin, is the same standard of care for both a family practice physician doing obstetrics and an obstetrician. Your suggestion that Dr. Rai is somehow not comparable to Dr. Phillips, because Dr. Rai has a different perspective, makes no sense since the Court is required to make a decision based upon expert testimony about the applicable standard of care, not perspective or medical practice.

| ORANGE COUNTY | SAN DIEGO | FRESNO | RIVERSIDE | BAKERSFIELD |
|---|---|---|---|---|
| 23120 ALICIA PARKWAY, SUITE 228 | 4370 LA JOLLA VILLAGE DRIVE, SUITE 400 | 516 W. Shaw Ave. Ste.200 | 11801 Pierce St. 2nd Floor | 4900 California Ave. |

| PHOENIX | SAN FRANCISCO | SACRAMENTO | OAKLAND | SAN JOSE | LAS VEGAS |
|---|---|---|---|---|---|
| 2375 E. Camelback Rd. Suite 600 | 425 MARKET STREET, SUITE 2200 | 980 NINTH STREET, SUITE 1600 | 1300 Clay St Suite 600 | 2033 GATEWAY PLACE, Suite 500 | 500 N. RAINBOW BLVD. SUITE 300 |

Victoria Boesch, Esq.
October 6, 2014
Page 2


Dr. Manning will be testifying about standard of care for Dr. Davainis and causation similar to Dr. Druzin, and he will not be offering opinions about the nursing standard of care. Banner Hospital has designated Dr. Ross who offered opinions about the nurses and Dr. Paul's opinions are offered to counter Dr. Ross. Although Dr. Paul also has opinions about Dr. Davainis, we agree to temporarily de-designate Dr. Paul relative to such opinions pending your motion to the Court. You have decided not to ask Dr. Paul about his opinions regarding Dr. Davanis, although his opinions are in both his initial report and his supplemental report. If your motion is not granted by the Court, plaintiff will agree to offer Dr. Paul again for deposition, although we could require you to obtain an order from the Court for such a deposition, and obviously any additional expense will be your responsibility.

With regard to Dr. Nageotte whom you designated as a supplemental expert, despite your initial designation of Dr. Druzin, since Dr. Manning will be plaintiff's only maternal-fetal medicine expert with opinions about Dr. Davainis, we would request that you now withdraw Dr. Nageotte. Since Dr. Druzin has already given his opinions about Dr. Davainis, and any opinions by Dr. Nageotte would be cumulative.

Very truly yours,
LAW OFFICES OF BRUCE G. FAGEL
AND ASSOCIATES

*Dictated But Not Read*
BRUCE G. FAGEL

BGF:as
cc: Thomas Doyle, Schuering Zimmerman & Doyle LLP *via facsimile (916) 568-0400*

10/28/14 11:52 G:\PALACIO-FEDERAL\CORRESPONDENCE\Boesch re cumulative experts.wpd