BRUCE G. FAGEL, State Bar No. 103674
EDUARDO J. ASCENCIO, State Bar No. 182061
Law Offices of Bruce G. Fagel
& Associates
100 North Crescent Drive, Suite 360
Beverly Hills, California 90210
Tel: (310) 281-8700
Fax: (310) 281-5656
brucefagel@fagellaw.com
eduardoascencio@fagellaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I.P., a MINOR, by and through her guardian ad litem, FACUNDO PALACIO DIAZ, MICAELA PALACIO,<br><br>    Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Case No. 2:13-CV-01012 JAM-CKD<br><br>[Consolidated with 2:13-CV-02013 JAM-CKD]<br><br>DECLARATION OF BRUCE G. FAGEL SUPPORTING OPPOSITION TO MOTION OF UNITED STATES TO EXCLUDE PLAINTIFFS' LIFE EXPECTANCY EXPERT AND REPORTS<br><br>Date: November 19, 2014<br>Time: 9:30 a.m<br>Judge: Hon. John A. Mendez<br>Crtrm: 6, 14th Floor |
| I.P, A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, FAGUNDO PALACIO, MICAELA PALACIO, FACUNDO PALACIO DIAZ,<br><br>    Plaintiffs,<br><br>vs.<br><br>BANNER HEALTH, AN ARIZONA CORPORATION, DOING BUSINESS AS BANNER LASSEN MEDICAL CENTER, DOES 1-250, INCLUSIVE,<br><br>    Defendants. | |

## DECLARATION OF BRUCE G. FAGEL IN SUPPORT OF OPPOSITION TO MOTION TO EXCLUDE DR NICHOLS EXPERT TESTIMONY

I, BRUCE G. FAGEL declare as follows:

1. I am the attorney for Plaintiffs in the above-entitled action.

2. Attached as Exhibit A is a true and correct copy of the plaintiffs' life expectancy expert report of Carl Thomas Nichols, MD, FACP, dated June 25, 2014, that was included in the Plaintiffs' initial disclosure of expert witnesses.

3. Attached as Exhibit B is a true and correct copy of the plaintiffs' rebuttal expert report of Carl Thomas Nichols, MD, FACP, dated August 26, 2014.

4. Attached as Exhibit C is a true and correct copy of the plaintiffs' obstetrical expert report of Richard H. Paul, M.D., MD, dated June 30, 2014, which was included in the Plaintiffs' initial disclosure of expert witnesses.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on October 28, 2014, at Beverly Hills, California.

/s/ Bruce G. Fagel
BRUCE G. FAGEL
Attorneys for Plaintiffs

# Exhibit A

2200 South Hayden Street

Amarillo, Texas 79109

25Jun2014

Mr. Eduardo J. Ascencio

100 North Crescent Drive – Suite 360

Beverly Hills, California 90210

Re: Palacio vs USA   (Isabella Palacio, DOB 30Apr2012)

Dear Mr. Ascencio:

I am fully trained and board certified in Internal Medicine and Endocrinology. I practiced these disciplines for more than 30 years. I have estimated life expectancies for American General Life Insurance Company for more than 30 years. Please refer to my C. V. for details.

I have reviewed the neurological examination by Donald M. Olson, MD dated 6Feb2013 and the neurological examination by Ira T. Lott, MD dated 19May2014.

These medical records show that Isabella Palacio suffers neurologic deficits stemming from a neonatal episode of hypoxic ischemic encephalopathy. These deficits include inability to self feed, no meaningful upper extremity use and unable to be mobile. Her head is small, indicating poor brain growth.

With my training and experience I have calculated the life expectancy of Isabella Palacio to be 36.9 years from now.

These calculations are based upon data in the medical literature, especially from Dr. Shavelle and his group.

Sincerely,

*Carl Thomas Nichols*

Carl Thomas Nichols MD, FACP

# CURRICULUM VITAE
## OF
## Carl Thomas NICHOLS, M.D.
2200 S. Hayden
Amarillo, Texas 79109
806-372-9755

**PROFESSIONAL ADDRESS:** 2200 S. Hayden Street
Amarillo, Texas 79109

**TELEPHONE:** 806-345-7445

**DATE OF BIRTH:** 08June1936

**PLACE OF BIRTH:** Indianapolis, Indiana

**CITIZENSHIP STATUS:** U.S.A.

## MILITARY EXPERIENCE AND STATUS:
U.S. Air Force - March 1966 through March 1968 – Captain. Amarillo Air Force Base Hospital. Honorable discharge.

## ACADEMIC PREPARATION:
Schools Attended:
   Warren Central High School, Indianapolis, Indiana, 1950-1954.
   Indiana University 1954-1958, B.A. Degree - Anatomy & Physiology.
   Indiana University School of Medicine 1957-1961, M.D. degree.

Honorary Scholarship Societies and Student Honors:
   Alpha Epsilon Delta – Indiana University, 1956.
   Alpha Omega Alpha – Indiana University, 1962.

Internship:
   University of Utah School of Medicine – Straight Medicine Internship,
      July 1961 through June 1962.

Residency and/or Fellowships:
   Indiana University School of Medicine – Internal Medicine
      July 1962 through June 1963.
   University of Utah School of Medicine – Endocrinology & Metabolism
      Fellowship - July 1963 through June 1965.

Case 2:13-cv-00022-JAM-CKD Document 52-13 Filed 11/05/14 Page 6 of 20
Case 2:13-cv-00022-JAM-CKD Document 54-13 Filed 10/08/14 Page 4 of 33

Page 2

Carl Thomas Nichols, M.D. — curriculum vitae

Residency and/or Fellowships cont:
    University of Utah School of Medicine — Chief Resident
        July 1965 through March 1966.
    (Drafted into active military service at that time.)

## SPECIALTY CERTIFICATION:
American Board of Internal Medicine.
Internal Medicine — Certified:    08 February 1968
               Recertified:  24 October 1974
                             25 October 1980

Advanced Achievement in Internal Medicine: 16 May 1987.

## SUBSPECIALTY CERTIFICATION:
American Board of Internal Medicine — Endocrinology and Metabolism —
    Certified 17 October 1972.

## TEACHING APPOINTMENTS:
Associate Clinical Professor of Medicine, Texas Tech University School of
    Medicine — 1973 through 1990. Clinical Professor of Medicine 1990
    through present.

## HOSPITAL STAFF APPOINTMENTS:
High Plains Baptist Hospital (Baptist-St. Anthony's Health Care System)
    Amarillo, Texas. Active Staff March 1968 to July 1999. Emeritus Staff
    July of 1999 to present.
Chief of Internal Medicine, AUSAF Hospital, Amarillo Air Force Base,
    March 1967 to March 1968.
Amarillo Veterans Administration Hospital Consultant in Endocrinology and
    Metabolism, January 1970 to July 1999.

Case 2:13-cv-01012-JAM-CKD Document 52-13 Filed 11/05/14 Page 7 of 20
Case 2:13-cv-01012-JAM-CKD Document 41-3 Filed 10/08/14 Page 5 of 53

Page 3

Carl Thomas Nichols, M.D. — curriculum vitae

**HOSPITAL ADMINISTRATIVE POSITIONS:**
  Chief of Internal Medicine, High Plains Baptist Hospital,
    September 1971 through September 1975.
  President-Elect, Medical and Dental Staff, High Plains Baptist Hospital,
    October 1975 to September 1976.
  President, Medical and Dental Staff, High Plains Baptist Hospital,
    October 1976 through October of 1977.

**PROFESSIONAL SOCIETIES:**
  Fellow of The American College of Physicians.
  Fellow of The Endocrine Society.
  Member of Texas Medical Association.
  Member of Potter-Randall County Medical Association.

**OTHER:**
  Medical Director, Western National Life Insurance Company, 1975 to July 1999
  Director, Texas Academy of American College of Physicians, 1987 through 1989.
  Director, FirstCare, Greater Amarillo Health Plan ( Health Maintenance Organization), 1987 through 1991.
  Director, High Plains Independent Practice Association, 1987 through 1999.
  Retired from patient care activities July 1999.
  Full-time Medical Director, American General Annuity, July 1999 to August 2011

# BIBLIOGRAPHY
## Carl Thomas Nichols, M.D.

1. Nichols, C.T., Moore, R.R., and Tyler, F.H.: Diurnal variation in the suppressibility of ACTH release. Clin. Res., 12: 118, 1964 (Abstract).

2. Nichols, C.T., Nugent, C.A., and Tyler, F.H.: Diurnal variation in suppression of adrenal function by glucocorticoids. J. Clin. Endocrin., 25: 343, 1965

3. Nichols, C.T., Nugent, C.A., and Tyler, F.H.: Suppression of urinary testosterone excretion in hirsute females by glucocorticoids. Clin, Res., 13: 132, 1965 (Abstract).

4. Nugent, C.A., Nichols, C.T., and Tyler, F.H.: Diagnosis of Cushing's syndrome. Arch. Intern. Med., 116: 172, 1965.

5. Nichols, C.T., Nugent, C.A., and Tyler. F.H.: Glucocorticoid suppression of urinary testosterone excretion in patients with idiopathic hirsutism. J. Clin. Endocrin., 26:79, 1996.

6. Nichols, C.T., and Nugent, C.A.: Steroid tests in the diagnosis of Cushing's syndrome. Clin. Res. 15: 125, 1967.

7. Nichols, C.T., and Tyler, F. H.: Diurnal variation in adrenal cortical function. Ann. Rev. Med., 18: 313, 1967.

8. Nichols, C.T., Nugent C.A., and Tyler, F.H.: The laboratory diagnosis of Cushing's syndrome. Am. J. Med., 45, 116, 1968.

9. Nichols, C.T., Nugent, CA.: Cushing's syndrome. Current Diagnosis 3, 738, Conn & Conn, W.B. Saunders Co., 1971.

10. Lamar, C. Jr., Nichols, C.T.: Chronic active hepatitis associated with cholangiocarcinoma. Tex. Med., 72: 70, 1976.

11. Sutherland, R.D., Guynes, W.A., Nichols, C.T., and Martinez, H.E.: Excessive strut wear allowing ball-poppet embolism in a DeBakey Surgitool aortic valve prosthesis. J. Cardiovasc. Surg., 23: 179, 1982.

12. Nichols, C.T.: Pancreas transplantation. Panhandle Health, 4: 40, 1993.

13. Nichols, C.T.: Osteoporosis. Panhandle Health, 5: 16, 1994.

2200 South Hayden Street

Amarillo, Texas 79109

3July2014

Eduardo Ascencio

100 West Crescent Drive-Suite 360

Beverly Hills, California 90210

Re: Testimony

Dear Mr. Ascencio:

I do not keep records that reflect prior testimony. However, in the past 4 years I do not believe I have testified in court. I have given two depositions:

Barse v. Sangorgonio, approx. 26June2013, for Douglas Malcomb, plaintiff atty, recorded in or around LAX

Welch v. County of LA, approx. 5Sept2013, for Bruce Fagal, plaintiff atty, recorded in Amarillo, Texas.

Sincerely,

Carl T. Nichols MD

Carl Thomas Nichols MD, FACP

# Exhibit B

2200 South Hayden Street

Amarillo, Texas 79109-2206

26Aug2014

Mr. Eduardo J. Ascencio

100 North Crescent Drive-Suite 360

Beverly Hills, California 90210

Palacio v. USA

Dear Mr. Ascencio:

I have reviewed the letters from Dr. Kush and Dr. Day regarding their estimated life expectancies of Isabella Palacio, DOB 30Apr2012.

I respectfully disagree for the following reasons:

1. I believe she should be classified as in a mobile minimally conscious state because of her ability to roll from side to side, lift her head when prone, have some use of her hand, and have some arm extension.
2. There was no consideration given for improvement in her neurologic status in spite of her parents stating there has been incremental improvement at approximately six month intervals and the literature suggesting that improvement may occur in children who are in the mobile minimally conscious state at age three years and then retested at age six years. Improvement occurred in approximately 38% of these patients.

For these reasons I believe the estimate of the life expectancy of Isabella Palacio is 36.9 years from now. This estimate is based on review of medical reports, my education, training, and experience.

Sincerely,

Carl T. Nichols MD

Carl Thomas Nichols MD, FACP

# Exhibit C

DECLARATION OF RICHARD H. PAUL, MD

I, Richard H. Paul, MD, declare and state as follows:

1. All of the information set forth herein is based upon my personal knowledge, and/or based upon my review of the medical records, deposition transcripts, physician declarations, and other materials set forth herein. If called as a witness I could and would testify to the following:

2. I received my Medical Degree in 1960 from Loma Linda University School of Medicine, and then completed an OB/GYN Residency in 1964 at White Memorial Medical Center. I was Board Certified in 1967 in Obstetrics and Gynecology (with re-certification in 1986), and received sub-specialty certification in Maternal-Fetal Medicine in 1976. I am a Professor *Emeritus* in the Department of Obstetrics and Gynecology at the Keck School of Medicine, University of Southern California. Previously, I was Director of the Division of Maternal-Fetal Medicine, Department of Obstetrics and Gynecology at LA County/USC Medical Center from 1978 to 1998. I was also Program Director of Fellowship Training, Division of Maternal-Fetal Medicine, Department of Obstetrics and Gynecology at LA County/USC Medical Center from 1974 to 2000.

Through the years, I have acted as a consultant for various organizations including the American College of Obstetricians and Gynecologists and the National Institute of Child Health and Human Development (NIH). I have managed thousands of laboring patients and delivered their children over my 50 year career. One of my major research interests throughout my career has been fetal heart rate interpretation and monitoring and I have published extensively on the subject. I am an expert on fetal heart rate interpretation. Attached hereto is a correct copy of my Curriculum Vitae.

3. Based upon my education, training, experience, research, and teaching responsibilities, I am competent and qualified to render opinions on the national standard of care governing physicians and nursing staff rendering care to laboring patients as of 2012. Specifically, I am familiar with the national standard of care as it pertains to the hospital nursing staff at Banner Lassen Medical Center and Paul Davainis, M.D., during the events of the labor of

Law Offices of Bruce G. Fagel & Associates

1

Declaration of Richard H. Paul, M.D.

the mother, Micaela Palacio, and the delivery of her baby, Isabella Palacio. Based on my education, training, experience, research, and review of the materials set forth herein, I am familiar with the issues of causation as they pertain to injuries suffered by the mother and baby in this case. I can competently testify with regard to the issues of standard of care and causation as they relate to the acts and omissions of the hospital staff at Banner Lassen Medical Center and Paul Davainis, MD.

4. In forming my opinions in this case, I reviewed the prenatal records of Micaela Palacio from Northeast Rural Health Clinics. Additionally, I have reviewed Mrs. Palacio's medical records and fetal heart rate tracings from Banner Lassen Medical Center in Susanville, CA. I have reviewed pertinent medical records on Isabella Palacio from UC Davis Medical Center, all of which summarize her pertinent NICU course, radiographic and laboratory studies and diagnoses. I have also reviewed the deposition of Paul Davainis, MD, the family practitioner who managed Mrs. Palacio's labor and delivered Isabella Palacio. In addition, I reviewed the deposition of Kelley Delcarlo, RN, one of the Labor and Delivery nurses who rendered care to Mrs. Palacio during her labor.

5. This Declaration is offered for purposes of Plaintiffs' Expert Disclosure. My review of the materials listed herein revealed the following factual information:

6. Mrs. Palacio's pregnancy history indicates that she gave birth to two healthy children prior to becoming pregnant with Isabella. On August 15, 2000, Mrs. Palacio gave birth to her first child weighing approximately 7 pounds at 40 weeks gestation and on January 20, 2005, she gave birth to her second child weighing about 8 lbs, also at 40 weeks gestation. Both children were born vaginally and are reportedly healthy and developing normally.

7. My review of Mrs. Palacio's prenatal records from Northeastern Rural Health Clinics ("Northeastern") in Susanville, CA, was unremarkable. According to the records, Mrs. Palacio commenced prenatal care at Northeastern in September 2011. On October 20, 2011, she presented at 11 weeks gestation with a blood pressure of 100/64 and positive fetal movement. Prenatal laboratory studies, including RPR and antibodies, were negative and non-reactive. Blood was negative for both illicit drug use and alcohol consumption. Mrs. Palacio's prenatal

Law Offices
of
Bruce G. Fagel
&
Associates

2

Declaration of Richard H. Paul, M.D.

1  visits at 15 and 19 weeks, on November 16, 2011, and December 15, 2011, respectively, were
2  also unremarkable.

3      8.    On December 15, 2011, Mrs. Palacio underwent an obstetric ultrasound at 20
4  weeks demonstrating normal fetal anatomy. Her estimated date of delivery (EDD) was May 3,
5  2012, according to this study.

6      9.    Mrs. Palacio continued her routine prenatal care at Northeastern throughout early
7  2012. Again, all her subsequent prenatal visits were unremarkable. On January 18, 2012, Mrs.
8  Palacio's three (3) hour glucose tolerance test was within normal limits. Mrs. Palacio's prenatal
9  visits on February 15, March 14, March 28, April 11, April 18 and April 25 all yielded normal
10 physical examination findings. The fetal heart tones during each of those visits were reassuring.
11 Group Beta Strep (GBS) testing on April 11, 2012, was negative. Review of Mrs. Palacio's
12 prenatal care records demonstrates no anomalies, abnormalities or complications.

13     10.    Mrs. Palacio presented in active labor to Labor & Delivery at Banner Lassen
14 Medical Center on April 29, 2012, at approximately 11 pm. Ginger Leeth, RN, and Kelley
15 DelCarlo, RN, were assigned to care for Mrs. Palacio during her labor. According to Nurse
16 DelCarlo's deposition testimony, Mrs. Palacio was the only patient in Labor and Delivery that
17 night until she delivered by Cesarean section at 5:28 am the following morning. Upon her
18 presentation to Labor & Delivery, Mrs. Palacio was placed on an external fetal heart monitor.

19     11.    Based on the nursing records, Nurse Leeth performed a vaginal examination on
20 Mrs. Palacio at 11:20 pm and determined that Mrs. Palacio's cervix was dilated to 4 cm with
21 70% effacement. Mrs. Palacio's membranes were intact. The fetus was noted to be positioned 1
22 cm above the ischial spines and fetal movement was present. Nurse DelCarlo testified that she
23 was unaware of any complications in Mrs. Palacio's prenatal course. Nurse DelCarlo
24 documented that the fetal heart rate was 140 beats per minute (bpm) and demonstrated reassuring
25 moderate variability, or what is currently known as a "Category I" heart rate.

26     12.    At 11:30 pm, Nurse DelCarlo called Paul Davainis, MD, the on-call family
27 practitioner in Labor & Delivery, to inform him of her evaluation of Mrs. Palacio and obtain
28 admission orders. Nurse DelCarlo documented that she advised Dr. Davainis of maternal and

Law Offices of Bruce G. Fagel & Associates

3

Declaration of Richard H. Paul, M.D.

fetal status, including the vaginal examination results and the fetal heart rate pattern. Nurse DelCarlo testified in her deposition that she had no concerns relative to maternal and fetal status upon the patient's admission. Nurse DelCarlo testified that the fetal heart rate pattern was reassuring.

13. At 12:09 am on April 30, 2012, Mrs. Palacio's vaginal exam showed 5 cm of dilatation and 80% effacement, based on the nursing documentation. The fetus was noted to be at 2 cm above the ischial spines. At 12:17 am, Nurse DelCarlo documented a reassuring fetal heart rate pattern with 135 bpm and moderate variability. An epidural was ordered for Mrs. Palacio at 12:30 am, according to the nursing notes. At 12:30 am, the fetal heart rate pattern continued to be reassuring with moderate variability and 140 bpm as noted in the nursing documentation. At 1:00 am, the fetal heart rate was still reassuring with moderate variability and a baseline of 135 bpm. At 1:08 am, Nurse Leeth performed a vaginal exam showing 6 cm of cervical dilatation and 80% effacement. The fetus was 1cm above the ischial spines. At 1:17 am, an epidural was administered to Mrs. Palacio by CRNA Joel Paoner.

14. Between 1:30 am and 1:40 am, several variable and late decelerations lasting between 45-90 seconds appeared on the fetal monitor strip. During this time, Dr. Davainis was available by phone. However, Nurse DelCarlo testified that she did not advise Dr. Davainis about these decelerations. Dr. Davainis confirmed that he was not notified about these decelerations. Nursing documentation indicated that oxygen and IV fluids were administered to the patient and she was placed on her left side in an attempt to resuscitate the fetus.

15. At 1:47 am, Mrs. Palacio's membranes spontaneously ruptured. Nurse DelCarlo testified that the fluid was clear, although the nursing notes indicate conflicting entries regarding the existence of meconium. At 1:54 am, a deep variable fetal heart rate deceleration to 60 bpm lasting 40 seconds with overshoot to 180 bpm is evident on the fetal heart rate strip. Nurse DelCarlo testified that she spoke to Dr. Davainis to tell him that "delivery was imminent". Nurse DelCarlo admitted, however, that she did not tell Dr. Davainis about the prior fetal heart rate decelerations.

16. At 1:56 am, Nurse DelCarlo performed a vaginal examination showing 9 cm of

Law Offices of Bruce G. Fagel & Associates

4

Declaration of Richard H. Paul, M.D.

1  cervical dilatation and 100% effacement. The fetal station was now "0", according to the nursing
2  notes. Both Dr. Davainis and Nurse DelCarlo testified that they expected this multiparous patient
3  to minimally dilate at least 1 cm per hour. Notwithstanding their expectations, Mrs. Palacio
4  stopped making cervical change, according to the testimony of Nurse DelCarlo and the nursing
5  notes. When the cervix stops dilating, this is commonly referred to as an "arrest of labor".

6  17. At 2:00 am, early, variable and late decelerations are documented in the nursing
7  notes and appear on the fetal monitor strip. Uterine contractions are noted to be strong at this
8  time. Nurse DelCarlo testified that she did not express any concerns to Nurse Leeth or Dr.
9  Davainis about those decelerations.

10  18. Dr. Davainis testified that he first met Mrs. Palacio at her bedside at 2:15 am.
11  Nurse DelCarlo did not notify Dr. Davainis about any of the decelerations but testified that Dr.
12  Davainis looked at the fetal monitor strip upon his arrival. Dr. Davainis confirmed that he looked
13  at the fetal monitor strip when he arrived and was aware of the strip continuously throughout the
14  morning. The nursing staff continued to document early and late decelerations at 2:30 am. There
15  was significant loss of fetal heart rate recording which made pattern interpretation difficult.
16  Between approximately 1:45 am and 3:00 am, the fetal monitor strip demonstrated deep recurrent
17  variable and late decelerations with occasional overshoot to 180 bpm.

18  19. From 3:00 am onward, the fetal monitor strip clearly revealed deep, late recurrent
19  decelerations in the fetal heart rate. Such repetitive decelerations are ominous signs of fetal
20  intolerance to labor and commonly known as "Category III" fetal heart tracings. At 3:13 am, Mrs.
21  Palacio's last documented vaginal examination showed that she remained at 9 cm cervical
22  dilatation. Dr. Davainis testified that he was at the patient's bedside at 3:30 am and was aware
23  that she had stopped making cervical progress as of 1:56 am. Although Dr. Davainis testified that
24  he had performed many Cesarean sections at Banner Lassen Medical Center prior to April 2012,
25  including numerous emergency Cesarean sections, he encouraged Mrs. Palacio to continue her
26  trial of labor and attempt a vaginal delivery.

27  20. The nursing staff repeatedly documented recurrent late decelerations in the fetal
28  heart rate from 3:15 am until 5:00 am. Nurse DelCarlo testified that she was aware of the

Law Offices
of
Bruce G. Fagel
&
Associates

Declaration of Richard H. Paul, M.D.

recurrent late decelerations. However, Nurse DelCarlo testified that she never advocated for the patient by challenging Dr. Davainis's plan to continue allowing this patient to labor. Dr. Davainis testified that he was at the patient's bedside a third time at 4 am but encouraged her to continue a trial of labor despite being aware of the continuous pattern of recurrent late fetal heart rate decelerations.

21. Dr. Davainis issued an order for a Cesarean section at 5:00 am. The necessary personnel were assembled minutes after 5:00 am and all were present in the OR by 5:13 am, according to the records. In fact, Dr. Davainis testified that the personnel could have been assembled within minutes at any time that morning.

22. Although all members of the OR team were present by 5:13 am, the patient was not incised until 5:22 am. Prior to incising the patient, Dr. Davainis testified that he spent several minutes in the OR attempting to auscultate fetal heart tones.

23. Isabella Palacio was delivered by C section at 5:28 am on April 30, 2012, without spontaneous respiration, movement or tone. There was no heart rate at birth. APGAR scores of 0, 2, and 3 and 1, 5 and 10 minutes, respectively, were documented. As of 10 minutes of life, the baby was still unresponsive, flaccid and demonstrated no spontaneous respiration. Isabella was intubated and placed on a mechanical ventilator. Isabella's initial arterial cord blood gas was drawn at 6:00 am and revealed values of pH 7.10, pCO2 57, pO2 30, HCO3 16.9 and base excess of -11.1. An arterial blood gas was next drawn at 6:42 am during bag valve mask (BVM) ventilation and values were noted to be pH 6.84, pO2 66, pCO2 97, HCO3 10.6 with a base excess of -20.6. The baby was transferred to UC Davis for hypothermia and arrived at UC Davis at 12:20 pm.

24. According to the NICU admission records from UC Davis Medical Center, Isabella Palacio was admitted with a diagnosis of severe hypoxic ischemic encephalopathy (HIE) and underwent whole body cooling. The blood gasses clearly evidence acidosis from perinatal asphyxia consistent with the diagnosis of HIE. Hypoxic ischemic encephalopathy is a brain injury that results from lack of perfusion to the brain resulting in lack of adequate oxygenation, or hypoxia.

25. When admitted to the NICU at UC Davis, Isabella demonstrated no suck or Moro reflexes. She had neither plantar nor palmar grasp bilaterally. Isabella underwent several EEG studies with markedly abnormal results demonstrative of clinical seizure activity. Isabella's brain MRI on May 7, 2012, demonstrated significant irreversible brain injury caused by severe HIE. On May 24, 2012, Isabella underwent gastrostomy tube placement for feeding due to her inability to nipple. She remained in the NICU at UC Davis for 6 weeks and was discharged on June 5, 2012. She was discharged on Phenobarbital, among other medications, to control her seizure activity. Isabella Palacio's condition was noted to be permanent and severe and, throughout her admission to UC Davis, the parents were continually informed that their child's deficits were likely to require lifelong medical care and therapeutic interventions.

26. Based upon my review of the referenced medical records and deposition transcripts, as well as my education, training and experience, it is my opinion that Paul Davainis, MD, and the nursing staff at Banner Lassen Medical Center assigned to Mrs. Palacio during her labor on April 29, 2012, violated the accepted standards of care and proximately caused Isabella's injuries as follows:

A. The standard of care required that the nursing staff recognize signs of fetal intolerance to labor demonstrated by fetal monitoring changes as seen here and communicate those concerns to the provider, Dr. Davainis, no later than 2 am on April 30, 2012. Delivery by Cesarean section should have been ordered when Dr. Davainis saw the patient at 3:30 am, based on the severe recurrent variable decelerations and the failure of the patient to make cervical change. There was no cervical change beyond 9 cm so there would have been no reasonable expectation of an "imminent" delivery. According to Dr. Davainis's own deposition testimony, the personnel necessary to perform an emergency C section could easily have been assembled much earlier and delivery could have been effected at least 2 hours earlier. Delivery at 5:28 am was below the national standard of care.

B. Additionally, when Dr. Davainis continued expressing his desire to continue the trial of labor, the standard of care required the nursing staff to advocate for a C section for Mrs. Palacio. If such advocacy had failed, the standard of care required the nursing staff to then access

Law Offices of Bruce G. Fagel & Associates

7
Declaration of Richard H. Paul, M.D.

their chain of command in the face of this rapidly deteriorating fetal heart rate. The severe late decelerations, which had become recurrent as of 3:00 am, evidenced fetal intolerance to labor. Both the nurses and Dr. Davainis were continuously aware of the persistent fetal distress and of the potentially devastating consequences to the fetus, including severe hypoxia.

C. The standard of care also required the application of a fetal scalp electrode at approximately 2:30 am when there was significant loss of fetal heart rate data and this would have provided enhanced continuous fetal heart rate recording. The fetal scalp electrode would have remained on as the patient was taken to the operating room and alerted the providers to the deteriorating fetal status and would have prompted more timely delivery.

D. It is my further opinion that the violations of the standard of care by Dr. Davainis and the nursing staff were substantial factors in causing the marked depression of the fetus and the acidosis. Mrs. Palacio's prenatal course was uncomplicated and normal. The fetal heart rate was reassuring, and there was good fetal movement, upon Mrs. Palacio's admission to Labor & Delivery on the night of April 29, 2012. The delay in effecting delivery, given the arrest of dilatation during the manifestation of recurrent late decelerations, caused Isabella Palacio's severe perinatal depression to a reasonable degree of medical probability. Earlier delivery would have resulted in less hypoxia and better APGAR scores, to a reasonable degree of medical probability.

E. The foregoing Declaration is not an exhaustive list of all of my opinions. As this case progresses, I reserve the right to amend and/or supplement these opinions after review of further medical records, declarations, deposition testimony and the opinions of other physicians.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 30th day of June, 2014, at San Luis Obispo, CA.

Richard H. Paul, M.D.