Bruce G. Fagel, (103674)
LAW OFFICES OF BRUCE G. FAGEL
& ASSOCIATES
100 North Crescent Drive, Suite 360
Beverly Hills, California 90210
Tel: (310) 281-8700
Fax: (310) 281-5656

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I.P., A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, FACUNDO PALACIO DIAZ, MICAELA PALACIO,<br><br>    Plaintiffs,<br>v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Case No. 2:13-CV-01012 JAM-CKD<br><br>**PLAINTIFF'S TRIAL BRIEF ON DAMAGES, PERIODIC PAYMENTS AND LIFE EXPECTANCY**<br><br>Courtroom 6, 14th floor<br>Judge: Hon. John A. Mendez<br><br>Trial: September 24, 2015 |
| I.P, A MINOR, BY AND THROUGH HER GUARDIAN AD LITEM, FAGUNDO PALACIO DIAZ, MICAELA PALACIO, FACUNDO PALACIO DIAZ,<br><br>    Plaintiffs,<br>v.<br><br>BANNER HEALTH, AN ARIZONA CORPORATION, DOING BUSINESS AS BANNER LASSEN MEDICAL CENTER, DOES 1-250, INCLUSIVE,<br><br>    Defendants. | |

      Plaintiff I.P., a Minor, by and through her Guardian Ad Litem, Facundo Palacio Diaz, respectfully submits her Trial Brief on Damages, Periodic Payments and Life Expectancy. Damages for I.P.'s parents Micaela Palacio and Facundo Palacio Diaz are not included in this brief.

### A. Background of Injury to I.P.

I.P. suffered a totally preventable severe hypoxic-ischemic injury during her birth on April 30, 2012, and will require lifetime care for all activities of daily living. All experts in this case agree that I.P. was a normal healthy fetus when her mother, Micaela Palacio, entered the Labor and Delivery unit of Banner Lassen Medical Center at 11 pm on April 29, 2012.

All experts also agree that if I.P. had been delivered at any time prior to 5:00 am on April 30, 2012, she would be a normal, healthy child today. Instead, Dr. Paul Davainis allegedly delayed the decision to deliver I.P. until 5:00 am and she was not delivered by C-section until 5:28 am.

Following the delivery, Dr. Paul Holmes allegedly failed to timely and properly resuscitate I.P., which further contributed to her hypoxic brain injury. I.P. was subsequently transferred to UC Davis Medical Center at 12:20 pm on April 30, where she was diagnosed with hypoxic-ischemic encephalopathy and underwent brain cooling.

A brain MRI performed several days after the cooling protocol was completed showed severe hypoxic injury to areas of I.P.'s mid-brain, which have resulted in a severe and permanent brain injury.

### B. Economic Damages to I.P.

Although I.P. requires lifelong 24 hour LVN care because of the significant risk of complications from her gastrostomy tube and copious upper respiratory secretions, no LVNs are available to render care in Avenal, CA. I.P. currently receives no LVN care at home. The family hopes to purchase a suitable home in or around the Fresno area to enable them to obtain appropriate skilled nursing care for I.P and to permit greater proximity to her Children's Hospital Central California (CHCC) doctors. This home will likely require substantial modifications to accommodate I.P's needs.

I.P. continues to be followed by a neurologist, pulmonologist, gastroenterologist, orthopedist, ophthalmologist, physiatrist, and pediatrician. She requires physical, occupational and speech therapy but only currently receives physical and occupational

therapy through Regional Center once a month.

Plaintiffs' retained neurologist, Ira Lott, MD, examined the child on May 14, 2014. Dr. Lott opined that I.P. suffered a severe hypoxic ischemic brain injury causing profound developmental disability, spastic quadriparesis, cortical visual defect, joint contractures and an inability to feed orally. As of May 2014, Dr. Lott placed I.P.'s development at four months or less. Dr. Lott opined that I.P.'s life expectancy is an additional 26 years.

Dr. Donald Olson, a pediatric neurologist, opines that because of her severe and permanent disability, I.P will be dependent on others for all her activities of daily living. Dr. Olson opined that I.P. will live an additional 20-30 years.

Plaintiffs' retained physiatrist, Luis Montes, MD, also examined I.P for the purpose of determining her future care needs. Dr. Montes made specific recommendations pertaining to equipment needs, physicians, diagnostic assessments, future hospitalizations, future surgical interventions, and nursing care. Dr. Montes is of the opinion that I.P. will required 24 hour LVN care for life. She is at risk for choking and aspiration due to severe drooling and chest congestion. She requires numerous respiratory treatments daily. She requires frequent suctioning due to her secretions. In addition, she requires G tube feedings day and night. She is dependent on others for mobility, grooming, hygiene and all her activities of daily living.

Karen Preston, RN, Plaintiffs' certified nurse life care planner, based her life care plan on the recommendations of Dr. Montes and Dr. Olson.

Nurse Preston's life care plan was submitted to Peter Formuzis, PhD, Plaintiff's retained economist, for calculations of present cash value and total future dollars for the economic damages in this case utilizing life expectancies of 20 and 26 additional years offered by Dr. Olson and Dr. Lott, respectively.

Based on a life expectancy of 26 additional years, the present cash value of I.P.'s future medical care amounts to $12,949,673. Based on a life expectancy of 20 additional years, the present cash value of I.P.'s future medical care will be

Law Offices
of
Bruce G. Fagel
&
Associates

$10,552,845.

Dr. Formuzis also calculated I.P.'s loss of future earning capacity and testified that I.P. lost 100% of her earning capacity and the present value of future loss of earnings for a female with a high school diploma and with some college ranges from $881,426 to $967,796. Defense Economists Cohen & Volk estimate I.P.'s earning loss at $423,616 for a female with a high school diploma.

### C. I.P.'s Non-Economic Damages

I.P.'s non-economic damages are capped at $250,000 by Civil Code Section 3333.2.

### D. The Periodic Payment of A Judgment in A Medical Malpractice Case Makes I.P.'s Life Expectancy Irrelevant

California Code of Civil Procedure Sec. 667.7 makes medical malpractice cases unique among all other types of personal injury actions, because the trier of fact must award all future damages in present cash value [CACI 3904 A].

Under CCP Sec. 667.7, in medical malpractice cases only, any award for more than $50,000 in future damages can be paid in future periodic payments, which stop upon the death of the plaintiff.

Further, under the Federal Tort Claim Act, all payments made by the government are subject to a reversionary trust, which means that any money not used by the injured plaintiff for her care returns to the government upon the death of the plaintiff.

The combination of CCP Sec. 667.7 and the use of a reversionary trust by the government for the payment of all future care needs makes any finding on life expectancy both unnecessary and irrelevant.

The government has designated Joseph Capell, M.D., to testify about the life expectancy of I.P. based on his evaluation of her medical condition in comparison to other children with severe developmental disabilities. Such testimony can only provide statistical probabilities regarding her life expectancy which would be relevant if her

damages were reduced to present cash value, since any calculation of present cash value requires some specific number for life expectancy. Since the government is only liable to pay for the future medical care costs during the actual life expectancy of the plaintiff, the government will never be required to pay more than the amount necessary to provide for her future care. However, if the plaintiff is awarded damages on a specific life expectancy finding, but lives longer than that specific finding, she will run out of money for her future care needs. Dr. Capell estimates I.P. has a life expectancy of 15 to 20 additional years. Steven Day, PhD, a defense statistician, reports that I.P. has a life expectancy of 18-22 more years with a median survival time of 15-19 remaining years.

### E. Life Expectancy Is Irrelevant When a Judgment Is Paid Periodically Pursuant to Code of Civil Procedure § 667.7, the Periodic Payment Section of MICRA, or Subject to a Reversionary Trust

The MICRA statute section 667.7 provides that "it is the intent of the legislature . . . to provide compensation sufficient to meet the needs of an injured plaintiff for <u>whatever period</u> is necessary . . . "Thus, life expectancy is not a necessary element as the statute itself provides that periodic payments for future medical care continue until the plaintiff dies. The same is true when the payments revert to the government upon the plaintiff's death.

### F. Section 667.7 Does Not Require a Finding of Life Expectancy

The statute (C.C.P. Section 667.7) provides that payments for future healthcare benefits terminate upon the plaintiff's death.[1]

---

[1] Code of Civil Procedure 667.7. provides in relevant part:
(a) In any action for injury or damages against a provider of health care services, a superior court shall, at the request of either party, enter a judgment ordering that money damages or its equivalent for future damages of the judgment creditor be paid in whole or in part by periodic payments rather than by a lump-sum payment if the award equals or exceeds fifty thousand dollars($50,000) in future damages. In entering a judgment ordering the payment of future damages by periodic payments, the court shall make a specific finding as to the dollar amount of periodic payments which will compensate the judgment creditor for such future damages. . . .. Upon termination of periodic payments of future damages, the court shall order the return of this security, or so much as remains, to the judgment debtor.
(b) (1) The judgment ordering the payment of future damages by periodic payments shall

Law Offices
of
Bruce G. Fagel
&
Associates

In *Atkins vs. Strayhorn* (1990) 223 Cal.App 3d 1380, a medical malpractice action, the jury found the plaintiff's life expectancy to be six years. The court ordered periodic payments over a four year period, implicitly finding that the plaintiff would need the expenses earlier, and before his death. The Trial Court stated the jury's finding of life expectancy was only "advisory." The Court of Appeal upheld the court's ruling saying it was well within the trial court's discretion: "Here, the court ordered payments over four years, implicitly finding Owren's anticipated expenses and losses in the future would be incurred in a shorter period of time than his projected life expectancy as found by the jury. The court acted well within its discretion in so finding." The *Atkins* Court further stated:

> "In structuring a periodic payment schedule, a trial court is simply "guided," not bound, by the evidence of future damages introduced at trial. (See American Bank & Trust Co. v. Community Hospital, supra, 36 Cal.3d at p. 377.) *Nowhere in the statutory scheme or legislative history is the court's periodic payment specify the recipient or recipients of the payments, the dollar amount of the payments, the interval between payments, and the number of payments or the period of time over which payments shall be made. Such payments shall only be subject to modification in the event of the <u>death</u> of the judgment creditor.*
> (c) However, money damages awarded for loss of future earnings shall not be reduced or payments terminated by reason of the death of the judgment creditor, but shall be paid to persons to whom the judgment creditor owed a duty of support, as provided by law, immediately prior to his death.
> (e) As used in this section:
> (1) "Future damages" includes damages for future medical treatment, care or custody, loss of future earnings, loss of bodily function, or future pain and suffering of the judgment creditor.
> (2) "Periodic payments" means the payment of money or delivery of other property to the judgment creditor at regular intervals.
> (f) It is the intent of the Legislature in enacting this section to authorize the entry of judgments in malpractice actions against health care providers which provide for the payment of future damages through periodic payments rather than lump-sum payments. By authorizing periodic payment judgments, *it is the further intent of the Legislature that the courts will utilize such judgments to provide compensation sufficient to meet the needs of an injured plaintiff and those persons who are dependent on the plaintiff for whatever period is necessary* while eliminating the potential windfall from a lump-sum recovery which was intended to provide for the care of an injured plaintiff over an extended period who then dies shortly after the judgment is paid, leaving the balance of the judgment award to persons and purposes for which it was not intended. It is also the intent of the Legislature that all elements of the periodic payment program be specified with certainty in the judgment ordering such payments and that the judgment not be subject to modification at some future time which might alter the specifications of the original judgment. (Emphasis added).

*schedule necessarily dependent on, nor must it directly correspond to, a plaintiff's life expectancy.* Instead, life expectancy is one of several factors for the court to consider in structuring a periodic payment schedule "for whatever period is necessary." (Code Civ. Proc., § 667.7, subd. (f).)" [223 Cal.App.3d 1397-1398.] (Emphasis added).

### G. A Finding of Life Expectancy Would Actually Be Prejudicial to the Minor

A defendant's obligation to pay for the plaintiff's future care ends upon the plaintiff's death, so there is no reason for the court to make a finding that would likely <u>conflict</u> with the plaintiff's actual life expectancy. If the plaintiff lives longer than a finding by the court (which can only be based on expert testimony, which, at best, is only based on statistical probabilities) then the plaintiff will <u>not</u> receive the compensation required for her needs for the period necessary (which is her actual lifetime).

Section 667.7 requires a judgment sufficient to meet the needs of the plaintiff, for whatever period is necessary. It is little more than speculation to predict how long an individual person may live. Section 667.7 requires a judgment based on the <u>actual</u> life span of the plaintiff, "[F]or whatever period is necessary."

Unfortunately, the evidence on life expectancy is inherently speculative since any medical expert will admit that they cannot make an accurate prediction about the life expectancy of any specific individual. All they can do is to compare the average life expectancy of a group of individuals, or cohort, who have similar injuries or medical needs. This means that there will necessarily be cases where a jury or court finding on life expectancy will be wrong and, if too low, will result in inadequate compensation to the plaintiff. *Salgado vs. County of Los Angeles* (1999) 19 Cal.4th 629, recognized that even annuity companies can be wrong with respect to life expectancy, yet that is their business. The Court in *Nguyen vs. Los Angeles County Harbor/UCLA Medical Center* (1995) 40 Cal.App.4th 1433, 1451-1454 explained that an annuity company, is a <u>more reliable</u> 'witness' than the expert economists and doctors called by the parties because insurance companies, unlike the parties' expert witnesses, survive by determining life expectancies and investing customer's premiums. And the court also found that annuity

companies "put its money where its mouth is. " (*Id* at p. 1452).

There is also no way to predict in advance which specific plaintiffs will live beyond the average life expectancy of similarly injured individuals. Currently the risk that the plaintiff may live longer than the jury or trial court finding is placed entirely on the plaintiff.

The Legislature, in enacting section 667.7, had two goals: To utilize medical malpractice judgments in a form sufficient to meet the needs of the plaintiff, for whatever period is necessary, and, at the same time to avoid a windfall to the plaintiff's heirs, should the plaintiff die earlier than the life expectancy estimate. The reverse is also true. The defendant receives a windfall, if the life expectancy finding by the jury proves incorrect, and the plaintiff survives beyond that life expectancy. Periodic payments of any judgment remedies that inequity without placing any artificial limit on those payments by a finding of life expectancy, which at best is speculative based on conflicting expert opinions.

The only concern in determining the amount of future medical care costs is what care is needed and the annual cost of such care. If the jury is forced to determine how long the plaintiff will live, and the plaintiff lives longer than they estimated, the plaintiff would be without funds to provide for the continuing healthcare expenses. The statute does <u>not</u> require a determination of the plaintiff's life expectancy because periodic payments terminate upon the plaintiff's death.

**H: If the Plaintiff Lives Longer than the Life Expectancy Opinions of the Experts, Periodic Payments Stop, and the Plaintiff Is Left Without Medical Care Which Previously Kept Her Healthy, It Is Then the Defendant Tortfeasor Who Receives a Windfall**

As pointed out by George McDonald in his treatise, <u>California Medical Malpractice, Law & Practice</u>, Revised Edition, Vol. 3, page 384:

> "The "windfall" argument usually focuses on premature death. Few consider the reverse scenario: that the subject will out-live the actuarial date the trier has assumed and in so doing will

also outlive the last cent the judgment has awarded."

The Legislative intent, however, is to provide compensation sufficient to meet the needs of an injured plaintiff . . . "for whatever period is necessary" while eliminating the potential windfall from a lump/sum recovery which was intended to provide for the care of an injured plaintiff over an extended period . . . "

Since all such payments under Code of Civil Procedure Section 667.7 stop upon the plaintiff's death, there is no windfall to the heirs. However, all of the experts in this case agree that I.P. will require 24-hour care for as long as she lives, which will be an extended period into the future (whether 20 or 26 additional years).

The only way to meet the Legislative intent of Code of Civil Procedure Section 667.7 is a requirement that the government purchase a life-only annuity post trial with a reversionary interest that will pay I.P. the sums required for her future care, as determined by this Court. Such an annuity will pay for I.P.'s future care costs for as long as she lives (providing the protection she requires) and stop upon her death (with any remaining value in the annuity reverting to the government), thus protecting the government.

The life-only annuity premium is presumptively the present value of future damages and the Court may use that amount to calculate attorney fees. Otherwise, the cost of any annuity purchased by the defendant to fund the future payments is presumed to be the appropriate present value of periodic payments for calculating attorney fees. *Schneider v. Kaiser Foundation Hosps.*, (1989) 215 Cal.App.3d 1311 at 1319.

To secure this result, the Court needs only to be aware that damages for future healthcare costs of $50,000 or above are, at the option of either party, periodicized over the life expectancy of the plaintiff and that upon the plaintiff's death no further payments shall be made. With this knowledge, the Court would not be placed in the position of speculating as to how long the plaintiff will survive.

The only concern in determining the amount of future medical care costs is what care is needed and the annual cost of such care. If the Court is forced to determine

how long the plaintiff will live, and the plaintiff lives longer than they estimated, the plaintiff would be without funds to provide for the continuing healthcare expenses. <u>The statute does not require a determination of the plaintiff's life expectancy because periodic payments terminate upon the plaintiff's death</u>.

A Court or Jury does not have to be concerned with life expectancy in determining future loss of earnings, as Code of Civil Procedure §667.7 subdivision (c), specifically provides that "Money damages awarded for loss of future earnings shall not be reduced or payments terminated by reason of the death of the judgment debtor, but shall be paid to persons to whom the judgment debtor owed a duty of support, as provided by law, immediately prior to death."

### I. This Same Principle That A Plaintiff May Outlive Expert Opinions Was Recognized by the California Supreme Court When it Approved The Use Of Annuities In Medical Malpractice Cases. A Reversionary Trust is Appropriate When the United States is the Defendant, Should the United States Elect to Not Purchase an Annuity.

In *Salgado vs. County of Los Angeles* (1999) 19 Cal.4th 629, a case involving birth injuries and medical malpractice against the County, the Supreme Court of California discussed the issue of periodic payments of a judgment (installment payments) and ruled that *Code of Civil Procedure* § 667.7 was enacted for the express purpose of avoiding a windfall to the plaintiff's family in the event of his or her premature death.

The court noted with respect to annuities:

"Even though the jury, based on the evidence presented at trial, concludes that the plaintiff has a fairly long life expectancy, life insurance companies, after reviewing the medical records and applying actuarial principles, frequently are willing to assume a <u>shorter life expectancy</u> and price an annuity accordingly. Such a savings to defendant <u>has no adverse impact on the plaintiff because the annuity must continue to pay periodic payments even if the plaintiff lives longer than the life insurance company anticipated</u>."

Id. at page 643. (Emphasis added).

*Cibula v. United States* 664 F.3d 428 (4th Circuit) (2012), a medical malpractice action and for birth injuries related to the pregnancy medical care to Mrs. Cibula while she was pregnant and the subsequent birth of her son who had developed cerebral palsy.

The case was filed in the Eastern District of Virginia, brought after the negligence of Government doctors in California caused significant and irreversible brain damage to J.C., his parents brought a Federal Tort Claims Act (FTCA), 28 U.S.C. 2674, suit against the United States.

The negligence of the Government doctors in California caused significant and irreversible brain damage to J.C., and also damages to his parents, Andrew and Jennifer Cibula.

Following a bench trial, the district court found the United States liable for J.C.'s damages and awarded the Cibulas $2,704,800 for past care costs, $250,000 for J.C.'s pain and suffering, $250,000 for Mrs. Cibula's pain and suffering, $2,360,771 for J.C.'s lost future earnings, and, most relevant to the appeal, $22,823,718 for J.C.'s future care costs

This case returned to the court after a previous remand to the District Court (Cibula I). where the Circuit Court held the FTCA waives the federal Government's sovereign immunity in tort actions, making the United States liable "in the same manner and to the same extent as a private individual under like circumstances (28 U.S.C. § 2674)." Cibula I also stated that courts determine the Government's liability in accordance with the law of the place where the [negligent] act or omission occurred. *Cibula vs. United States*, supra at p. 430

On remand of Cibula 1, the district court held that it could not provide the government with a reversionary interest in the future care award that "would comply with" both the FTCA and California law. The United States appealed.

The *Cibula* II Court held that because granting the government a reversionary interest in J.C.'s future care award eliminated the potential for a windfall without in any

Plaintiffs' Trial Brief on Damages

way rendering the award less sufficient compensation for J.C., the court found such a remedy approximated Cal. Civ. Proc. Code 667.7 in a manner that was consistent with the FTCA. Accordingly, the court remanded the case with instructions for the district court to fashion such a remedy. The court affirmed in all other respects. In the opinion, the Court quoted extensively from *Salgado vs. County of Los Angeles* (1998) 19 Cal.4th 629 at pp. 431-433 permitting a defendant to elect to pay any judgment periodically instead of in a lump sum. However, because courts cannot subject the United States to continuing obligations like periodic payments (*Hull vs. United States*, 971 F.2d 1499, 1505 (10th Cir.1992), the *Cibula* Court stated the FTCA "<u>permits courts to craft remedies that 'approximate' state periodic payment statutes including reversionary trusts</u>." (*Cibula*, supra at p. 433). (Citations omitted). (Emphasis added).

There are abundant cases in medical malpractice actions involving the United States where the Government elected, as part of a settlement, to purchase an annuity to fund the stream of payments necessary to care for an injured plaintiff. Should the United States not elect to fund an annuity, then as in <u>Cibula</u>, supra, a lump sum payment should be made by the Government (from which the Plaintiff would then purchase her own annuity), with a beneficial reversionary interest in that annuity to the Government which would prevent a windfall for either party, either in the event of an early or later death of the minor.

### K. Conclusion

The Court does not have to be concerned with life expectancy in determining future medical payments as they cease at the time of death. Code of Civil Procedure section 667.7 subdivision (c), further specifically provides that "Money damages awarded for loss of future earnings shall not be reduced or payments terminated by reason of the death of the judgment debtor, but shall be paid to persons to whom the judgment debtor owed a duty of support, as provided by law, immediately prior to death."

Since injured plaintiffs need the assurance of payments for future care costs for however long they live, the periodic payment of the judgment is the only way to

provide such assurance without a finding of an arbitrary life expectancy, which would provide a windfall to the defendant, if the plaintiff outlives such a speculative opinion.

If the evidence shows that an injured plaintiff will require some level of care for as long as they live (i.e. their condition will never improve or be cured) then the only reasonable amount of money that will reasonably compensate the plaintiff for their future damages is the periodic payment of any judgment based on the actual damages found by the court to be reasonably necessary for such future care without any life expectancy limitation.

Respectfully submitted,

DATED: September 17, 2015        Law Offices of Bruce G. Fagel and Associates

By: */s/ Bruce G. Fagel*

Bruce G. Fagel
Attorneys for Plaintiffs

CERTIFICATE OF SERVICE BY U.S. MAIL

The undersigned hereby certifies that she is an employee of the Law Offices of Bruce G. Fagel and Associates and is a person of such age and discretion to be competent to serve papers;

That on September 17, 2015 she served a copy of:

**PLAINTIFF'S TRIAL BRIEF ON DAMAGES, PERIODIC PAYMENTS AND LIFE EXPECTANCY**

by placing said copy in a postpaid envelope addressed to the person(s) hereinafter named at the place(s) and address(es) stated below, which is/are the last known address (es), and by depositing said envelope and its contents in the United States Mail at Beverly Hills, California.

Addresses(s):

| Benjamin B. Wagner<br>United States Attorney<br>Victoria Boesch<br>Assistant US Attorney<br>Chi Soo Kim<br>Assistant US Attorney<br>United States Attorney's Office<br>501 I Street, Suite 10-100<br>Sacramento, California 95814 | Attorneys for Defendant, United States<br>Telephone No. (916) 554-2743<br>Telephone No. (916) 554-2700<br>Facsimile No. (916) 554-2900<br>email Victoria.Boesch@usdoj.gov<br>email chi.soo.kim@usdoj.gov |
|---|---|

/s/ Brenda Assfy