BENJAMIN B. WAGNER
United States Attorney
VICTORIA L. BOESCH
CHI SOO KIM
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA  95814
Telephone:  (916) 554-2700
Facsimile:   (916) 554-2900
victoria.boesch@usdoj.gov
chi.soo.kim@usdoj.gov

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

I. P., A MINOR, BY AND
THROUGH HER GUARDIAN AD LITEM,
FACUNDO PALACIO DIAZ; MICAELA
PALACIO,

                     Plaintiffs,

        v.

UNITED STATES OF AMERICA,

                     Defendant.

CASE NO.   2:13-CV-01012 JAM-CKD

**DEFENDANT UNITED STATES OF
AMERICA'S TRIAL BRIEF**

**JUDGE:    HON. JOHN A. MENDEZ
CTRM.:    6, 14th Floor**

**TRIAL DATE:  SEPTEMBER 24, 2015**

UNITED STATES' TRIAL BRIEF

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

I.    INTRODUCTION ....................................................................................................... 1

II.   BACKGROUND .......................................................................................................... 1

      A.    Factual Background ........................................................................................... 1

            1.    Micaela Palacio arrives at Banner ........................................................ 2

            2.    Electronic fetal monitoring background. ............................................... 2

                  a.    *Category 1 Normal Tracings* ...................................................... 3

                  b.    *Category 3 Abnormal Tracings* .................................................. 4

                  c.    *Category 2 Indeterminate Tracings* ............................................ 4

            3.    Nurse Del Carlo and Nurse Leeth care for Ms. Palacio
                  as their only patient until Dr. Davainis arrives at the hospital............... 4

            4.    Dr. Davainis arrives, examines Ms. Palacio, and focuses
                  on caring for her as his only patient until delivering her child. ............. 5

            5.    Dr. Davainis and Dr. Holmes deliver I.P. via c-section surgery,
                  incising the patient 22 minutes after Dr. Davainis called the surgery. ................... 8

            6.    Dr. Holmes and the resuscitation team revive I.P.
                  after she is born floppy and not breathing. ........................................... 9

      B.    Procedural History ........................................................................................... 10

III.  ANALYSIS................................................................................................................... 13

      A.    Expert testimony establishes that Dr. Davainis and
            Dr. Holmes met the standard of care in managing labor,
            delivering I.P., and resuscitating I.P. after birth. ......................................... 14

            1.    Dr. Davainis properly assessed the fetal monitoring strip
                  and the patient's history and progress to decide that a trial
                  of labor was medically appropriate up until 5:00 a.m. ......................... 14

            2.    Dr. Holmes quickly revived I.P. when she did not breathe
                  on her own after birth, starting her heart within three minutes........... 17

      B.    Even if Plaintiffs could establish liability, any appropriate
            damages award would be much lower than what Plaintiffs seek...................... 17

            1.    Life Expectancy ................................................................................... 18

2.    Pricing for Attendant Care ...................................................................18

3.    Pricing for Future Medical Expenses – Reasonable Value (*Howell/Corenbaum*) and Insurance Offset (MICRA) .........................19

4.    Present Cash Value ...............................................................................21

5.    MICRA's Noneconomic Damages Cap.................................................22

6.    MICRA's Periodic Payment Statute .....................................................23

7.    Banner Settlement Offset .....................................................................23

C.   Other Trial-Related Issues. ............................................................................23

IV.   CONCLUSION...............................................................................................................24

1

# TABLE OF AUTHORITIES

2

## FEDERAL CASES

3   *Aguilar v. Atlantic Richfield Co.*,
        25 Cal.4th 826 (2001) ............................................................................................ 13

4
    *Avivi v. Centro Medico Urgente Med. Ctr.*,
5       159 Cal. App. 4th 463 (2008) ............................................................................... 13

6   *Barme v. Wood*,
        37 Cal.3d 174 (1984) .............................................................................................. 21
7
    *Bregman v. United States*,
8       2014 WL 4961127  (C.D. Cal. 2014)..................................................................... 21

9   *Brewington v. United States*,
        2015 WL 4511296  (C.D. Cal. 2015)..................................................................... 21
10
    *Budd v. Nixen*,
11      6 Cal.3d 195 (1971) ................................................................................................ 13

12  *Cibula v. United States*,
        664 F.3d 428 (4th Cir. 2012) ................................................................................. 23
13
    *Colburn v. United States*,
14      45 F. Supp. 2d 787 (S.D. Cal. 1998)............................................................... 14, 22

15  *Corenbaum v. Lampkin*,
        215 Cal. App. 4th 1308 (2013) ............................................................................. 20
16
    *Cox v. Superior Court*,
17      120 Cal. Rptr. 2d 45 (Cal. Ct. App. 2002) ........................................................... 20

18  *Dumas v. Cooney*,
        235 Cal. App. 3d 1593 (1991) ............................................................................... 14
19
    *Fein v. Permanente Medical Group*,
20      38 Cal.3d 137 (1985) .............................................................................................. 21

21  *Gami v. Mullikin Medical Center*,
        18 Cal. App. 4th 870 (1993) ................................................................................. 13
22
    *Graham v. Workers' Comp. Appeals Bd.*,
23      258 Cal. Rptr. 376 (Cal. Ct. App. 1989)............................................................... 21

24  *Hernandez v. California Hospital Medical Center*,
        78 Cal. App. 4th 498 (2000) ................................................................................. 21
25
    *Howell v. Hamilton Meats & Provisions, Inc.*,
26      52 Cal. 4th 541 (2011) ........................................................................................... 20

27  *Huffman v. Lindquist*,
        37 Cal.2d 465 (1951) .............................................................................................. 14
28

*Johnson v. Superior Court*,
    143 Cal. App. 4th 297 (2006) .................................................................................................... 13

*Jones v. Ortho Pharmaceutical Corp.*,
    163 Cal. App. 3d 396 (1985) ..................................................................................................... 14

*Landeros v. Flood*,
    17 Cal.3d 399 (1976) ................................................................................................................ 14

*Miller v. Sciaroni*,
    218 Cal. Rptr. 219 (Cal. Ct. App. 1985) ................................................................................... 20

*Salgado v. County of Los Angeles*,
    19 Cal. 4th 629 (1998) .............................................................................................................. 22

*Stinnett v. Tam*,
    198 Cal. App. 4th 1412 (2011) ................................................................................................. 22

**STATUTES**

28 U.S.C. §§ 1346(b) & 2674 .......................................................................................................... 13

# I.     **INTRODUCTION**

Plaintiffs attempt to hold the physician who delivered I.P. and the physician who saved her life responsible for her extremely rare neurologic injury that developed into cerebral palsy.  That neurologic injury occurs in only 1-3 per 1,000 births, and of these 1-3 per 1,000 babies, even fewer actually develop cerebral palsy.  Unfortunately, there is no way to predict or prevent this extremely rare neurologic injury.  Even the tool available to monitor a baby during the labor process, an electronic fetal monitor (EFM), cannot predict or prevent such injuries.  Doctors cannot use EFM to predict or to prevent such neurologic injuries because it is a test that is almost always *wrong*.  As a result, though EFM has been used in labors for 40 years, it has not reduced the incidence of cerebral palsy or fetal deaths.

In this case, Dr. Paul Davainis carefully assessed Micaela Palacio's labor progress, her childbirth history, and the fetal heart rate strip.  He relied on his experience delivering over 1,000 babies and the most up-to-date scientific evidence.  Based on Ms. Palacio's history of two successful vaginal births and on the labor progress he observed, he reasonably believed she could deliver I.P. vaginally – without resorting to an invasive operative intervention.  As he continued to help Ms. Palacio labor towards a natural vaginal birth, he relied on reassuring signs on the fetal heart rate strip – in particular moderate variability in the fetal heart rate — which shows good fetal oxygenation.  When that variability started to decrease, and he concluded that the baby was no longer moving enough during pushing for her to be vaginally born very soon, he called for cesarean-section surgery at 5:00 a.m.  Dr. Davainis quickly assembled the surgery crew, bringing in Dr. Paul Holmes to assist.  Dr. Davainis made the surgical incision only 22 minutes after calling for the c-section and delivered I.P. just 2 minutes later.  And, when I.P. was born without a heartbeat, Dr. Holmes performed cardio pulmonary resuscitation (CPR) and got her heart beating within three minutes, saving her life.

# II.     **BACKGROUND**

## A.     **Factual Background**

Plaintiff I.P. was delivered by cesarean-section surgery on April 30, 2012, at the Banner Lassen Medical Center in Susanville, California.  Banner is a nonprofit, 25-bed hospital that provides medical care, including labor and delivery services, in rural Lassen County.  It is the only hospital in all of Lassen County.  Plaintiff Micaela Palacio gave birth to I.P. at Banner.  Dr. Paul Davainis delivered I.P.,

assisted by Dr. Paul Holmes.  Northeastern Rural Health Clinic, a Federally Qualified Health Center, employed both doctors, who were deemed federal employees under the Federal Tort Claims Act (the "FTCA").

In April 2012, Dr. Davainis and Dr. Holmes were experienced Family Medicine Practitioners who had regularly delivered babies for more than 15 years, including by performing cesarean-section surgery when needed.  Dr. Davainis had delivered 1,400 to 1,500 babies, approximately 500 of them via c-section surgery.  He had managed many labors that slowed down towards the end and still resulted in a vaginal delivery.  And, he had vaginally delivered many healthy babies whose fetal heart-rate strips showed patterns like those on I.P.'s fetal heart-rate strip.  None of his prior deliveries resulted in injuries like those experienced by I.P.

### 1.    Micaela Palacio arrives at Banner.

Micaela Palacio presented to Banner in labor late in the evening on April 29, 2012, at a little after 11:00 p.m.  She was at 39 weeks of gestation and had delivered two prior children vaginally without complications.  Banner nurse Kelley DelCarlo triaged Ms. Palacio (i.e., assessed her to determine her condition at hospital admission).  After doing so, Nurse DelCarlo called Dr. Davainis at his home and communicated her findings.  Dr. Davainis issued by phone initial orders for Ms. Palacio's treatment.  Dr. Davainis was on call that evening because Northeastern Rural Health Clinic's doctors generally staff Banner's Obstetrics department.  Northeastern is right next to Banner and, like Ms. Palacio, many patients receive prenatal care at Northeastern and deliver at Banner.

Nurse DelCarlo, a very experienced registered nurse, took care of Ms. Palacio together with Nurse Ginger Leeth, a labor and delivery nurse with five or more years' experience.  Shortly before midnight on April 29, 2012, the two nurses began monitoring the fetal heart rate using an external monitor.  That monitor measured and recorded the fetal heart rate and maternal uterine contractions, allowing the nurses to view a graph called fetal heart-rate strip or tracing.

### 2.    Electronic fetal monitoring background.

Electronic fetal monitoring (EFM) is used in most labors, and it produces a graph of the fetal heart rate and maternal uterine contractions that can show that the fetus is well oxygenated (i.e., is receiving adequate oxygen).  Despite the frequency of its use, EFM is limited because it cannot predict

or prevent injuries such as the rare neurological injury that occurred here.  EFM can confirm good fetal oxygenation but it <u>cannot</u> predict or prevent neurologic injury, which is why despite 40 years of use, EFM has not reduced the incidence of cerebral palsy or fetal death.  EFM's limitations include (1) poor inter-observer and intra-observer reliability (i.e., inconsistency in interpretation by different medical professionals and by the same medical professional), (2) uncertain efficacy in decreasing complications (such as fetal death during labor or delivery and cerebral palsy) while avoiding unnecessary operative deliveries and (3) an extremely high false-positive rate in predicting cerebral palsy (i.e., almost every positive result is wrong).

Fetal heart rate tracings fall into three categories:  Category 1 (Normal), Category 2 (Indeterminate), and Category 3 (Abnormal).

a.    *Category 1 Normal Tracings*

A Category 1 Normal tracing has several key features.  First, it includes a baseline (average over time) fetal heart rate of 110 to 160 beats per minute.  It also shows the absence of late or variable decelerations (decreases followed by increases) in the fetal heart rate.  And, it displays a fetal heart rate with moderate variability (short-term fluctuations).

The <u>baseline heart rate</u> is the mean heart rate during a ten-minute segment of the fetal heart rate tracing.

<u>Decelerations</u> are decreases in the fetal heart rate followed by subsequent increases.  A late deceleration is a gradual decrease and return of the fetal heart rate usually associated with a uterine contraction, with the deceleration's low point (nadir) occurring after the peak of the contraction.  A variable deceleration is an abrupt decrease in the fetal heart rate.  When variable decelerations are associated with uterine contractions, their onset, depth, and duration generally vary with successive contractions.

Late and variable decelerations are absent on a Category 1 Normal tracing.  Early decelerations – gradual heart-rate decreases and returns with the deceleration's onset, low-point (nadir), and recovery mirroring the contraction – may be present or absent on a Category 1 Normal tracing.  Accelerations (abrupt fetal heart rate increases) may also be present or absent in such tracings.

//

_Variability_ means that there are fluctuations in the baseline fetal heart rate that are irregular in amplitude and frequency.  Moderate variability on a fetal heart rate tracing shows an amplitude range of 6 to 25 beats per minute.

Category 1 Normal EFM tracings indicate good fetal oxygenation (i.e., normal fetal acid-base status).  Fetal acid-base status reflects oxygenation in that an abnormal fetal acid-base status (referred to as acidemia) indicates that the fetus is not well oxygenated.

b.    *Category 3 Abnormal Tracings*

As relevant to the issues in this case, Category 3 Abnormal tracings show <u>absent variability</u> in the fetal heart rate <u>and</u> (1) recurrent late or variable decelerations or (2) a baseline fetal heart rate of less than 110 beats per minute (called bradycardia).  A tracing that shows variability in the fetal heart rate thus <u>cannot</u> be a Category 3 Abnormal tracing.  Abnormal tracings are associated with abnormal fetal acid-base status.  But abnormal fetal acid-base status (acidemia) does not mean that a baby will experience neurologic injury resulting in cerebral palsy.  Even with significant acidemia, most newborns will be neurologically normal.  And, notwithstanding its long-term use, EFM has failed to reduce the incidence of cerebral palsy because EFM cannot predict or prevent cerebral palsy.

c.    *Category 2 Indeterminate Tracings*

The rest of fetal heart rate tracings are Category 2 Indeterminate.  Such indeterminate tracings are very common, making up most fetal heart rate tracings and occurring in most labors.  Indeterminate tracings are just that.  They are not predictive of abnormal fetal acid-base status, but there is inadequate evidence to categorize them as Category 1 Normal or Category 3 Abnormal.  So, Category 2 Indeterminate tracings lack predictive value.  But, within the diverse spectrum of indeterminate tracings, the presence of fetal heart rate <u>accelerations</u> or <u>moderate variability</u> or both are strong indicators of normal fetal acid-base status and so can be used to guide a doctor's decision making.

**3.    Nurse DelCarlo and Nurse Leeth care for Ms. Palacio as their only patient until Dr. Davainis arrives at the hospital.**

At 12:09 a.m. on April 30, 2012, Nurse DelCarlo recorded a vaginal exam of 5 centimeters cervical dilation.  During a vaginal birth, the cervix (the opening of the uterus) gradually dilates (opens) in order to allow the baby to be born.  Ten centimeters cervical dilation is complete dilation, i.e., a

completely open cervix through which the baby can pass.  Nurse DelCarlo also recorded that I.P. was 2 centimeters above the spine.  This refers to the ischial spine, which is a bony landmark of the pelvis. This measurement assesses how far the baby has descended into the pelvis.  It is generally expressed from 3 to 1 centimeters above the spine, then at 0 station (just level with the spine), and finally from 1 to 3 centimeters below the spine.  A few minutes later, Nurse DelCarlo recorded a Category 1 Normal fetal heart rate tracing.

Between 12:30 and 1:15 a.m., Nurse Anesthetist Joel Paoner administered epidural anesthesia to Ms. Palacio.  He recorded that the epidural (local anesthetic used to block some of the pain of childbirth) was successful and provided good pain relief.

At 1:00 a.m., Nurse Leeth again recorded a Category 1 Normal tracing.  Eight minutes later, Nurse DelCarlo recorded a vaginal exam of 6 centimeters dilation, with the baby 1 centimeter above the spine.  At 1:30 a.m., Nurse Leeth recorded a Category II Indeterminate tracing.  She and Nurse DelCarlo then administered oxygen to Ms. Palacio, helped her change position multiple times, and provided intravenous hydration.  At 1:47 a.m., Nurse DelCarlo recorded the spontaneous rupture of the amniotic sac (the membrane that contains the amniotic fluid surrounding the fetus) with a moderate amount of clear fluid with amniotic fluid odor.  Rupture of the membranes is colloquially referred to as the "water breaking," which often occurs at full term at the beginning of or during labor.

At 1:54 a.m., Nurse DelCarlo again called Dr. Davainis because, per standard practice, he had waited to come to the hospital until Ms. Palacio made further progress towards delivery.  Nurse DelCarlo reported to him the fetal heart rate tracing interpretation, contraction pattern, and latest vaginal examination results.  She also informed Dr. Davainis that the membranes had spontaneously ruptured and that she and Nurse Leeth believed delivery was imminent, so he should probably come to the hospital.  At 1:56 a.m., Nurse DelCarlo recorded a vaginal exam of 9 centimeters dilation and 0 station (so at the spine, 1 centimeter lower than the previous exam).

### 4.  Dr. Davainis arrives, examines Ms. Palacio, and focuses on caring for her as his only patient until delivering her child.

Dr. Davainis arrived at the hospital at 2:15 a.m.  He introduced himself to Ms. Palacio because she had received prenatal care from a different doctor.  At bedside, he spoke with Ms. Palacio and her

husband, who translated between Spanish (Ms. Palacio) and English (Dr. Davainis).  Dr. Davainis reviewed the fetal heart rate strip and examined Ms. Palacio, determining that her cervix was between 8 and 9 centimeters dilated.

Following his initial examination of Ms. Palacio, Dr. Davainis anticipated a normal spontaneous vaginal delivery and so noted in the hospital record.  Accordingly, he decided that Ms. Palacio, who had successfully delivered two prior children vaginally, should continue with the current plan of care of laboring towards a vaginal delivery.

A vaginal delivery is best as long as the fetus is tolerating labor because surgical deliveries overall have more negative health outcomes than vaginal deliveries.  In other words, vaginal deliveries are safer than c-section surgery, and so better for mothers and babies.  Mothers recover more quickly from vaginal deliveries, and vaginal deliveries also avoid c-section risks.  C-section surgery involves cutting into a woman's abdomen and through her uterus to remove a baby.  Such surgery creates risks for mothers such as blood loss, infection, bowel or bladder injury, bowel obstruction, long-lasting pain, blood clots, and anesthesia complications.  Vaginal deliveries also benefit babies because the process of traveling though the birth canal squeezes fluid out of the baby's lungs, making the baby less likely to suffer breathing problems at birth.

Dr. Davainis recognized that, because Ms. Palacio had successfully delivered two prior children vaginally, she had a very high statistical likelihood of a third successful vaginal delivery.  She had what is referred to as a "proven pelvis."

Following his initial assessment, Dr. Davainis tracked Ms. Palacio's progress by monitoring the fetal heart rate strip (within her hospital room and remotely from the nursery located just steps away from her hospital room) and periodically attending Ms. Palacio at her bedside.  Nurse Leeth and Nurse DelCarlo also continued monitoring and caring for Ms. Palacio, with Nurse Leeth taking primary responsibility for Ms. Palacio and Nurse DelCarlo taking on the role of the neonatal nurse responsible for the baby's care after birth.

At 2:30 a.m., Nurse Leeth recorded a Category 2 Indeterminate tracing with accelerations, early and late decelerations, and moderate variability; and at 3:00 a.m. another with accelerations, early decelerations, and moderate variability.  At 3:13 a.m. she recorded a vaginal exam of 9 centimeters

1   cervical dilation and 1 centimeter below the spine (1 centimeter lower than Nurse DelCarlo's previous

2   exam of 0 station).  Two minutes later, at 3:15 a.m., Nurse Leeth again recorded a tracing with

3   decelerations (variable, late, and early), accelerations, and moderate variability.  At 3:30 a.m., Nurse

4   Leeth recorded a tracing showing accelerations, recurrent early decelerations, and moderate variability.

5           Also at approximately 3:30 a.m., Dr. Davainis examined Ms. Palacio and reviewed the fetal heart

6   rate strip at her bedside, deciding based on the strip and the progress he observed to continue the plan of

7   care of laboring towards a vaginal delivery.  At 3:45 a.m., Nurse Leeth recorded a tracing with

8   accelerations, recurrent early decelerations and moderate variability, and at 4:00 a.m. she recorded a

9   tracing with accelerations, recurrent late decelerations, and moderate variability.

10          At 4:00 a.m., Dr. Davainis examined Ms. Palacio at her bedside, determining that she had

11  progressed to a "rim" of cervix.  A rim of cervix means a small lip of remaining cervix along one edge.

12  Based on his previous experience, Dr. Davainis believed that, because Ms. Palacio had previously

13  delivered two children vaginally, she could push past a rim of cervix to deliver.  Accordingly, he had

14  Ms. Palacio begin a series of pushes.  During pushes, Dr. Davainis had his hand inside the patient to

15  assess the pushing's effect and he watched the fetal heart rate strip.  This series of pushes occurred with

16  periodic contractions and with some pauses to allow Ms. Palacio to rest.  During the time period

17  between 4:00 a.m. and 5:00 a.m., Dr. Davainis also discussed with Ms. Palacio (through her husband

18  who translated) c-section surgery as a means to deliver her baby.  As pushing and c-section discussions

19  occurred, Nurse Leeth continued recording fetal heart rate tracing interpretations.  At 4:15 a.m. and 4:30

20  a.m. she recorded accelerations, recurrent late decelerations, and moderate variability.  Ms. Palacio

21  pushed intermittently during this time, often with Dr. Davainis' hand inside her to assess the baby's

22  descent.  Dr. Davainis watched the fetal heart rate strip.  At 4:45 a.m., Nurse Leeth recorded

23  accelerations, variable decelerations, recurrent late decelerations and moderate variability.

24          At this time, Ms. Palacio was pushing and Dr. Davainis assessing pushing effectiveness.  As Ms.

25  Palacio pushed, he believed that any single push could result in vaginal delivery of the baby.  But, he

26  then began to observe that the baby's head was descending through the pelvis less during pushing than it

27  had been.  As pushes became less effective, he began to think that vaginal delivery was not imminent,

28  i.e. that it would not occur soon enough given the fetal heart rate tracing.  Shortly before 5:00 a.m., he

UNITED STATES' TRIAL BRIEF                    7

therefore told Ms. Palacio that he recommended c-section surgery because he believed vaginal delivery was too far off for the baby.  She gave consent for surgery, and Dr. Davainis called for the surgery at 5:00 a.m.  Nurse Leeth recorded a 5:00 a.m. fetal heart rate tracing with recurrent late decelerations and moderate variability.

At 5:00 a.m., Dr. Davainis called Dr. Holmes at his home, asking him to come to the hospital immediately to assist with an unscheduled c-section surgery.  C-section surgery requires the primary surgeon to have an assistant who, after helping with delivery, is available to treat the baby if resuscitation is required.  Dr. Holmes immediately headed to Banner to assist with the surgery.

While Nurse Leeth and Nurse DelCarlo started preparing Ms. Palacio for surgery by dressing her and removing any jewelry, Dr. Davainis briefly stepped out of the room and dictated a note regarding the choice to call for c-section surgery (5:01 a.m.) and electronically signed another hospital record (5:04 a.m.).  Dr. Davainis then returned to the hospital room to check on pre-operative preparations and to accompany the patient down the hall to the OR (operating room).  Nurse DelCarlo and Nurse Leeth continued preparing Ms. Palacio to move to the OR, including by placing a Foley catheter.  At 5:10 a.m., Nurse Leeth recorded a fetal heart rate tracing with variable and recurrent late decelerations and minimal fetal heart rate variability while Nurse DelCarlo unhooked her from the monitor.  Nurse DelCarlo and Dr. Davainis moved Ms. Palacio on her labor and delivery bed to the OR.

### 5. Dr. Davainis and Dr. Holmes deliver I.P. via c-section surgery, incising the patient 22 minutes after Dr. Davainis called the surgery.

At 5:13 a.m., Ms. Palacio was wheeled into the OR.  Dr. Holmes then arrived in the OR to assist Dr. Davainis with the surgery.  Nurse DelCarlo told Dr. Davainis that she was unable to find fetal heart tones (i.e., a fetal heartbeat), and he ordered emergency procedures to accomplish delivery as quickly as possible.  Everyone moved as fast as they could to get the surgery done.

During other preparations, Dr. Holmes and Dr. Davainis did an abbreviated scrub, dried off, put on surgical gowns, and put on surgical gloves.  Because it was an emergency, no pre-surgery instrument count was done.  The moment Anesthetist Paoner had achieved successful intubation and Ms. Palacio was unconscious and could be ventilated, Dr. Davainis incised the patient — at 5:22 a.m.  Dr. Davainis was moving quickly because of his concern at the loss of fetal heart tones, and he delivered I.P. through

1    an abdominal incision two minutes later, at 5:24 a.m.

2              **6.    Dr. Holmes and the resuscitation team revive I.P. after she is born floppy and**
3                      **not breathing.**

4              I.P. was born with her umbilical cord wrapped around her neck (called a "nuchal cord").  She

5    was floppy and did not breathe spontaneously.  The umbilical cord was clamped and cut and Dr. Holmes

6    took charge of the baby's care, with Nurse DelCarlo and Respiratory Therapist Drondee Perez assisting

7    in resuscitating I.P.  Dr. Holmes carried I.P. to the resuscitation table.

8              Because I.P. showed no spontaneous respiratory effort or heart rate, Respiratory Therapist Perez

9    began breathing for the baby using a bag valve mask — a hand-held device used to provide positive

10   pressure ventilation to patients who are not breathing.  Within 20 to 30 seconds, Nurse DelCarlo began

11   chest compressions.  Dr. Holmes ordered administration of epinephrine (a drug used to start the heart)

12   subcutaneously (under the skin).  Though he knew that intravenous administration was the preferred

13   route for epinephrine in this context, he did not have intravenous access (i.e., an IV line) established.

14   Because he wanted to get epinephrine into the child to start her heart as soon as possible, he ordered

15   immediate subcutaneous administration.  Nurse DelCarlo gave that subcutaneous epinephrine between 1

16   and 2 minutes of life.  Bag valve mask ventilation and chest compressions continued.  By 2 minutes of

17   life, Dr. Holmes still could not detect a heart rate, so he ordered a second dose of epinephrine, this time

18   injected directly into the umbilical vein using a syringe.  Nurse DelCarlo injected the second dose of

19   epinephrine.

20             Then, between 2 and 3 minutes of life, Dr. Holmes detected a heart rate.  Because the heart rate

21   at that time was below 60 beats per minute, both ventilation and chest compressions continued.  By 4

22   minutes of life, I.P. had a heart rate of over 100 beats per minute, and so Nurse DelCarlo discontinued

23   chest compressions.  Between 4 and 5 minutes of life, Dr. Holmes intubated I.P.  Though he could have

24   stopped bag valve mask ventilation earlier to intubate I.P., he decided not to because he observed that

25   she was ventilating well.  He wanted that to continue without a pause for intubation while the

26   resuscitation team got her heart started.  While Dr. Holmes intubated, Respiratory Therapist Perez

27   listened for breath sounds.  After intubation, Nurse DelCarlo and Dr. Holmes observed equal chest rise.

28   Dr. Holmes then placed an umbilical venous catheter (an IV line into the umbilical vein), through which

1   Nurse DelCarlo administered a saline bolus (which increases blood pressure).

2         Nurse DelCarlo assigned I.P. APGAR scores of 0, 2, and 3, at 1, 5, and 10 minutes of life

3   respectively.  APGAR scores are used to quickly summarize the health of a newborn.  The APGAR

4   score is determined by evaluating the newborn on five simple criteria on a scale from 0 to 2, then adding

5   up the five values. The resulting score ranges from 0 to 10, with scores 7 and above generally considered

6   normal.  The five criteria are summarized using the following words:  **A**ppearance, **P**ulse, **G**rimace,

7   **A**ctivity, **R**espiration.

8         After finishing Ms. Palacio's surgery, Dr. Davainis quickly contacted hospitals with Neonatal

9   Intensive Care Units to seek higher-level care for I.P.  He received guidance from U.C. Davis doctors

10  that he, Dr. Holmes, and the Banner staff promptly implemented while arrangements were made for

11  I.P.'s transfer.  Later that morning, I.P. was taken to U.C. Davis hospital via helicopter.  She received

12  cooling therapy used to lessen the effects of brain injury.  During her month-long stay at U.C. Davis, I.P.

13  was diagnosed with hypoxic brain injury (injury caused by lack of oxygen).  She was later diagnosed

14  with spastic quadriplegic cerebral palsy, cortical visual impairment, and severe global developmental

15  delay.

16        Because the parties' neuroradiology experts agree, the parties have stipulated that

17  neuroradiologists analyzing the May 1, 2012 ultrasound and the May 7, 2012 MRI of I.P.'s brain

18  concluded that those images are consistent with I.P. having experienced hypoxic ischemic injury of the

19  acute profound pattern.  Order Approving Stipulation, Dkt. 98.  A hypoxic ischemic injury of the acute

20  profound pattern results from a near-total cessation of oxygenated blood reaching the fetus for a short

21  amount of time, typically 10 to 20 minutes.  *Id*.  These imaging results are consistent with I.P. having

22  experienced a sentinel event (an unexpected occurrence involving death or serious injury) such as a cord

23  compression occurring within the last 15 to 20 minutes prior to birth.  *Id*.

24        B.   **Procedural History**

25        In August 2012, I.P., mother Micaela Palacio, and father Facundo Palacio Diaz sued Banner

26  Health in state court, alleging that negligence by Banner-employed nurses caused I.P. injury during

27  labor and delivery.  *See* Case 2:13-cv-02013-JAM-CKD, Dkt. 1-1. Three months later, I.P. and Ms.

28  Palacio filed administrative tort claims with the Department of Health and Human Services.  Mr. Diaz

did not file an administrative tort claim. Dkt. 77 at 4. In January 2013, Banner filed a cross-complaint for indemnity against Dr. Davainis in the state-court action. *See* Case 2:13-cv-02013-JAM-CKD, Dkt. 1-2.

In May 2013, I.P. and Ms. Palacio filed suit against the United States in this Court under the FTCA alleging negligence by Dr. Davainis and Dr. Holmes. Dkt. 1. The United States subsequently removed the Banner state-court action to this Court, substituting the United States for Dr. Davainis for purposes of Banner's cross-complaint. Case 2:13-cv-02013-JAM-CKD, Dkt. 1. The two cases were then consolidated. Dkt. 15. During discovery, both Plaintiffs and Defendants filed motions seeking to exclude certain proffered experts. The Court excluded one of Plaintiffs' four life expectancy experts because, even after the Court gave Plaintiffs the opportunity to correct the expert's deficient report, his amended expert report was still deficient under Rule 26(a)(2). Dkt. 67. The Court also excluded one of Plaintiffs' three obstetrical experts because Plaintiffs submitted almost verbatim identical expert disclosures from different experts. Dkt. 61; Dkt. 64 at 10-12, 16; Dkt. 67. The Court denied Plaintiffs' motion to exclude Defendants' damages experts, holding that Defendants properly disclosed various damages reports as rebuttal reports.

Banner Health recently settled the case against it alleging negligence by Banner's nurses and that case has been dismissed. Dkt. 102, 104. Trial will therefore proceed only on the FTCA claim brought by Plaintiffs I.P. and Micaela Palacio against the United States. With the case against Banner dismissed, Facundo Diaz is no longer a Plaintiff because it is undisputed that he does not have any claims against the United States.

The parties filed motions in limine in late March 2015, and those motions were resolved as follows:

- Annuities Evidence (United States MIL No. 1, Plaintiffs MIL No. 1) – Plaintiffs filed a motion in limine seeking to admit evidence regarding annuities. The United States filed a motion seeking to exclude testimony concerning annuities based on an untimely and deficient report from Plaintiffs' economist, Peter Formuzis. In that report, Plaintiffs disclosed new opinions seven months late, attempting to nearly triple their economist's present value opinion. The Court granted the United States' motion because Plaintiffs'

economist's report was untimely and did not provide a complete statement of all opinions and the basis and reasons for them.  The Court denied Plaintiffs' motion.  Dkt. 80; Dkt. 85; Dkt.  97.

- Dr. Luis Montes Life Expectancy Testimony (United States MIL No. 2) – The United States sought to exclude life expectancy testimony by Plaintiffs' expert Dr. Montes, challenging his qualifications to offer such an opinion and seeking to exclude his opinions as not relevant, not reliable, cumulative, and incompatible with Plaintiffs' two other life expectancy opinions.  Instead of opposing the United States' motion, Plaintiffs agreed not to offer life expectancy testimony from Dr. Montes and the Court granted the United States' motion pursuant to the parties' stipulation.  Dkt. 81; Dkt. 88; Dkt. 97.

- Dr. Steven Braatz Testimony (United States MIL No. 3) – The United States sought to exclude testimony by Dr. Braatz as improperly disclosed.  Instead of opposing the United States' motion, Plaintiffs agreed not to call Dr. Braatz as a witness and the Court granted the United States' motion pursuant to the parties' stipulation.  Dkt. 82; Dkt. 89, Dkt. 97.

- Health Insurance Benefits/ Collateral Sources Evidence (United States MIL No. 4, Plaintiffs MIL No. 2) – The United States sought to admit and Plaintiffs sought to exclude evidence regarding insurance benefits payable to I.P.  The Court ruled that the United States may introduce evidence of Plaintiff's Blue Shield policy as a collateral source under California's Medical Injury Compensation Reform Act ("MICRA").  In addition, it concluded that evidence of future collateral sources is admissible under MICRA and that evidence related to the Affordable Care Act is admissible as it pertains to the likelihood of Plaintiff's future insurance benefits.  The Court also held that the United States may not introduce evidence of IHSS, Medi-Cal, California Children's Services, or Regional Center benefits as collateral sources.  Dkt. 83; Dkt. 86; Dkt. 97.

- <u>Non-Economic Damages Cap</u> (Plaintiffs MIL No. 3) – Plaintiffs requested a post-trial hearing on non-economic damages (if there should be an award for such damages in excess of the statutory cap).  The Court denied this motion as premature.  Dkt. 87; Dkt. 97.

### III.  ANALYSIS

The FTCA generally renders the United States liable for negligence by its employees that occurs within the scope of federal employment.  28 U.S.C. §§ 1346(b) & 2674.  Within limitations imposed by the FTCA, the United States is liable in tort as a private individual would be under like circumstances.  *Id.*  So the law of the state where the negligence occurred generally governs the scope of the United States' liability.  *Id.*  Here, I.P.'s birth occurred in Lassen County, California and so California law applies.

Under California law, a medical malpractice plaintiff bears the burden of proving:  (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise (the standard of care), (2) a breach of that duty, (3) a causal connection between the negligent conduct and the resulting injury, and (4) actual loss or damage resulting from the professional's negligence.  *Avivi v. Centro Medico Urgente Med. Ctr.*, 159 Cal. App. 4th 463, 468 n.2 (2008); *Gami v. Mullikin Medical Center*, 18 Cal. App. 4th 870, 877 (1993); *Budd v. Nixen*, 6 Cal.3d 195, 200 (1971).

A plaintiff must prove each of these elements by a preponderance of the evidence.  *See Johnson v. Superior Court*, 143 Cal. App. 4th 297, 305 (2006).  The preponderance of the evidence standard requires a plaintiff to present evidence that makes the matter to be proved *more likely* than the alternative.  *See Aguilar v. Atlantic Richfield Co.*, 25 Cal.4th 826, 857 (2001); CACI (Judicial Council of California Civil Jury Instruction) No. 200.  If the evidence is equally balanced the plaintiff loses.  *See Aguilar*, 25 Cal.4th at 857; CACI No. 200.

The standard of care for physicians is the reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of the medical profession under similar circumstances.  *Avivi*, 159 Cal. App. 4th at 470–71.  "Similar circumstances" include the geographic location and

resources available where the physician practices. *Id.* Expert testimony is required to establish the applicable standard of care. *See Landeros v. Flood*, 17 Cal.3d 399, 410 (1976). A physician is not negligent just because his efforts are unsuccessful or even if he makes an error that was reasonable under the circumstances. *See Huffman v. Lindquist*, 37 Cal.2d 465, 473 (1951); CACI No. 505. Negligence can be proven only if the physician was not as skillful, knowledgeable, or careful as other reasonable physicians would have been in similar circumstances. *Huffman*, 37 Cal.2d at 473; CACI No. 505. "A plaintiff must convince the trier of fact that the physician's peers would consider his or her act to be blameworthy to constitute a breach of the reasonable standard of care." *Colburn v. United States*, 45 F. Supp. 2d 787, 791 (S.D. Cal. 1998).

Plaintiffs also must prove that a breach in the standard of care was a substantial factor is causing harm to a "reasonable medical probability based upon competent expert testimony." *Dumas v. Cooney*, 235 Cal. App. 3d 1593, 1603 (1991) (citing *Jones v. Ortho Pharmaceutical Corp.*, 163 Cal. App. 3d 396, 402 (1985)); CACI No. 4.30.

**A.** **Expert testimony establishes that Dr. Davainis and Dr. Holmes met the standard of care in managing labor, delivering I.P., and resuscitating I.P. after birth.**

        **1.** **Dr. Davainis properly assessed the fetal monitoring strip and the patient's history and progress to decide that a trial of labor was medically appropriate up until 5:00 a.m.**

Expert testimony will establish that Dr. Davainis reasonably chose to continue a trial of labor towards a vaginal delivery up until calling for c-section surgery at 5:00 a.m. Dr. Davainis made that decision in real time using the information available to him. He determined that Ms. Palacio's history of two successful vaginal deliveries combined with the ongoing progress he observed in cervical dilation and fetal descent indicated she could likely deliver her third child vaginally. He also correctly read the fetal monitor strip as Category 2 Indeterminate and including the reassuring signs of fetal heart-rate accelerations and variability. Both sides' experts agree that the fetal heart rate strip was Category 2 Indeterminate until at least 4:50 a.m. And even a Category 3 strip at 4:50 a.m. would only have required evaluation and, if it did not resolve, prompt operative delivery — which is exactly what Dr. Davainis did.

Calling for c-section surgery requires an exercise of medical judgment. Under these

circumstances, the standard of care allowed for a range of reasonable judgments.  Though Dr. Davainis could have called for surgery at an earlier time, the standard of care did not require him to do so.  In other words, the standard of care *permitted* Dr. Davainis to call for surgery earlier but did not *mandate* that he do so.  Here, acceptable alternative treatments existed.  The choice of one treatment over another that, in hindsight, would have been a better choice does *not* establish negligence.  *See* CACI No. 506 (A doctor "is not necessarily negligent just because [he/she] chooses one medically accepted method of treatment or diagnosis and it turns out that another medically accepted method would have been a better choice.").  "Negligence in a malpractice action is not to be determined by hindsight nor by what a party subsequently learns."  *Bregman v. United States*, Case No. cv 12–10930 BRO(FFMx), 2014 WL 4961127, at *10 (C.D. Cal. 2014).

**Dr. Maurice Druzin** is a Professor of Gynecology and Obstetrics at Stanford University Medical Center.  He is also the Program Director for its Obstetrics and Gynecology Residency Program.  In addition to teaching obstetrics, Dr. Druzin practices Maternal-Fetal Medicine (specializing in high-risk pregnancies), regularly managing laboring patients.  He is Board Certified in Obstetrics and Gynecology and Maternal-Fetal Medicine, and he has delivered thousands of babies.  Dr. Druzin will testify that Dr. Davainis met the standard of care by exercising appropriate clinical judgment in managing Ms. Palacio's labor and delivery and in calling for a c-section at 5:00 a.m.  In particular, Dr. Druzin will testify that Dr. Davainis appropriately responded to the patient's circumstances and the fetal heart-rate tracing.  That tracing showed accelerations and moderate variability — both highly indicative of normal fetal acid-base status (i.e., good fetal oxygenation) and so appropriate to use to guide a doctor's decision making.

**Dr. Yvonne Wu** is a Professor of Neurology and Pediatrics at the University of California, San Francisco.  She is Board certified by the American Board of Psychiatry and Neurology with Special Qualification in Child Neurology.  She also has a Master of Public Health from U.C. Berkeley in Epidemiology (the branch of medicine dealing with the incidence and prevalence of disease in large populations).  Dr. Wu's research over the past 16 years has focused on risk factors for neonatal brain injury and cerebral palsy, and she has cared for countless children with neonatal brain injury and cerebral palsy as a child neurologist.  Dr. Wu has published numerous articles related to the causes of

cerebral palsy and neonatal brain injury. She also serves on the Task Force on Neonatal Encephalopathy (a syndrome characterized by disturbed neurologic function in the earliest days of life in an infant born at or beyond 35 weeks of gestation, manifested by a reduced level of consciousness or seizures, and often accompanied by difficulty with initiating and maintaining respiration, and by depression of tone and reflexes). That Task Force publishes a report by the American College of Obstetricians and Gynecologists and the American Academy of Pediatrics. Dr. Wu thus has extensive expertise regarding the causes and prevention of brain injury in term infants like I.P. Dr. Wu will testify that, despite improvements in obstetric care, doctors have not been able to prevent or reduce the incidence of hypoxic brain injuries like I.P.'s. Though electronic fetal monitoring has been used since the 1970s, it has not reduced the incidence of cerebral palsy. Although electronic fetal monitoring reliably shows the *absence* of hypoxia-ischemia (inadequate blood flow/oxygenation to maintain normal cell and organ function) and acidemia, its greatest weakness is its inability to predict the *presence* of those conditions with any clinically relevant accuracy. The positive predictive value of electronic fetal monitoring for cerebral palsy is extremely low – less than 1%. In fact, research shows that electronic fetal monitoring failed to reduce the incidence of low Apgar scores, acidemia, cerebral palsy, or neonatal deaths despite a 63% increased rate of cesarean deliveries in those who receive such monitoring. Electronic fetal monitoring has thus failed as a public health screening program.

**Dr. Daljeet Rai** is the Associate Director of the San Jose-O'Connor Hospital Family Medicine Residency Program. Dr. Rai has been a leading educator of the hospital's residents in women's health, including obstetrics, for the past 15 years. He is Board certified in Family Medicine. Providing obstetrical care is an important part of his practice, and Dr. Rai has primary surgeon c-section privileges at O'Connor Hospital. Dr. Rai has delivered about 3,000 babies. Dr. Rai will testify about the Family Medicine practitioner's role in obstetrics. The tenet of Family Medicine is to provide care for the entire family, and that includes prenatal care and delivering babies. All Family Medicine practitioners train to provide obstetric care during residency, and approximately 10 percent of them continue to regularly deliver babies as part of their practice. As a Family Medicine doctor who (like Dr. Davainis) delivers babies including by performing c-section surgery, Dr. Rai assessed Dr. Davainis' care from a Family Medicine doctor's perspective. Dr. Rai will testify that Dr. Davainis met the standard of care while

1    attending to Ms. Palacio during the labor and delivery of her child.  In particular, Dr. Rai will testify that

2    Dr. Davainis' interpretation of the fetal heart rate strip was appropriate, that his decision to attempt

3    vaginal birth was appropriate, and that he appropriately proceeded with c-section delivery.

        **2.**      **Dr. Holmes quickly revived I.P. when she did not breathe on her own after birth, starting her heart within three minutes.**

6          Expert testimony will establish that Dr. Holmes quickly and efficiently resuscitated I.P. after her

7    birth, meeting the standard of care and saving her life.

8          **Dr. Philippe Friedlich** is a Professor of Pediatrics and Surgery at the University of Southern

9    California.  Dr. Friedlich is Board certified in Pediatrics and Neonatal-Perinatal Medicine (a

10   subspecialty of pediatrics concerned with the care of critically ill newborn and premature infants).  He is

11   also the Medical Director of the Newborn & Infant Critical Care Unit (NICCU) at Children's Hospital

12   Los Angeles and the Associate Division Chief of the University of Southern California's Division of

13   Neonatal Medicine.  He teaches courses in Neonatal Resuscitation and has done so since 1996.  Dr.

14   Friedlich will testify that Dr. Holmes' resuscitation of I.P. met the standard of care in every respect.  In

15   particular, Dr. Holmes and his team immediately provided assisted breathing by means of bag and mask

16   ventilation, then quickly used epinephrine to start I.P.'s heart between 2 and 3 minutes of life, and then

17   intubated I.P. by 5 minutes of life.  Dr. Friedlich will also testify that Dr. Holmes' care and decision-

18   making did not cause or contribute to any injury suffered by I.P. because Dr. Holmes resuscitated I.P. as

19   quickly as could reasonably be expected under the circumstances.

       **B.**      **Even if Plaintiffs could establish liability, any appropriate damages award would be much lower than what Plaintiffs seek.**

22         For a variety of reasons, Plaintiffs' damages calculations are inflated.  If the Court were to find

23   liability here, then calculating a reasonable damages award would require resolving several issues that

24   would merit post-trial briefing.  The parties agree (1) that I.P. was diagnosed with a hypoxic brain injury

25   and spastic quadriplegic cerebral palsy, cortical visual impairment, and severe global developmental

26   delay, (2) that I.P.'s medical condition will prevent her from being able to work, and (3) that I.P.'s

27   condition will require significant future medical care.

28         With regard to future medical expenses, the Court would first need to determine I.P.'s life

expectancy, which would represent the time period for which she could seek such expenses.  For I.P.'s attendant care going forward, the Court would have to identify reasonable projected costs.  The Court would also have to determine reasonable projected costs for medical services, medication, and equipment, taking into account the actual likely costs and who will pay them.  Then, the Court would have to use those determinations to reach a future medical-expense present-value calculation using economic assumptions that it finds reasonable.

The Court would also have to calculate projected lost future earnings using reasonable economic assumptions.  And, it would have to consider noneconomic damages, in accordance with California statutory law capping such damages.

Finally, the Court would need to offset money paid by co-defendant Banner Health in settlement against any judgment rendered here.

### 1.    Life Expectancy

I.P.'s remaining life expectancy significantly influences the cost of her future medical care because it determines how long that care will be needed.  Critically, the parties are very close in terms of life expectancy opinions.  The United States will present expert testimony from **Dr. Steven Day** that I.P.'s condition makes it likely she will live for 18 to 22 additional years from age 2 (so to age 20 to 24). In discovery, one of Plaintiffs' pediatric neurology experts (Dr. Donald Olson) offered a life expectancy opinion (to age 20 to 30) that partially overlapped with Dr. Day's opinion.  But Plaintiffs have informed the United States that, though Dr. Olson will testify at trial on other issues, he will not offer life-expectancy opinions.  Instead, Plaintiffs will offer testimony by Plaintiffs' second pediatric neurologist, Dr. Ira Lott, who has opined that I.P. will likely live 26 additional years from age 2 (so to age 28).

### 2.    Pricing for Attendant Care

I.P.'s parents (who have no formal medical training) currently provide all of her care.  The parties' experts agree that they have done a good job caring for I.P. and that I.P. has been well cared for. The parties also agree that I.P. needs 24-hour care.  The parties differ, however, on how that need should be met in the event of a liability finding.

United States experts **Dr. Joseph Capell and Life Care Planner Tim Sells** opine that I.P.'s care should be provided by privately hired health attendants because I.P.'s daily care does not medically

require a licensed nurse.  The United States' proposal provides compensation for 24 hours of daily care, including six hours per day rendered by I.P.'s family.  The United States' proposal also includes two weeks of agency-provided back-up care to cover leave time for home health aides.  In addition, the United States' plan provides for a case manager to help the family with finding and hiring home health aides, managing the administrative aspects of such hiring (e.g., payroll, taxes, etc.), coordinating and scheduling medical appointments, communicating with medical professionals, and accompanying the family to medical appointments when needed.

On the other hand, Plaintiffs assert that I.P. should hire a licensed vocational nurse ("LVN") for 24 hours a day through an agency.  Regulatory requirements for agencies require an agency to provide I.P. with at least LVN-level care because she receives nourishment through a gastronomy tube. Plaintiffs' experts therefore assert that attendant care for I.P. will cost approximately $427,000 per year.

The United States will prove that home health attendants can provide the care I.P. needs, as demonstrated by the excellent care her parents have provided I.P.  LVN care is not medically indicated for I.P., and the agency-hire LVN care Plaintiffs propose is *more than triple* the cost of private-hired home health aide care (which is approximately $125,000 per year).  Reasonably priced HHAs can be specially trained to meet I.P.'s specific needs, just as I.P.'s parents have been.  Because LVN care is not medically required for I.P., the Court should adopt the United States' proposal of privately hired home health attendants in the event of a liability finding.

If the Court were to conclude that LVN care was medically required, the United States' life care plan also offers an alternative proposal that provides for *privately hired* LVN care.  Private-hire LVN care ($217,000 per year) is approximately *half* the cost of agency-hire LVN care ($427,000 per year). Privately hiring therefore makes financial sense.  It would be improper to impose double the amount of damages on the United States for care that an economically rational actor would obtain at half the cost. In addition to making economic sense, privately hiring preserves the family's control over who cares for I.P. in their home.

### 3.    Pricing for Future Medical Expenses – Reasonable Value (*Howell/ Corenbaum*) and Insurance Offset (MICRA)

Under California law, a personal injury plaintiff may recover only the reasonable value of past

1   and future medical care required by an injury.  *Howell v. Hamilton Meats & Provisions, Inc.*, 52 Cal. 4th

2   541, 548, 555 (2011); CACI No. 3903A.  Such reasonable value cannot exceed what has been or will be

3   actually paid for that care.  *Howell*, 52 Cal. 4th at 548, 555; CACI No. 3903A; *Corenbaum v. Lampkin*,

4   215 Cal. App. 4th 1308, 1330-32 (2013).  This ceiling on medical-care damages renders admissible

5   evidence regarding what has been paid and what likely will be paid for a plaintiff's medical care, though

6   the source of payments may be inadmissible if the collateral source rule applies.  *Howell*, 52 Cal. 4th at

7   567; *Corenbaum*, 215 Cal. App. 4th at 1328-32.

8          The California Supreme Court addressed this issue in *Howell v. Hamilton Meats*.  *Howell*

9   involved a personal injury plaintiff who obtained a jury verdict awarding past medical expenses in the

10  amount billed by her medical provider instead of the lesser amount actually paid by her insurer.  52 Cal.

11  4th at 549-50.  The *Howell* court held that the plaintiff could recover no more that the amounts actually

12  paid (or still owed) by the plaintiff or her insurer.  *Id.* at 566.  It went on to conclude that evidence of

13  amounts paid is relevant to prove plaintiffs' damages for past medical expenses while evidence

14  regarding the full billed amount is not.  *Id.* at 567.  In *Corenbaum*, the California Court of Appeal

15  extended *Howell*'s reasoning to future medical expense damages, concluding that future-damages

16  evidence must be based on *amounts likely to be paid*, which renders past amounts billed but not paid for

17  medical services inadmissible.  *Corenbaum*, 215 Cal. App. 4th at 1328-32.

18         Amounts likely to be paid for I.P.'s future medical care therefore set the upper limit for what she

19  could recover in this medical malpractice case for future medical-expense damages.  Plaintiffs' life care

20  plan inappropriately uses charged (or billed) costs for many items that have been and will continue to be

21  paid by insurance, and also fails to account for cash discounts.  By contrast, in accordance with *Howell*

22  and *Corenbaum*, the United States' life care plan instead provides insurance-based cost numbers for

23  those items and accounts for cash discounts.

24         In determining any future medical-expense damage award, the Court should reduce the amount

25  per MICRA's modification of the collateral source rule, offsetting amounts likely to be paid by an

26  insurer (and so not by Plaintiffs).  MICRA abrogates the collateral source rule in medical malpractice

27  actions for certain collateral sources, such as health insurance.  *Cox v. Superior Court,* 120 Cal. Rptr. 2d

28  45, 47 (Cal. Ct. App. 2002) ("[MICRA] sets out an exception to the collateral source rule."); *Miller v.*

*Sciaroni,* 218 Cal. Rptr. 219, 221 (Cal. Ct. App. 1985) ("[§ 3333.1] thus abrogates the traditional

collateral source rule as to health care providers."); *Graham v. Workers' Comp. Appeals Bd.,* 258 Cal.

Rptr. 376,379 (Cal. Ct. App. 1989) ("As part of MICRA, the Legislature enacted Civil Code § 3333.1

which abrogated the collateral source rule in medical malpractice actions.").  MICRA thus allows

deductions from a plaintiff's damages recovery for medical expenses paid by insurance while precluding

subrogation by the insurer and so protecting plaintiffs from a double deduction.  Cal. Civil Code

§ 3333.1(b); *Barme v. Wood,* 37 Cal.3d 174, 177, 179 n.5 (1984); *but see Hernandez v. California*

*Hospital Medical Center,* 78 Cal. App. 4th 498, 506 (2000) (Section 3333.1 does not extinguish Medi-

Cal's lien rights).  This aspect of MICRA is generally viewed as an attempt to eliminate a potential

"double recovery" obtained by plaintiffs who have their medical expenses paid by their own health

insurance and still obtain damages for such expenses from defendant tortfeasors.  *Barme,* 37 Cal.3d at

179 n.5.  MICRA thus promotes fairness by ensuring that plaintiffs will recover what they spend but not

what they have or will not spend because insurance pays.  *See id.* at 179 ("[a]pparently, the Legislature's

assumption was that the trier of fact would take the plaintiff's receipt of such benefits into account by

reducing damages."); *Fein v. Permanente Medical Group,* 38 Cal.3d 137, 164-65 (1985).

The Court has already ruled in response to motions in limine that the United States may

introduce evidence under MICRA relating to (1) I.P.'s Blue Shield health insurance and (2) the

Affordable Care Act ("ACA") as it pertains to the likelihood of Plaintiff's future insurance benefits.

Dkt. 97; *see also Brewington v. United States,* 2015 WL 4511296 at *5, *6 (C.D. Cal. July 24, 2015)

(taking "insurance benefits available under the ACA into consideration in calculating reasonable future

life care plan needs" in an FTCA case).

### 4.      Present Cash Value

The parties' economists have offered opinions regarding the present cash value of future medical

expenses for I.P.  California law instructs that "[t]o find present cash value, [the trier of fact] must

determine the amount of money that, if reasonably invested today, will provide [plaintiff] with the

amount of [her] future damages."  CACI No. 3904A (Present Cash Value).

Accordingly, the economists calculated present cash values by applying net discount rates to

future costs.  These present-value calculations incorporate certain economic assumptions regarding the

appropriate discount rate, as well as life expectancy figures, attendant care pricing from the party's life care plan, and pricing that does (United States) or does not (Plaintiffs) account for insurance per MICRA.  Though the economic assumptions made by the parties' economists differ somewhat, both use a long-term historical approach.  So, for the most part, the differences in their present-value calculations result from (1) differences in attendant-care pricing and (2) MICRA.  A summary of the economists' calculations is provided in the following table.

| Future Medical Expense Calculations | 20+ Years Life Expectancy |
| --- | --- |
| United States (MICRA, HHA Private Hire) | $ 2,473,823 |
| United States (MICRA, LVN Private Hire) | $ 3,950,614 |
| Plaintiffs (No MICRA, LVN Agency Hire) | $10,552,845 |

The United States economist, **Erik Volk**, calculated the numbers above for a 20 additional-years life expectancy because it represents a life expectancy to 23 years of age — on the higher end of the age range (20 to 24) offered by the United States' life expectancy expert, Dr. Day.  Mr. Volk's methodology allows him to calculate present-value figures for different life expectancies with relative ease using the assumptions he will testify about.  If the Court were to find liability, and to find a life expectancy other than to age 23, the United States respectfully requests the opportunity to provide such figures in post-trial briefing.

The parties' economists have also calculated present cash values for projected lost earnings for I.P. using certain economic assumptions.

### 5.    MICRA's Noneconomic Damages Cap

MICRA imposes a $250,000 non-economic damages cap in time-of-judgment dollars that cannot be increased to account for inflation.  *See* Dkt. 94 (United States Opposition to Plaintiffs' MIL No. 3 Requesting a Hearing on Non-Economic Damages and Inflation); *Salgado v. County of Los Angeles*, 19 Cal. 4th 629, 635-636, 638-43 (1998); *see also Stinnett v. Tam*, 198 Cal. App. 4th 1412, 1419-26, 1432 (2011).  Under MICRA, any single plaintiff can recover only up to a $250,000 maximum in non-economic damages regardless of how many claims that plaintiff makes.  *Colburn v. United States*, 45 F.

Supp. 2d 787, 793-94 (S.D. Cal. 1998).  Accordingly, MICRA mandates that Plaintiffs I.P. and Micaela

Palacio may each seek to recover up to a maximum of $250,000 in non-economic damages here.

Plaintiffs' Federal Rule of Civil Procedure 26 disclosures also limit their non-economic damages claims

because those disclosures sought only $250,000 in general damages for I.P. and $250,000 in general

damages for Micaela Palacio.

### 6.        MICRA's Periodic Payment Statute

The United States, in the event of a verdict awarding future damages, intends to invoke

California's periodic payment statute, California Code of Civil Procedure § 667.7.  *See Cibula v. United*

*States*, 664 F.3d 428 (4th Cir. 2012) (discussing application of California's periodic payment statute to

the United States in an FTCA case).  Because the FTCA prevents courts from impose continuing

obligations on the United States, only a lump-sum damages award could be imposed.  Therefore, the

Court would be required to determine I.P.'s life expectancy in order to calculate such a lump-sum

award.  That award would then be put into a reversionary trust to approximate the effect of California's

periodic payment statute.  This complex issue would require post-trial briefing.

### 7.        Banner Settlement Offset

Under California law, any judgment against the United States would have to be reduced to offset

Banner's settlement payment of $500,000.  Cal. Code Civ. Proc. § 877; Dkt. 101 at 5.

*        *        *

Given the numerous and complex damages issues in this case, the United States submits that

post-trial briefing would be necessary to address such issues if liability were found.

### C.        Other Trial-Related Issues.

A court certified Spanish interpreter will be used for Plaintiff Micaela Palacio's testimony.

Dr. Davainis and Dr. Holmes will attend trial as the United States' party representatives.  Though

Facundo Palacio is no longer a party, he is I.P.'s guardian ad litem and the United States does not object

to his presence during trial.  The United States also proposes the customary practice that experts not be

excluded from the courtroom during trial.

During the parties' motions in limine, the parties agreed that each side would only present one

life expectancy expert and the United States informed Plaintiffs that it would only present Dr. Day at

trial on life expectancy.  Dkt. 88.  Plaintiffs informed the United States that it would be presenting Dr.

Ira Lott on life expectancy and Dr. Donald Olson on causation.  The United States also previously

informed Plaintiffs that it will present only one Maternal-Fetal Medicine expert at trial.

IV.     **CONCLUSION**

Dr. Davainis and Dr. Holmes met the applicable standard of care and were not negligent.  The

Court should enter judgment for the United States.


Respectfully submitted,

Dated:  September 17, 2015                    BENJAMIN B. WAGNER
                                             United States Attorney


                                    By:  /s/ *VICTORIA L. BOESCH*
                                             VICTORIA L. BOESCH
                                             Assistant United States Attorney

Dated:  September 17, 2015                    */s/ CHI SOO KIM*
                                             CHI SOO KIM
                                             Assistant United States Attorney

                                             Attorneys for the United States