1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

I.P., A MINOR, BY AND THROUGH
HER GARDIAN AD LITEM, FACUNDO
PALACIO DIEZ; MICAELA
PALACIO,

              Plaintiffs,

     v.

UNITED STATES OF AMERICA,

              Defendant.

No.  2:13-cv-01012-JAM-CKD

**FINDINGS OF FACT AND CONCLUSIONS
OF LAW**

## I.   BACKGROUND AND PROCEDURAL HISTORY

Plaintiff I.P., a minor, and her mother, Micaela Palacio
(collectively, "Plaintiffs") originally sued the hospital where
I.P. was born for negligently failing to perform a timely C-
section, causing I.P. brain damage that rendered her severely and
permanently disabled.  That case proceeded in Lassen County
Superior Court.  Upon learning that the United States employed
the two doctors involved in the delivery – Drs. Paul Davainis and

1

1  Paul Holmes – Plaintiffs brought this action against the United

2  States ("Defendant") under the Federal Tort Claims Act ("FTCA"),

3  28 U.S.C. § 2671 et seq.  This Court is vested with jurisdiction

4  pursuant to 28 U.S.C. § 1346(b).

5      Plaintiffs' federal complaint alleged three causes of

6  action: negligence as to I.P., and negligence[1] as well as

7  negligent infliction of emotional distress as to Micaela Palacio.

8  Facundo Palacio Diaz, I.P.'s father, also asserted a claim

9  against the hospital in the Lassen County case, but appears in

10  this FTCA action only as I.P.'s guardian ad litem.  In July 2015,

11  this Court confirmed a settlement between the hospital, I.P. and

12  her father.  In the federal action, the parties proceeded to

13  trial.

14      This Court conducted a nine-day bench trial beginning

15  September 24, 2015.  The parties offered testimony from

16  percipient witness including I.P.'s parents, both doctors, and a

17  nurse, as well as expert testimony on each doctors' negligence,

18  causation, and several damages issues.  The Court also considered

19  the parties' stipulations reached prior to and during trial

20  (Docs. ##98, 131) as to certain causation and damages issues.

21      After the close of Plaintiffs' case, the government moved

22  for partial judgment as to the issue of Dr. Holmes's negligence.

23  The Court agreed with the findings of fact and conclusions of law

24  argued and submitted by the government (Doc. #153), and granted

25  the motion pursuant to Federal Rule of Civil Procedure 52(a)(1)

26

27  [1] As confirmed at trial, Mrs. Palacio abandoned her negligence
    claim and asserted only a claim for negligent infliction of
28  emotional distress.

1    and (c).  Because the Court concluded that Dr. Holmes was not

2    negligent and his actions did not result in injury to Plaintiffs,

3    all issues involving Dr. Holmes are resolved and this Order does

4    not address them.

5         As to Dr. Davainis, the Court's findings of fact and

6    conclusions of law pursuant to Rule 52 follow.

7

8              II.   FINDINGS OF FACT AS TO LIABILITY

9         1.   Banner Health is a nonprofit corporation that owns

10   BLMC, a 25-bed hospital that provides medical care in Lassen

11   County, California.

12        2.   Micaela Palacio presented to BLMC around 11:00 PM on

13   the evening of April 29, 2012, in active labor.  She was at 39

14   weeks of gestation and had delivered two prior children vaginally

15   without complications.

16        3.   Facundo Palacio Diaz is I.P.'s father and Mrs.

17   Palacio's husband.

18        4.   Mrs. Palacio and her husband were both 34 years old as

19   of April 2012.

20        5.   In April 2012, Dr. Paul Davainis and Dr. Paul Holmes

21   were Northeastern Rural Health Clinic employees.

22        6.   Northeastern Rural Health Clinic is located in

23   Susanville, California and is a Federally Qualified Health

24   Center.

25        7.   Dr. Davainis and Dr. Holmes are doctors with a

26   specialty in Family Medicine who were in April 2012 deemed

27   federal employees pursuant to the Federally Supported Health

28   Centers Assistance Act.

8.   In April 2012, Kelly DelCarlo was a registered nurse and a Banner employee.

9.   Ms. DelCarlo and Ms. Ginger Leeth were working at BLMC the evening of April 29, 2012 and provided nursing care to Mrs. Palacio.

10.   Dr. Davainis was on call for Obstetrics during the evening of April 29, 2012.  Dr. Davainis was at his home when he was called to come in by the nursing staff around 2:00 AM on the morning of April 30, 2012.

11.   At that time, the nursing staff informed him that Mrs. Palacio had dilated to 9 cm and that her membranes had spontaneously ruptured.  The nursing notes state that Mrs. Palacio remained at 9 cm dilation from 2:00 AM until the C-section.

12.   Dr. Davainis had not provided Mrs. Palacio's prenatal care, and the early morning of April 30 was the first time the two had met.  He examined her medical records that morning, but he was not generally familiar with her or her medical history.

13.   The nurses and Dr. Davainis monitored I.P.'s wellbeing prior to birth by using an external electronic fetal heart rate monitor.  The heart rate was measured on a tracing strip between approximately 11:06 PM and 5:07 AM.  Dr. Davainis looked back at the entire strip when he arrived, and continued to examine it throughout Mrs. Palacio's labor.

14.   The first stage of labor involves dilation of the cervix.  Once the cervix is fully dilated, labor moves to the second stage, in which contractions push the baby down the birth canal.

4

15.   At 2:15 AM when Dr. Davainis arrived, it was expected that Mrs. Palacio would fully dilate and deliver within the hour, because she had dilated rapidly since arriving at the hospital, she had a history of two prior vaginal deliveries without complication, and in general, the last part of dilation is the most rapid.

16.   When Dr. Davainis examined Mrs. Palacio around 2:15 AM, he determined that she had dilated to between 8 and 9 cm and that the cervix "seemed loose."

17.   Around 2:15 or 2:30 AM, Mrs. Palacio had an urge to push, so Dr. Davainis turned down the epidural and directed her to attempt pushing.  They then abandoned the attempt because it caused swelling of the cervix.  Dr. Davainis turned the epidural up and the swelling subsided.

18.   Over the next hour to hour and a half, Dr. Davainis observed that Mrs. Palacio went from "between 8 and 9 cm" to 9 cm dilated.  The nurses administered oxygen, IV fluids, and changed her position.

19.   At 4:00 AM, Mrs. Palacio had a "rim of cervix."  The cervix did not dilate any further.  Mrs. Palacio never reached the second stage of labor, because her cervix never fully dilated.

20.   Between 4:00 and 5:00 AM, Dr. Davainis had Mrs. Palacio resume pushing as he attempted to reduce the cervix.

21.   Dr. Davainis felt the baby's head slightly descending at times between 4:00 and 5:00 AM.  He considered that the baby might be in occiput posterior position, which could slow labor, or that there was cephalo-pelvic disproportion, which could

1  prevent vaginal delivery.

2      22.  At 5:00 AM, Dr. Davainis called for a C-section.  He

3  described his reasons in a preoperative note recorded at 5:01 AM,

4  indicating that the fetal heart rate tracing was worsening and he

5  felt that "a vaginal delivery [was] too far off for this baby and

6  that she will have a difficult time tolerating any prolonged

7  pushing."  He also was "afraid [cephalo-pelvic disproportion

8  would] be proven."

9      23.  Dr. Holmes was at his home when he was called at 5:00

10  AM on April 30, 2012, to assist with the delivery of I.P.

11      24.  After Dr. Davainis called for a C-section, the nurses

12  prepared Mrs. Palacio for surgery.

13      25.  In preparing her for surgery, they disconnected the

14  fetal heart rate monitor at approximately 5:07 AM.

15      26.  I.P. experienced a hypoxic ischemic injury of the acute

16  profound pattern due to near-total cessation of oxygenated blood

17  through the umbilical cord sometime between approximately 5:08

18  and 5:13 AM.

19      27.  This injury led to neonatal encephalopathy, which

20  ultimately resulted in spastic quadriplegic cerebral palsy,

21  cortical visual impairment, and severe global development delay.

22      28.  The nurses reconnected Mrs. Palacio to the fetal heart

23  monitor once inside the operating room, around 5:13 AM.  The

24  nurses were unable to find a fetal heart rate.  Dr. Davainis

25  observed a heart rate, but a very slow one.

26      29.  Dr. Davainis immediately thereafter performed a C-

27  section on Mrs. Palacio, assisted by Dr. Holmes.

28      30.  I.P.'s time of birth was sometime between 5:24 and 5:28

1  AM.  I.P. had APGAR scores of 0, 2, and 3 at 1, 5, and 10 minutes

2  of life, respectively.

3      31.  After I.P. was delivered, Dr. Holmes resuscitated her

4  and was assisted by hospital staff in the resuscitation.

5      32.  I.P. was later transferred to U.C. Davis Medical Center

6  NICU.

7      33.  I.P. was cared for at U.C. Davis Medical Center from

8  April 30, 2012 to June 5, 2012.

9      Further findings of fact are described and explained below.

10

11          III.   OPINION AS TO LIABILITY

12      A.   Legal Standard

13      The FTCA makes the United States liable for the negligent

14  actions of its employees.  28 U.S.C. § 1346(b)(1).  Because the

15  allegedly negligent medical care in this case was provided in

16  this state, California law applies.  Id.; Hernandez ex rel.

17  Telles-Hernandez v. United States, 665 F. Supp. 2d 1064, 1076

18  (N.D. Cal. 2009) (citing Richards v. United States, 369 U.S. 1,

19  11-12 (1962)).

20      To prove negligence, Plaintiffs must demonstrate by a

21  preponderance of the evidence that (1) Dr. Davainis had a duty

22  to use such skill, prudence, and diligence as other members of

23  his profession commonly possess and exercise (the standard of

24  care);[2] (2) he breached that duty; and (3) the breach was the

25  _____

26  [2] The evidence in this case demonstrated agreement between the
   parties that the standard of care applicable in this case was
   that of an obstetrician (not a family practice physician) and

27  that this standard of care is the reasonable degree of skill,
   knowledge and care ordinarily possessed and exercised by

28  obstetricians under similar circumstances.

1  proximate cause of (4) Plaintiffs' injuries.  <u>Hanson v. Grode</u>,

2  76 Cal.App.4th 601, 606 (1999) (citing <u>Budd v. Nixen</u>, 6 Cal.3d

3  195, 200 (1971) & <u>Gami v. Mullikin Med. Center</u>, 18 Cal.App.4th

4  870, 877 (1993)); <u>Mgmt. Activities, Inc. v. United States</u>, 21 F.

5  Supp. 2d 1157, 1174 (C.D. Cal. 1998).

6       B.   <u>Analysis</u>

7            1.   <u>Negligence of Dr. Davainis</u>

8                 a.   <u>Duty and Breach of Standard of Care</u>

9       Dr. Davainis breached a duty owed to his patients if he

10  failed to "exercise that reasonable degree of skill, knowledge

11  and care ordinarily possessed and exercised by members of [his]

12  profession under similar circumstances." <u>Alef v. Alta Bates</u>

13  <u>Hosp.</u>, 5 Cal.App.4th 208, 215 (1992); <u>see</u> <u>Burgess v. Superior</u>

14  <u>Court</u>, 2 Cal.4th 1064, 1069 (1992) (holding that negligence as to

15  delivery of a fetus also breaches a duty owed to the mother).

16  The central issue in dispute is whether Dr. Davainis complied

17  with the standard of care by calling for a C-section at 5:00 AM,

18  or whether that standard required him to call for a C-section

19  earlier.

20       In general, the evidence showed that the standard of care

21  indicates a C-section in the face of arrest of labor and fetal

22  intolerance to labor.  Both Plaintiffs' and Defendant's experts

23  (Drs. Frank Manning and Maurice Druzin, respectively) opined that

24  there were medical indications for a C-section as early at 3:00

25  AM and that those indications persisted throughout Mrs. Palacio's

26  labor until delivery.

27       The government argues that at best the evidence shows that a

28  C-section before 5:00 AM was permissible, not required.  The

1    government further contends that the standard of care did not

2    require a C-section before 5:00 AM, because labor had progressed

3    up to that point and the baby was tolerating labor sufficiently.

4        Contrary to the government's representations, labor in this

5    case was arrested much earlier than 5:00 AM, and under the

6    circumstances, the standard of care required Dr. Davainis to call

7    for a C-section around 4:00 AM.   Only one witness, Dr. Druzin,

8    defined arrest of labor.   Dr. Druzin testified that arrest of

9    labor occurs where the cervix dilates at less than 1.5 cm per

10   hour.   According Dr. Davainis's own testimony, Mrs. Palacio's

11   cervix dilated (at most) 1.5 cm over two hours: between 2:00 and

12   4:00 AM.   The Court therefore concludes, as Plaintiff's expert

13   Dr. Manning did, that the progress reported by Dr. Davainis was

14   not appreciable and the standard of care required Dr. Davainis to

15   recognize that labor was arrested by at least 4:00 AM.

16       Once labor was arrested, it was unreasonable for Dr.

17   Davainis to have Mrs. Palacio push for an hour in the presence of

18   worsening fetal wellbeing.   The standard of care may have allowed

19   him to make one last attempt to vaginally deliver this fetus at

20   4:00 AM, but the evidence showed that he fell below the standard

21   of care by waiting until 5:00 AM to intervene.

22       The Court reaches this conclusion after a thorough and

23   careful consideration of the trial record, as well as an

24   assessment of and conclusions about the credibility and relative

25   persuasiveness of witnesses and exhibits.

26       The record here reveals numerous divergent and contradictory

27   opinions regarding interpretation of the fetal heart rate tracing

28   and what the standard of care required Dr. Davainis to do in

1   response.   In fact, almost every individual who analyzed this

2   strip had a different interpretation - from the nurses present

3   during labor to Dr. Davainis to the testifying experts.   The

4   experts even appeared to have had a difficult time interpreting

5   the strip consistently over time, evidenced by the divergence in

6   their descriptions of the strip during depositions and at trial.

7          The Court finds it unnecessary and impractical to choose a

8   particular interpretation from this mess of opinions.   The range

9   of opinions appears to be a normal consequence of asking multiple

10  individuals to interpret a strip minute-by-minute; indeed, Dr.

11  Ivonne Wu testified that interpretation of fetal heart rate

12  tracings can be subjective, that interrater reliability is poor,

13  and that the same person may view a strip differently at

14  different times.   These reliability issues appear to have been

15  borne out in this case.

16         But the fact that fetal heart rate tracings are subjective

17  and unreliable does not make them worthless.   As each witness

18  testified, the standard of care required using and interpreting

19  this tool.   And the witnesses generally agreed that a reasonable

20  interpretation of the strip included at least the following:

21  (1) the strip showed a Category I tracing from its inception

22  until about 1:30 AM; (2) the strip then depicted a Category II

23  tracing from 1:30 AM until at least 4:45 AM; (3) Category II

24  meant, among other things, that the tracing was no longer in

25  Category I; (4) Category I would have been a good indicator that

26  the baby was doing well, and by 1:30 AM, Dr. Davainis no longer

27  had that reassurance; (5) the fetus was increasingly stressed by

28  the labor (evidenced by some combination of the type, frequency,

1  and length of decelerations and the decrease in variability); and

2  (6) at some point – a point that no one could predict – this

3  increasingly stressed fetus would be unable to compensate and

4  would metaphorically "fall off the cliff."

5      So the situation faced by Dr. Davainis raises the following

6  questions: by 4:00 AM, why wait?  Why wait when labor has been

7  arrested for over an hour without apparent explanation and no

8  appreciable progress?  Why wait when the previous pushing attempt

9  produced swelling of the cervix?  Why wait with a patient whose

10  medical history is unfamiliar and when a language barrier impedes

11  communication?  Why wait for the fetus to get closer to the cliff

12  – especially when it is impossible to determine where the cliff

13  is?  Why wait when at every time between 3:15 and 5:00 AM, there

14  were clear medical indications for a C-section?

15      Dr. Manning[3] offered credible and reasoned answers to these

16  [3] The government attempts to cast Dr. Manning's trial testimony

17  as a devious scheme to manufacture causation and as evidence that
   he is not qualified to offer a medical opinion.  The Court

18  disagrees.  The Court found his testimony at trial to be
   credible, forthcoming, and professional.  As a Professor of

19  Obstetrics with over forty years of experience, Dr. Manning is
   qualified to opine on the issues in this case.  Also, where the

20  government contends that Manning changed his answers between
   deposition and trial, the Court finds no important discrepancies.

21  For example, the government pointed out that Manning testified at
   his deposition that the strip became Category III at 4:50 AM,

22  whereas at trial he stated it was 4:45 AM.  As discussed above,
   the Court finds it unnecessary and impractical to decide what

23  exactly the strip showed at each minute or when exactly the strip
   moved from Category II to Category III.  The government also

24  contends that Dr. Manning changed his testimony at trial to
   indicate that a C-section was required by 3:15 AM versus 4:50 AM

25  (which he supposedly testified to at deposition).  This
   characterization of his testimony and his statements at

26  deposition is inaccurate; the thrust of his opinion has always
   remained the same: worsening fetal wellbeing required Dr.

27  Davainis to call for a C-section when it became clear that labor

28  11

1  questions.  He opined that the standard of care required Dr.

2  Davainis to recognize the warning signs of a worsening fetal

3  condition and intervene in the face of minimal progress.  Dr.

4  Davainis had many opportunities to intervene starting around 3:15

5  AM, and he took an unreasonable risk by waiting in the presence

6  of all the factors discussed above.

7      Dr. Manning testified that in certain circumstances, it

8  would in fact be reasonable to attempt a course of pushing even

9  in the presence of worsening fetal distress.  Those circumstances

10 include where the patient is experiencing rapid progress in

11 labor, such that she is likely to deliver before a C-section

12 could be completed.  But in this case, Mrs. Palacio's labor was

13 not progressing rapidly.  To the contrary, there had been no

14 appreciable progress for over an hour - and the fetal heart rate

15 was worsening.

16     Dr. Druzin, in contrast, was unable to offer a reasoned

17 answer to the questions posed above.  When pressed on the subject

18 of how long it was permissible to wait under the circumstances,

19 Dr. Druzin stated that there is no standard of care governing how

20 long Dr. Davainis should have waited.  Simply put, "at some point

21 you've got to call it," and Davainis called it.

22     The Court cannot accept that no standard of care governed

23 Dr. Davainis's decision.  "No standard" cannot possibly be the

24 standard applied in this legal context.

25 ///

26

27 was arrested.  This reliable and credible opinion is what the
Court has considered herein in forming its findings and
28 conclusions.

12

1    ///

2    ///

3    ///

4         The Court is also skeptical of Dr. Druzin's testimony[4] that

5    waiting for a vaginal delivery was reasonable because Dr.

6    Davainis was "hoping for" and "expecting" such a delivery.

7    Although the Court acknowledges a role for medical judgment in

8    these situations, Dr. Druzin's analysis would make the standard

9    of care entirely subjective.  That is, under Dr. Druzin's theory,

10   a doctor would always meet the standard of care so long as he

11   recounted a hope of vaginal delivery or stated that he

12   subjectively believed that there was progress, no matter how

13   slight.

14        The Court also rejects this testimony even assuming that Dr.

15   Davainis's expectation of a successful vaginal delivery between

16   4:00 and 5:00 AM was most likely objectively accurate.  The Court

17

18   [4] A further reason for the Court's partial skepticism toward Dr.
     Druzin's testimony is that he did not appear unbiased.  He
19   testified that he does 99.9% of his medical-legal work for
     defendants, indicating that his opinion may be colored by the
20   financial benefit of providing defense-friendly testimony in
     these kinds of cases.  He also revealed himself to be more an
21   advocate for the defense than a neutral observer.  For instance,
     he became argumentative with Plaintiffs' attorney and the Court
22   when pressed about the divisive issues in this case, and made at
     least one sarcastic comment impugning plaintiff-side work in
23   medical malpractice cases.  The Court does not however wholly
     disregard this expert's testimony (since he is very well
24   qualified in this area), and relies on it in part as discussed
     throughout this opinion.  The Court has discounted his opinion in
25   areas where he became argumentative and appeared to adapt his
     answers to counter Plaintiffs' theories.  For example, the Court
26   did not find credible his testimony that by "stalled" labor, he
     meant "slowly progressing" labor in response to questioning about
27   whether arrest of labor justified a C-section in this case.
28

1   accepts the fact (agreed to by all witnesses) that it is possible
2   for a patient similar to Mrs. Palacio to push past a rim of
3   cervix and deliver vaginally.  The Court also accepts the fact
4   that, in general, a fetus can withstand a significant amount of
5   stress and that it is possible – or even very likely – that a
6   stressed fetus showing a Category II tracing for long periods
7   will not develop cerebral palsy.  But these objective
8   possibilities do not absolve the government of liability.
9   Indeed, an unlikely event is not always unforeseeable.  And here,
10  the harm was foreseeable at least by 4:00 AM, because of the
11  worrying and worsening signs of fetal distress and the arrest of
12  labor for over an hour.
13      Dr. Davainis took an unreasonable risk by attempting pushing
14  for a full hour rather than calling for a C-section around 4:00
15  AM.  The Court agrees with Dr. Manning that Dr. Davainis's choice
16  to take this risk under the circumstances fell below the required
17  standard of care.  Dr. Davainis overlooked or discounted the
18  warning signs at 4:00 AM (i.e., unexplained arrest of labor for
19  over an hour and a progressively worsening fetal heart rate) that
20  the standard of care required him to consider and act upon.  He
21  hoped and expected that these warning signs would not spell
22  disaster for I.P.  But they did.
23      Dr. Druzin also testified that waiting for a vaginal
24  delivery during that hour was reasonable because Dr. Davainis
25  observed progress in the labor (i.e., the head moving down
26  slightly with pushing) and because the variability on the fetal
27  heart monitor tracing showed that the baby was tolerating labor.
28      The Court finds Dr. Druzin's testimony less persuasive than

14

1  that of Dr. Manning.  The statement that labor was still

2  progressing based on the baby's head moving slightly contradicts

3  Dr. Druzin's other testimony defining arrest of labor as dilation

4  of less than 1.5 cm per hour.  No witness here could reasonably

5  dispute that the first stage of labor was arrested, since by all

6  accounts the cervix dilated much slower than 1.5 cm per hour.  A

7  finding of arrest of labor is also bolstered by Dr. Davainis's

8  observation prior to 4:00 AM of swelling of the cervix upon

9  pushing.  The Court agrees with Dr. Manning that labor was

10 arrested and the reported progress was not appreciable.

11      Moreover, the Court was not convinced by Dr. Druzin's

12 testimony on direct examination that the presence of at least

13 some variability meant that the baby was fine and there was no

14 need to imminently intervene.  The weight of the evidence, as

15 well as Druzin's subsequent testimony on cross examination,

16 militate to the contrary.  In particular, every witness – Dr.

17 Druzin included – opined that the fetal heart rate was worsening.

18 No one thought the tracing would improve; everyone thought it

19 would continue to deteriorate.  Dr. Davainis himself noted the

20 increasingly worrisome signs in his notes that morning.  The

21 warning signs were there and Dr. Davainis should have heeded

22 them, particularly when the danger of veering off course if the

23 signs are ignored or misread, is so significant.

24      The Court does not reach its conclusions herein lightly and

25 recognizes the possibility that its decision today could subject

26 physicians to criticism and possible liability in cases involving

27 the subjective interpretation of fetal heart rate tracings.  The

28 standard of care indeed allows for a range of reasonable

1   interpretations and differences in close calls of judgment, and a

2   court should not venture to second guess a doctor whose decisions

3   fall within these bounds.  But under the specific circumstances

4   of this case, the Court concludes that the evidence and testimony

5   presented at trial was sufficient to establish that Dr.

6   Davainis's decision to wait until 5:00 AM to call for a C-section

7   breached the standard of care.  The weight of the evidence

8   favored Plaintiffs' persuasive explanation of this standard and

9   how it was breached.

10       For these reasons, the Court finds that the standard of care

11   required Dr. Davainis to be more conservative and to order a C-

12   section around 4:00 AM or shortly thereafter.

13                    b.    Causation

14       As to causation, the parties have stipulated that

15       1. Neuroradiologists analyzing the May 1, 2012
         ultrasound and the May 7, 2012 MRI of I.P.'s brain
16       concluded that those images are consistent with I.P.
         having experienced hypoxic ischemic injury of the
17       acute profound pattern.

18       2. A hypoxic ischemic injury of the acute profound
         pattern results from a near-total cessation of
19       oxygenated blood reaching the fetus for a short amount
         of time, typically 10 to 20 minutes.
20
         3. These imaging results are consistent with I.P.
21       having experienced a sentinel event such as a cord
         compression occurring within the last 15 to 20 minutes
22       prior to birth.

23   Despite this stipulation, the government offers two theories in

24   an attempt to defeat causation.  Neither is persuasive.

25       First, the government argues that even if Dr. Davainis did

26   not meet the standard of care, Plaintiffs cannot show that

27   compliance with the standard would have prevented I.P.'s

28   injuries.  The reasoning is that even if Dr. Davainis had called

1    for a C-section at 4:50 AM and properly performed it within

2    thirty minutes, I.P. still would have been injured.  But as

3    discussed above, the Court finds that the standard of care

4    required Dr. Davainis to call for a C-section around 4:00 AM.

5    Had he done so, I.P. would have been delivered well before 5:08

6    AM, which is the earliest I.P.'s injuries are estimated to have

7    occurred.  The Court therefore rejects this theory.

8        The government has also argued that the word "sentinel" in

9    the third stipulated fact above indicates that the injury was not

10   foreseeable, which would therefore defeat a showing of proximate

11   cause.  The argument relies on Dr. Druzin's testimony that

12   "sentinel" means an "unanticipated" event that is "not related to

13   the natural history of the disease."  The Court is not persuaded

14   by Dr. Druzin's testimony, because the evidence at trial

15   established that cord compression is in fact related to labor and

16   childbirth, and occurs to varying degrees in every labor.[5]

17   Moreover, the evidence showed that the standard of care required

18   Dr. Davainis to be alert to signs of fetal distress – such as the

19   possibility of cord compression – by using the electronic fetal

20   heart rate monitor.  While the extent of the harm may not have

21   been fully predictable, it cannot be said that I.P.'s injuries

22   were unexpected given the risks that Dr. Davainis took between

23   3:15 and 5:00 AM.

24       As the parties' stipulation strongly implies, there is clear

25   _____

     [5] Dr. Druzin also admitted on cross examination that the Joint
26   Commission defined "sentinel event" by stating, "Such events are
     called sentinel because they signal the need for immediate
27   investigation and response, and that each accredited organization
     is strongly encouraged, but not required to report sentinel
28   events to the Joint Commission."

                                  17

proof beyond a preponderance of the evidence that I.P.'s injuries were proximately caused by Dr. Davainis's negligence.

## IV.   CONCLUSIONS OF LAW AS TO LIABILITY

For the reasons set forth above, the Court concludes as follows:

1.   Dr. Davainis owed a duty of care to I.P. and her mother.

2.   Dr. Davainis was negligent as to both Plaintiffs in failing to call for a C-section until 5:00 AM.

3.   That negligence caused the injuries to Plaintiffs.

## V.   FINDINGS OF FACT AS TO DAMAGES

1.   Because of her injuries, I.P. will never be able to conduct the activities of daily living or otherwise care for herself.

2.   She will never be able to speak.

3.   She will never be able to walk.

4.   She will never be able to work.

5.   I.P. will always require 24-hour/day care.  She cannot eat and must be fed through a gastronomy tube.  She cannot swallow and requires frequent suctioning, including during the night.  Her need for this care will continue for her entire life.

6.   I.P. is at risk for complications, including pneumonia, seizures, and joint dislocation and deformity.

7.   I.P. turned three years old on April 30, 2015.

8.   On or about November 20, 2012, I.P. and Mrs. Palacio presented administrative tort claims to the Department of Health

1   and Human Services.

2       9.   Mrs. Palacio's administrative claim sought $500,000 for

3   severe emotional distress.

4       10.   I.P.'s administrative claim sought $25,000,000 for

5   personal injury.

6       11.   Mr. Palacio Diaz did not present an administrative tort

7   claim to the Department of Health and Human Services.

8       12.   Mr. Palacio Diaz brought a loss of consortium claim in

9   the Superior Court action against Banner Health.

10      13.   Mr. Palacio Diaz and I.P. entered into a settlement

11  with Banner Health before trial in the amount of $500,000.

12      14.   At the time of trial, Medi-Cal had issued a lien for

13  payments made by the Medi-Cal program for medical services

14  related to I.P.'s injury of $87,521.

15      Further findings of fact are described and explained below.

16

17              VI.   OPINION AS TO DAMAGES

18      According to the proof at trial, Dr. Davainis's negligence

19  has caused and will cause I.P. economic and noneconomic damages.

20  As to the amounts of those damages, the parties initially offered

21  separate life care plans and costs for each specific item needed

22  for I.P.'s future medical care.   They also argued about the

23  effect of future health insurance on damages.

24      After trial was underway, the parties reached a stipulation

25  (Doc. #131) that resolved most issues related to future medical

26  care.   Plaintiffs accepted the items and costs in the

27  government's life care plan prepared by expert Tim Sells, except

28  for attendant care.   Plaintiffs also agreed to the government's

1    method of taking insurance into account.  The future-care costs
2    agreed upon by the parties therefore include expenses for future
3    insurance premiums and out-of-pocket costs, as well as a
4    corresponding offset for future insurance benefits.  The parties
5    also agreed on four calculations of the present cash value of
6    these future care costs (except attendant care), contingent on
7    the Court's determination of I.P.'s life expectancy and the net
8    discount rate.

9         Pursuant to the parties' stipulation, the only remaining
10   issues as to future damages before the Court are:
11        1.   I.P.'s life expectancy;
12        2.   What type of attendant care I.P. needs;
13        3.   The present cash value for this future attendant care;
14        4.   The amount of I.P.'s projected lost earnings; and
15        5.   The net discount rate(s) to apply.
16   The Court addresses each of these items below.  Items 3 and 5 are
17   considered together as they involve similar issues.  The Court
18   also determines the amount of past economic and noneconomic
19   damages, to which the parties have not stipulated.
20        A.   Life Expectancy
21        The high end of Plaintiffs' life expectancy range for I.P.
22   and the low end of the government's range are only two years
23   apart (age 24 versus age 26), thus evidencing near agreement on
24   this issue between the parties.  The evidence at trial
25   demonstrated that life expectancy is an epidemiological concept
26   based on probabilities.  The Court therefore gives greater weight
27   to Dr. Steven Day's opinion, which was based on a comprehensive
28   statistical analysis of numerous population studies including

1   persons with characteristics and risk factors similar to I.P.

2   Dr. Ira Lott, in contrast, based his estimate on his "experience"

3   of treating patients with cerebral palsy.  Although Dr. Lott also

4   considered "literature," he did not undertake any apparent

5   statistical analysis to arrive at his conclusion.

6      Plaintiffs argue that Dr. Lott's opinion is more accurate

7   because he personally examined I.P. and Dr. Day did not.  But Dr.

8   Day reviewed extensive medical records for I.P. as well as the

9   recorded observations of her examining doctors, treating

10  physicians, and her parents in reaching his conclusion.  On cross

11  examination, Dr. Lott conceded that he could not identify any

12  particular risk factor or characteristic of I.P. that Dr. Day had

13  overlooked in his analysis.

14     For these reasons, the Court is persuaded by Dr. Day's

15  analysis and determines I.P.'s life expectancy to be

16  approximately 20 additional years (to 23 years of age).

17     B.   Type of Attendant Care

18     As to attendant care, Plaintiffs offered a plan providing

19  I.P. with 24-hour/day Licensed Vocational Nurse ("LVN") care

20  provided by an agency plus 24 hours/year of case manager time,

21  while the government offered two proposals: (a) 24-hour/day

22  private-hire Home Health Attendant ("HHA") care, plus two weeks

23  of 24-hour LVN agency care, 48 hours of case manager time,

24  payroll services, and 100 hours of conservator-fiduciary time for

25  the first year (and 60 hours/year thereafter), or (b) 18-hour/day

26  private-hire LVN care plus 6 hours/day HHA care, two weeks of 24-

27  hour agency LVN care, 48 hours/year of case manager time, payroll

28  services, and 100 hours of conservator-fiduciary time for the

1  first year (and 60 hours/year thereafter).  As discussed above,

2  the type of attendant care is the only issue before the Court.

3       The Court finds that I.P. requires 24-hour/day care from an

4  LVN.  Plaintiffs' evidence on this issue was far more persuasive

5  than that introduced by the government.  An LVN, rather than an

6  HHA as the government proposes, will provide the appropriate

7  level of care, because LVNs are trained in medical decision-

8  making, are supervised, and can be responsive to I.P.'s

9  particular and developing medical needs and risk factors.

10 Defendant's expert, Dr. Joseph Capell, conceded that it would be

11 "entirely appropriate" for I.P. to have care from an LVN, and

12 that certain tasks essential to I.P.'s daily care (such as

13 gastronomy tube feeding) require an LVN.  Contrary to the

14 government's position, I.P. needs LVN care around the clock,

15 because her medical needs and complications will arise around the

16 clock and cannot be scheduled in an 18-hour/day window.

17      With respect to the issue of whether I.P. needs an agency or

18 private LVN, the Court finds that an agency will more likely

19 ensure that I.P. experiences no gaps in coverage due to

20 unavailability of individual staff members.  Moreover, an agency

21 would offer employee screening, bonding, insurance, and medical

22 record compliance.  If not for an agency, this burden, as well as

23 the risks of gaps in care or low quality care, would fall on

24 I.P., her family, and the few hours of case manager time offered

25 by the government's plan.  That is neither fair or reasonable to

26 IP or her family.

27      For these reasons, the Court concludes that I.P. requires

28 and is entitled to 24-hour/day LVN agency care.

1

     C.    Present Cash Value

2

     Determination of present cash value depends on the net

3

discount rate.  The Court finds, based on the expert testimony,

4

that the best estimate of the net discount rate is 1%.  In

5

reaching this conclusion, the Court was more persuaded by Dr.

6

Peter Formuzis's analysis than that of Dr. Erik Volk.  Dr.

7

Formuzis considered a more compressive dataset over a longer time

8

period, and his opinion better aligned with current projections

9

of the Congressional Budget Office.  The Court declines to apply

10

a different discount rate for growth in attendant care wages,

11

because the dataset that Dr. Volk relied on was even more

12

temporally limited and was also not commensurate with official

13

projections.

14

     D.   Conclusion as to Present Cash Value of Future Care
           Costs

15

16

     The Court calculates future costs assuming a 1% discount

17

rate and a life expectancy to 23 years of age, as determined

18

above.  Relying on Dr. Formuzis's analysis,[6] the present value of

19

LVN agency care using those assumptions is $7,753,349.  Using

20

those same assumptions and pursuant to the parties' stipulated

21

calculations, the present cash value of I.P.'s future medical

22

expenses other than LVN agency care is $544,139.  Total future

23

medical costs therefore amount to $8,297,488 in present cash

24

value.

25

     E.    Projected Lost Earnings

26

     The Court is persuaded that I.P.'s projected lost earnings

27

 

28

[6] The government did not offer a calculation for agency LVN care
based on the above parameters.

23

1  should be based on an assumption that, absent the injury, she

2  would have achieved an education of 13.5 years.  As Plaintiffs'

3  expert Dr. Formuzis testified, this number represents the average

4  educational attainment in the United States.  The government's

5  expert, Mr. Sells, provided no basis for estimating her education

6  to be lower, except that her parents did not obtain college

7  degrees and she is Hispanic.  Mr. Sells did not cite any

8  methodology that would justify lowering the estimate of I.P.'s

9  capacity for educational attainment based on these or other

10 factors.  The Court therefore uses the national average.

11      Both parties' experts - Mr. Sells and Dr. Formuzis - agreed

12 that whatever education she obtained, I.P. would have been likely

13 to work full time.

14      Based on these assumptions, and applying a net discount rate

15 of 1%, I.P.'s lost earnings were proven at trial to have a

16 present cash value of $967,796.

17      F.   Past Medical Expenses

18      Plaintiffs proved I.P.'s past medical expenses at the time

19 of trial to be $87,521 pursuant to the Medi-Cal lien.  The

20 government has not disputed this figure.  Other past medical

21 expenses have been covered by health insurance, and are subject

22 to the parties' stipulation about insurance issues, discussed

23 above.

24      G.   Noneconomic Damages

25      In addition to economic damages, I.P. is also entitled to

26 noneconomic damages.  These damages are "subjective, non-monetary

27 losses including, but not limited to, pain, suffering,

28 inconvenience, mental suffering, emotional distress, loss of

1   society and companionship, loss of consortium, injury to

2   reputation and humiliation."  Cal. Civ. Code § 1431.2.  In

3   medical malpractice actions such as this, damages are capped at

4   $250,000.  Cal. Civ. Code § 3333.2(b).

5        The evidence here showed that I.P.'s medical condition has

6   caused and will forever cause severe impairment preventing her

7   from fully enjoying life, forming relationships, and expressing

8   her thoughts.  Her injuries will subject her always to the

9   indignity, inconvenience, and humiliation of being unable to

10  conduct even the most basic of tasks or to control bodily

11  functions.  This evidence overwhelmingly establishes that she has

12  incurred noneconomic damages of $250,000.

13        H.   Negligent Infliction of Emotional Distress as to
               Micaela Palacio
14

15       A physician whose negligence caused harm to a baby during

16  delivery is liable for damages not only to the child, but also to

17  the mother for negligent infliction of emotional distress.

18  Burgess, 2 Cal.4th at 1073 ("Any negligence during delivery which

19  causes injury to the fetus and resultant emotional anguish to the

20  mother . . . breaches a duty owed directly to the mother.").

21  These damages are limited to "emotional distress arising from the

22  'abnormal event' of participating in a negligent delivery and

23  reacting to the tragic outcome with fright, nervousness, grief,

24  anxiety, worry, mortification, shock, humiliation and indignity,

25  physical pain, or other similar distress."  Id. at 1085.  Damages

26  are also limited by California Civil Code section 3333.2(b) to a

27  maximum of $250,000.

28       The evidence here was more than sufficient to establish

25

1    noneconomic damages.  Mrs. Palacio's testimony demonstrated her

2    anguish and helplessness at realizing the severe and permanent

3    injury to her child.  The profound effect on her well-being was

4    painfully apparent.  The Court therefore awards the maximum

5    damages of $250,000.

6         I.   Offset of Damages Due to Settlement with Banner Health

7         California Code of Civil Procedure section 877 "requires a

8    setoff for preverdict settlement amounts paid by any tortfeasors

9    claimed to be liable for the same tort."  Hellam v. Crane Co.,

10   239 Cal.App.4th 851, 863 (2015) (quoting Poire v. C.L. Peck/Jones

11   Bros. Construction Corp., 39 Cal.App.4th 1832, 1837 (1995))

12   (quotation marks and alterations omitted).  To determine how much

13   to offset damages, the Court first looks to the settlement to see

14   if it "differentiate[s] between economic and noneconomic

15   losses[.]"  Id. at 862 (quoting Rashidi v. Moser, 60 Cal.4th 718,

16   722 (2014)).  If it does not differentiate, the Court must

17   determine "the amount of the settlement attributable to each type

18   of loss," id., by applying the methodology described in Espinoza

19   v. Machonga, 9 Cal.App.4th 268, 276-77 (1992).

20        First, the Court determines the percentage of the award at

21   trial attributed to economic damages.  Rashidi, 60 Cal.4th at

22   722-23 (describing and applying Espinoza).  The Court then

23   applies that percentage to the plaintiff's settlement recovery to

24   determine the amount of settlement dollars attributable to

25   economic loss.  Id.  The resulting amount of settlement dollars

26   is then deducted from the economic damages proved at trial.  Id.

27        I.P. and her father previously entered into a settlement

28   with Banner Health for $500,000.  Petition to Approve Compromise

1   (Doc. #102) ¶ 11.c, Attachment 11.  That settlement apportioned

2   $250,000 to I.P.'s father and $250,000 to I.P.  Id. ¶ 11.c; Fagel

3   Decl. at 2.  The settlement does not specify how much of I.P.'s

4   $250,000 is for economic versus noneconomic losses.  It only

5   states that this money was held by Plaintiffs' counsel's law firm

6   to satisfy attorneys' fees and costs pending resolution of the

7   federal action.  Fagel Decl. at 2.  The Court therefore must

8   apply Espinoza to determine how much of I.P.'s settlement is

9   attributable to economic loss.

10      I.P.'s damages determined herein are 97.4% economic and 2.6%

11  noneconomic.  Applying these same percentages to her settlement

12  recovery, $243,500 of that recovery is attributable to economic

13  loss and $6,500 to noneconomic loss.  The government is therefore

14  entitled to an offset of the economic damages in this case by

15  $243,500.

16      For noneconomic damages, the calculation is different.

17  Under California Civil Code section 1431.2, liability for

18  noneconomic damages is several, not joint.  Cal. Civ. Code

19  § 1431.2(a) ("Each defendant shall be liable only for the amount

20  of non-economic damages allocated to that defendant in direct

21  proportion to that defendant's percentage of fault . . . .").  In

22  order to be entitled to an offset of noneconomic damages, the

23  defendant at trial must demonstrate the comparative fault of the

24  settling defendants.  Rashidi, 60 Cal.4th at 727; Scott v. C.R.

25  Bard, Inc., 231 Cal.App.4th 763, 785 (2014).

26      Defendant here put on no evidence of Banner Health's degree

27  of fault in causing Plaintiffs' noneconomic injuries.  So the

28  government is not entitled an offset of these damages.

1  ///

2  ///

3  ///

4       J.    Summary of Total Damages Awarded By the Court

| Type of Damages | Amount Proved by a Preponderance of the Evidence |
|---|---|
| 24-hour/day LVN agency care | $7,753,349 (in present cash value) |
| All other future medical expenses | $544,139 (in present cash value) |
| Projected lost earnings | $967,796 (in present cash value) |
| Past medical expenses | $87,521 |
| I.P.'s noneconomic damages | $250,000 |
| Micaela Palacio's noneconomic damages | $250,000 |
|  | **TOTAL**: $9,852,805 |

                VII.   CONCLUSIONS OF LAW AS TO DAMAGES

        For the reasons set forth above, the Court concludes as follows:

        Because of Dr. Davainis's negligence, the United States is liable to I.P. in the amount of $9,602,805.

        The United States is entitled to an offset of I.P.'s economic damages by $243,500 pursuant to her prior settlement with Banner Health.

        1.    Because of Dr. Davainis's negligence, the United States is liable to Micaela Palacio in the amount of $250,000.

                            VIII.   ORDER

                                  28

Given the above conclusions of law:

1.   Defendant is ordered to pay I.P. (through her guardian ad litem, Facundo Palacio Diaz) $9,359,305 in economic and noneconomic damages.

2.   Defendant is ordered to pay Micaela Palacio $250,000 in noneconomic damages.

The government has stated its intent to invoke California's periodic payment statute, California Code of Civil Procedure section 667.7.  The Court grants the government's request for further briefing on this subject in order to advise the Court about the propriety of applying section 667.7 and how periodic payments would affect final judgment.  Both parties are to prepare briefs to be filed within ten (10) days from the date of this Order.  The Court may set this matter for a further hearing if it so requires.

IT IS SO ORDERED.

Dated: October 28, 2015

_____
JOHN A. MENDEZ,
UNITED STATES DISTRICT JUDGE

29